# In the United States Court of Federal Claims

No. 18-1115
Filed: April 8, 2022[*]
FOR PUBLICATION

---

**WILLIAM KING, et al.,**

                          ***Plaintiffs,***

**v.**

**UNITED STATES,**

                          ***Defendant.***

---

*Noah A. Messing*, Messing & Spector LLP, New York, NY, for the plaintiffs, with *Phillip M. Spector* and *Jason H. Kim*, of counsel.

*Geoffrey M. Long*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant, with *Alison S. Vicks*, of counsel.

## MEMORANDUM OPINION

***HERTLING*, Judge**

       The plaintiffs are vested participants in a pension plan.  They allege that the United States, acting through the Department of the Treasury ("Treasury"), in consultation with the Department of Labor ("Labor") and the Pension Benefit Guaranty Corporation ("PBGC"), violated the takings clause of the fifth amendment of the U.S. Constitution by authorizing cuts to their pension benefits under the Multiemployer Pension Reform Act of 2014 ("MPRA").  The case involves important issues that go to the heart of the ability of Congress and regulators to address the growing problem of underfunded pension plans.  *See, e.g.*, Tankersley & Rappeport, *1.5 Million Retirees Await Congressional Fix for a Pension Time Bomb*, N.Y. Times (Feb. 18, 2018), https://www.nytimes.com/2018/02/18/business/multiemployer-pension-crisis.html (last visited Mar. 18, 2022).

---

      [*] Pursuant to the protective order in this case, the Court initially filed this opinion under seal on March 24, 2022, and directed the parties to review the opinion and propose redactions of confidential or proprietary information.  The parties have notified the Court that they have no redactions to propose.  (ECF 147.)  Accordingly, the Court hereby releases in full the memorandum opinion of March 24, 2022.

The defendant moves for summary judgment under Rule 56 of the Rules of the Court of Federal Claims ("RCFC") on the grounds that (1) the plaintiffs have not identified a constitutionally cognizable property interest, and (2) no government action has given rise to a taking. The defendant reserves for later briefing issues that will affect the Court's takings analysis and the resolution of this case in the event the Court denies this motion.

The plaintiffs have identified a constitutionally cognizable property interest in receiving their vested pension benefits without any reduction in the amount of their monthly benefits. Further, the approval by the defendant of the plaintiffs' pension plan's request for authorization to reduce the pension benefits it pays to the plaintiffs may constitute sufficient government action to hold the government liable for a taking. The defendant has demonstrated, however, that the government did not coerce the plaintiffs' pension plan to apply to suspend benefits under the MPRA and that the pension plan was not the government's agent. Accordingly, the Court grants the defendant's motion for summary judgment with respect to the plaintiffs' claims relying on agency and coercion theories. The remainder of the defendant's motion for summary judgment is denied.

## I.    LEGAL BACKGROUND

### A.    ERISA

The Employee Retirement Income Security Act ("ERISA") was enacted in 1974. Under ERISA, "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age . . . ." 29 U.S.C. § 1053(a). A "normal retirement benefit" is statutorily defined as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." *Id.* § 1002(22). A plan participant reaches "normal retirement age" under the terms of the plan or at the later of "the time a plan participant attains age 65, or . . . the 5th anniversary of the time a plan participant commenced participation in the plan." *Id.* § 1002(24). "The term 'nonforfeitable' when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." *Id.* § 1002(19).

Under ERISA, pension benefits are generally protected by the "anti-cutback" rule. The "anti-cutback" rule forbids pension plans from reducing plan participants' accrued benefits unless a statutory exception applies. *Id.* § 1054(g)(1) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title."); *see also* 26 U.S.C. § 411(d)(6) (providing identical language).

One statutory exception to the "anti-cutback" rule permits insolvent pension plans to reduce accrued benefits to the level guaranteed by the PBGC, a government agency that insures pension funds. 29 U.S.C. § 1426(a) ("Notwithstanding sections 1053 and 1054 of this title, in any case in which benefit payments under an insolvent multiemployer plan exceed the resource benefit level, any such payment of benefits which are not basic benefits shall be suspended, in

accordance with this section . . . .").  The PBGC may pay a guaranteed benefit to the participants and beneficiaries of an insolvent pension fund, but the level of benefits would be lower than if the fund were solvent.  29 U.S.C. § 1322(a).

**B.     The MPRA**

In 2014, Congress passed the MPRA to "provide[ ] new options for troubled multiemployer plans to avoid insolvency."  Pension Benefit Guaranty Corporation: PBGC Paid Nearly $6 Billion in Pension Benefits to Retirees in FY 2015, 15-12, 2015 WL 7249945 (Nov. 17, 2015); *see also* 160 Cong. Rec. H9264 (daily ed. Dec. 11, 2014) (statement of Rep. King) (the MPRA was enacted to give trustees of "troubled" pension plans "additional tools to maintain the solvency of the plans").  The MPRA permits solvent pension funds that are in "critical and declining" status to, "by plan amendment, suspend benefits" of plan participants to avoid insolvency.  29 U.S.C. § 1085(e)(9)(A).[1]  The MPRA defines a "suspension of benefits" as "the temporary or permanent reduction of any current or future payment obligation of the plan to any participant or beneficiary under the plan, whether or not in pay status at the time of the suspension of benefits."  *Id.* § 1085(e)(9)(B)(i).  Before a pension fund may suspend benefits under the MPRA, the MPRA requires the completion of five steps.

First, a pension fund must apply to the Secretary of the Treasury for approval of its plan to reduce pension benefits.  *Id.* § 1085(e)(9)(G)(i).  A fund's application must specify the size of the proposed cuts and demonstrate that the cuts are projected to prevent insolvency.  *Id.*  The suspensions "shall be equitably distributed across the participant and beneficiary population, taking into account factors" such as the participants' age and life expectancy, length of time in pay status, and amount and type of benefit.  *Id.* § 1085(e)(9)(D)(vi).  Another factor is whether there is a risk that active participants will withdraw support for the plan.  *Id.* § 1085(e)(9)(D)(iv)(X).  The suspension of benefits is prohibited for anyone who is over the age of 80 or disabled.  *Id.* § 1085(e)(9)(D)(ii), (iii).  The proposed suspensions may not reduce benefits below 110 percent of the benefit level guaranteed by the PBGC.  *Id.* § 1085(e)(9)(D)(i).

Second, Treasury consults with the PBGC and Labor to review the application.  *Id.* § 1085(e)(9)(G)(i).  Treasury must approve or reject the application within 225 days; otherwise, the application is deemed approved.  *Id.* § 1085(e)(9)(G)(iii).  Treasury must approve the application unless it is "clearly erroneous."  *Id.* § 1085(e)(9)(G)(v).

Third, if the plan is approved, Treasury, the PBGC, and Labor must administer an election in which plan participants vote on the proposed reductions.  *Id.* § 1085(e)(9)(H)(i).  For the proposal to be rejected, a majority of plan participants must vote to reject the cuts.  *Id.* § 1085(e)(9)(H)(ii).  Plan participants who do not cast a vote are counted as voting to approve the proposed reductions.  *Id.*  Even if a majority of plan participants vote to reject the cuts,

---

[1] The Internal Revenue Code ("Tax Code") contains an identical provision at 26 U.S.C. § 432(e)(9)(A).  For consistency, the Court cites the provisions in 29 U.S.C. § 1085(e)(9), but the same language may be found in 26 U.S.C. § 432(e)(9).

Treasury may override the vote if it determines that the proposed reductions are "systematically important," *i.e.*, the PBGC would be exposed to more than $1 billion in insurance obligations if the pension plan were to become insolvent. *Id.* § 1085(e)(9)(H)(ii), (v).

Fourth, Treasury, the PBGC, and Labor must issue a final authorization for the suspension within seven days of the vote. *Id.* § 1085(e)(9)(H)(vi). For the fifth and final step, the pension fund may amend its plan documents to implement the suspension of benefits. *Id.* § 1085(e)(9)(A).

A pension plan that applies under the MPRA and receives approval from Treasury to reduce its benefits is immunized from liability for any reduction in benefits resulting from the approved MPRA application. *Id.* § 1085(e)(9)(B)(iii). A participant or beneficiary whose benefits are suspended has no cause of action arising under the MPRA. *Id.* § 1085(e)(9)(I)(iii).

### C.    Further Legislative Developments

In March 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. 117-2, 135 Stat. 4. Under the ARPA, pension plans that reduced benefits to plan participants under the MPRA may apply to Treasury for economic assistance to improve the plans' financial stability. *Id.* § 1432(a)(1). To obtain ARPA funding, a pension plan must commit to restoring the benefits it pays to plan participants to the levels it was paying prior to any MPRA-authorized reductions. *Id.* § 1432(k)(1). A pension plan must also agree to reimburse beneficiaries the amount their benefits were reduced due to MPRA-authorized reductions. *Id.* § 1432(k)(2). These restorative payments may be made either as a lump sum within three months of Treasury's approval of a pension plan's ARPA application or in equal monthly installments over a period of five years. *Id.* These reimbursement payments under the ARPA do not include any adjustment for interest. *Id.* A qualifying plan may apply to Treasury under the ARPA at any time until December 31, 2025. *Id.* § 1432(f).

The plaintiffs' fund was eligible to apply for assistance beginning on January 1, 2022. Special Financial Assistance by PBGC, 86 Fed. Reg. 36,598 (July 12, 2021) (codified at 29 C.F.R. pt. 4000, 4262). Nothing currently in the record discloses whether the fund has specified if and when it intends to apply for financial assistance under the ARPA.

## II.    FACTUAL BACKGROUND[2]

### A.    The Fund

The plaintiffs are retired employees of United Parcel Service ("UPS") and vested participants in the New York State Teamsters Conference Pension and Retirement Fund ("the Teamsters Fund"). The Teamsters Fund was established in 1954, 20 years before ERISA was enacted. One of the plaintiffs began contributing to his pension prior to ERISA's enactment.

---

[2] This summary of facts does not constitute findings of fact but is simply a recitation of the parties' representations. The facts underlying the plaintiffs' claims are not in dispute.

4

Since the beginning of its establishment, the Teamsters Fund has advertised that "[a]ll pensions are payable for life without reduction." (ECF 129-1 at 4.[3]) Trustees of the Teamsters Fund are divided equally between management and the unions. (ECF 129-3 at 883:13-23.)

Plan documents govern the administration of the Teamsters Fund, as is the case generally with pension funds. The Teamsters Fund's plan documents provide that a participant's benefits have vested when the participant "has (a) met the minimum service requirements of Section 5.04(a) and has acquired a non-forfeitable right to a pension benefit under the Plan, or (b) attained Normal Retirement Age." (ECF 129-1 at 339.) When "non-forfeitable" is used with respect to a pension benefit or right, the term is statutorily defined as a claim to a benefit under the pension plan "which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19). The plan documents provide a lengthy, complex formula for the calculation of the participants' benefits and vesting. (ECF 129-1 at 349-63.) The plan documents provide that the "normal form of benefit payment shall be a Life Annuity," which it defines as "provid[ing] monthly payments for the life of the Pensioner." (*Id*. at 364.)

Plan participants have a limited right of access to the trust estate. A participant does not:

> have any right, title or interest in or to the Fund Estate or any part thereof, except the right of the member of the Union, or other person, who is covered for pension or retirement benefits, to pension or retirement benefits, subject to such terms and conditions as the Trustees shall have determined for entitlement thereto, and further subject to the limitations, terms and conditions that may or shall be specified in the Pension Plan or in any amendment or amendments thereto, except as the Trustees may in their sole and exclusive judgment and discretion otherwise determine and decide upon.

(ECF 126-1 at 145.)

The Teamsters Fund's trustees have repeatedly amended the plan documents to conform with evolving ERISA, Tax Code, and regulatory requirements. Article X of the plan provides, in pertinent part:

> The provisions of the Plan may be modified or amended, retroactively if necessary, to bring the Plan into conformity with statutory or regulatory requirements to preserve the qualified status of the Plan under section 401 of the [Tax] Code and the exempt status of the Trust under section 501 of the [Tax] Code. In no event, however, shall any modification or amendment of the provisions of the Plan make it possible for any part of the funds of the Plan to be

---

[3] The parties have filed documents and exhibits appended to their briefs. (ECF 126-1, 126-2, 129.) The Court refers to these documents by citing the pagination reflected in these appendices.

used for, or diverted to, purposes other than for the exclusive benefit of Pensioners, Participants and Survivors, or have the effect of decreasing a Participant's Accrued Benefit in violation of section 411(d)(6) of the [Tax] Code [the "anti-cutback" rule].

(ECF 129-1 at 383.)

The plaintiffs allege that prior to the enactment of the MPRA, the Teamsters Fund had informed all three named plaintiffs that their benefits had vested and that they would be entitled to receive their full benefits for life. (ECF 129-3 at 1029, 1044, 1061.) The plaintiffs further assert that the promise of lifetime pension benefits was a major factor in their career choices and decisions to retire. (ECF 128 at 14-15.) As of 2016, all three plaintiffs had retired and started to receive their vested pension benefits. (*Id.* at 14.)

## B.     Reduction of the Plaintiffs' Benefits

The Teamsters Fund submitted its first MPRA application on August 31, 2016, to reduce the amount it paid to plan participants. (ECF 129-6 at 1848.) Treasury identified concerns regarding some of the fund's actuarial assumptions. (ECF 129-2 at 496.) Treasury encouraged the Teamsters Fund to withdraw its application and resubmit it, offering to expedite its consideration of the resubmission. (*Id.* at 526, 551.) The Teamsters Fund subsequently withdrew its application. (*Id.* at 562.)

The Teamsters Fund submitted a revised application on May 15, 2017. (*Id.* at 638.) In its revised application, the Teamsters Fund proposed an 18-percent cut to the benefits of plan participants still actively employed and a 29-percent cut to the benefits of retirees. (*Id.* at 640.) The Secretary of the Treasury approved the application on August 2, 2017. (*Id.* at 698-99.)

Treasury proceeded to hold an election among Teamsters Fund plan participants. Regardless of the outcome, the PBGC had advised Treasury that the Teamsters Fund would likely qualify as "systematically important"—*i.e.*, big enough to allow Treasury to override any adverse MPRA vote. (ECF 129-6 at 1853.) Participants were given approximately three weeks to vote by mail, phone, or internet. (ECF 129-2 at 710.) Of the fund's 34,636 eligible participants, only 40 percent voted. (*Id.* at 724.) Of those who voted, 71 percent rejected the proposed reductions, and 29 percent approved them. (*Id.*) Treasury treated the outcome of the election as approval of the proposed reductions because, pursuant to the MPRA, the 60 percent of plan participants who did not vote were counted as voting to approve the proposed reductions. (*Id.*)

Following the vote, the Secretary of the Treasury issued a final authorization for the Teamsters Fund to reduce its benefit payments by the amounts that had been requested by the application, approved by Treasury, and ratified by the vote of plan participants. (*Id.* at 728-29.) With technical assistance and recommended edits from Treasury, the Teamsters Fund then amended its plan documents to implement the reductions. (*Id.* at 754-59.)

The reductions in pension benefits became effective on October 1, 2017.  Since then, the monthly pension benefits paid to the three named plaintiffs have reflected a 29-percent reduction in their pre-MPRA benefits.  As a result of that reduction, they allege that they have suffered financial hardship, including dwindling retirement savings, diminished access to necessary medical care, and increased debt.

## III.   PROCEDURAL HISTORY

The plaintiffs filed suit on July 31, 2018.  (ECF 1.)  The defendant moved to dismiss the plaintiffs' claims under RCFC 12(b)(1) and 12(b)(6).  (ECF 7.[4])  After holding oral argument on the defendant's motion, that motion to dismiss was converted into a motion for summary judgment to be briefed after discovery regarding the government's alleged liability.  (ECF 21.)  On December 17, 2019, the case was transferred to the undersigned.  (ECF 36, 37.)  The parties proceeded with discovery.

The defendant filed a motion for summary judgment on January 22, 2021.  (ECF 99.)  The plaintiffs responded to the defendant's motion and cross-moved for summary judgment on March 6, 2021.  (ECF 105.)

On March 11, 2021, Congress enacted the ARPA.  The following day, the defendant moved to vacate the schedule for summary-judgment briefing and to stay proceedings.  (ECF 109.) The plaintiffs opposed the motion.  (ECF 110.)  On March 26, 2021, following oral argument on the defendant's motion, the Court stayed proceedings until July 30, 2021.  (ECF 114.)

When the stay expired, the plaintiffs argued that the ARPA does not moot their claims, even if the Teamsters Fund applies for and receives relief under that law.  Although relief under the ARPA would restore the plaintiffs to their pre-MPRA level of benefits and compensate them for the losses they have suffered under the MPRA-approved reductions, the plaintiffs argued that the ARPA makes no provision for the payment of interest on the plaintiffs' reduced benefits and that as a result, even under the ARPA the defendant has still committed a per se taking.  (ECF 120 at 1.)  The plaintiffs urged that proceedings in the case continue and not wait for the Teamsters Fund to apply for relief under the ARPA.

The Court held a status conference on August 30, 2021, and requested that the defendant choose any discrete legal issues that were ripe for consideration on a motion for summary judgment even before the Teamsters Fund applied for relief under the ARPA.  (*See* ECF 121 (scheduling the status conference); ECF 125 at 7:8-15 (transcript of the status conference).)  The Court then adopted a schedule for summary-judgment briefing (ECF 122) and denied the parties' previous cross-motions for summary judgment as moot (ECF 123).

---

[4] After the defendant moved for summary judgment, the defendant's earlier motion to dismiss was denied as moot.  (ECF 104.)

On September 27, 2021, the defendant moved for summary judgment on two specific grounds: (1) that the plaintiffs do not have a cognizable property interest in their entitlement to unreduced pension benefits; and (2) that no government action gave rise to a taking.  (ECF 126.) The plaintiffs filed a response brief (ECF 128) on October 19, 2021, and the defendant filed a reply brief (ECF 130) on November 2, 2021.  The Court heard oral argument on November 10, 2021.  The Court held a telephonic status conference on November 19, 2021, and ordered supplemental briefing on the applicability of the doctrine of *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), to the present case.  (ECF 131, 132.)  The parties filed supplemental briefs on December 23, 2021, (ECF 139, 140) and reply briefs on January 21, 2022 (ECF 142, 143).

## IV. JURISDICTION

"[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).  The Tucker Act, 28 U.S.C. § 1491(a)(1), gives the Court of Federal Claims jurisdiction over claims for damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The plaintiffs have the burden of establishing jurisdiction by a preponderance of the evidence. *See, e.g.*, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

At an earlier stage of this case, the defendant moved to dismiss the plaintiffs' claim for a lack of subject-matter jurisdiction under RCFC 12(b)(1).  The Court converted the defendant's motion to dismiss into a motion for summary judgment (ECF 21) and later denied the defendant's motion to dismiss as moot.  (ECF 104.)  The defendant does not raise the issue of subject-matter jurisdiction in its present motion for summary judgment and focuses its argument instead on issues going to the merits of the dispute.  (*See* ECF 126, 130.)  Nonetheless, the Court *sua sponte* must examine whether it has jurisdiction over this dispute.  *See Henderson*, 562 U.S. at 434.

"Without subject matter jurisdiction, the trial court's ruling on the Government's motion for summary judgment is moot."  *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993). "In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source."  *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).  The court has "undisputed" jurisdiction over claims brought under the takings clause of the fifth amendment.  *Id.*

As was evident in the defendant's original motion to dismiss, issues of "'merits and jurisdiction will sometimes come intertwined,' and a court can decide 'all . . . of the merits issues' in resolving a jurisdictional question, or vice versa." *Brownback v. King*, 141 S. Ct. 740, 749 (2021) (quoting *Bolivarian Republic of Venez. v. Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017)). The Federal Circuit has provided some guidance on the appropriate approach:

> [F]ailure of proof of an element of the cause of action means the petitioner is not entitled to the relief he seeks. To conclude in such a case that the petitioner loses because the forum is "without jurisdiction" is to obscure the nature of the defect. It would be more accurate to conclude that the petitioner has failed to prove the necessary elements of a cause for which relief could be granted.

*Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687 (Fed. Cir. 1992); *see also Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1354 (Fed. Cir. 2011) (quoting identical language). The Court therefore declines to convert the merits of this case into a jurisdictional question.

The Court has jurisdiction over this dispute. The plaintiffs' nonfrivolous claim is based on the takings clause, which is a money-mandating source of law.

## V.      STANDARD OF REVIEW

Under RCFC 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court should draw inferences from the underlying facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The essential facts of the present case are not in dispute; the legal implications of the facts are at the heart of the parties' dispute.

## VI.     DISCUSSION

The defendant moves for summary judgment on two grounds. First, the defendant argues that the plaintiffs have not identified a constitutionally cognizable property interest. Second, the defendant argues that the federal government took no action that could be considered a taking.

Throughout this opinion, the Court limits its analysis to these specific issues raised by the defendant's motion. As previously discussed, implementation of the ARPA is ongoing, and the plaintiffs' benefits are subject to further change based on potential regulatory action if the Teamsters Fund applies for relief under the ARPA. Because of the ongoing nature of the regulatory process, whose outcome may well change the nature and scope of the plaintiffs' interests, the defendant has reserved many of its arguments, including those regarding which takings test applies and the application of that test, until the final contours of the plaintiffs' alleged injuries are settled. (*See* ECF 126 at 5 n.1; ECF 99 at 22-33.) The Court therefore

confines its analysis to the issues of whether the plaintiffs have a cognizable property interest at stake and whether there was any government action that could constitute a taking.

## A.      Property Interest

The takings clause of the fifth amendment provides: "nor shall private *property* be taken for public use, without just compensation." (Emphasis added.)  To prevail in a claim for a taking under the fifth amendment, a plaintiff must first identify a cognizable property right forming the subject of the alleged taking. *E.g.*, *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012).  A court must then determine whether the "asserted right is one of the rights in the bundle of sticks of property rights that inheres in a *res* by looking to 'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1376 (Fed. Cir. 2004) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)).

The first step in a takings analysis is thus to define the property interest at stake.  The defendant urges a narrow definition of the plaintiffs' alleged interest as "the right to receive unreduced payments." (ECF 126 at 16.)  During oral argument, the Court asked whether the plaintiffs' alleged property interest was "an entitlement to pension payments" or "an entitlement to a specific level of pension payments." (ECF 138 at 67:19-24.)  Counsel for the plaintiffs responded, "the answer is both because [the plaintiffs'] pensions have vested.  The Government tries to segregate the concepts of accruing and vesting, but they're closely related." (*Id.* at 67:25–68:1.)

Although the Court agrees with the plaintiffs that vesting affects their claims, the law supports the defendant's narrow definition of the interest at stake.  In its most recent takings case, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), the Supreme Court focused its analysis on the plaintiffs' rights to exclude others from their property.  In *American Pelagic Fishing*, the Federal Circuit determined whether the use of a specific commercial fishing vessel to fish for Atlantic mackerel and herring in the Exclusive Economic Zone was "a legally cognizable property interest." 379 F.3d at 1376.  Similarly, in *Acceptance Insurance Cos. v. United States*, 583 F.3d 849, 857 (Fed. Cir. 2009), the Federal Circuit framed the property interest at stake as the plaintiff's ability to sell a specific insurance portfolio to a specific buyer.

These cases, and many others, did not analyze fishing rights, insurance-portfolio rights, or real-property rights generally; rather, they focused on the specific interest at stake.  The same approach must be applied here.  Under the MPRA, the plaintiffs have *not* lost their right to their pensions; they continue to receive them to this day.  Instead, they lost their entitlement to the specific amount they were receiving under the Teamsters Fund plan prior to the MPRA-authorized reductions of these amounts.

The Court rejects the plaintiffs' effort to widen the analytical lens to the scope of pension rights generally.  The Court focuses its analysis on the more limited issue of whether the

plaintiffs have a legally cognizable property interest in their entitlement to a specific level of pension benefits.[5]

The defendant argues that the plaintiffs lack a constitutionally cognizable property interest in the level of their pension payments for four reasons.  First, the defendant argues that the level of pension benefits originates in ERISA and the Tax Code through the "anti-cutback" rule, and the plaintiffs cannot have a constitutionally cognizable property interest in benefits created under and subject to a statute.  Second, the defendant analogizes this case to other cases in which the Federal Circuit found no property interest.  Third, the defendant underscores that the plaintiffs' pension payments are subject to lawful reductions under the plan documents and ERISA.  Fourth, the defendant argues that no property interest can arise because the plaintiffs voluntarily engaged in an activity that brought them within an area subject to pervasive government regulation.

### 1.    Source of the Plaintiffs' Rights

The source of the plaintiffs' right to receive unreduced pension benefits largely determines whether they have a constitutionally cognizable property interest.  If the right to receive unreduced pension benefits derives from statute, the plaintiffs lack a cognizable property interest.  "[N]o one is considered to have a property interest in a rule of law."  *Branch v. United States*, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995).  For example, the Federal Circuit has held that claimants did not have a cognizable property interest under the fifth amendment when the rights forming the subject of the alleged taking "were governed exclusively by statute, not contract."  *Adams v. United States*, 391 F.3d 1212, 1221, 1225 (Fed. Cir. 2004).  The Federal Circuit explained that it would not "treat a statutory right to be paid money as a legally-recognized property interest, as we would real property, physical property, or intellectual property.  Instead, [the Circuit] view[ed] it as nothing more than an allegation that money is owed."  *Id.* at 1225.

The defendant argues that the source of the plaintiffs' right to receive unreduced pension benefits lies in the "anti-cutback" rule of ERISA.  That provision generally forbids the reduction of pension benefits unless a statutory exception applies.  29 U.S.C. § 1054(g)(1).  (ECF 126 at 17-19.)  The defendant posits that the "plaintiffs at most enjoy a 'statutory right to be paid money' based on the operation of ERISA as spelled out in the plan document."  (*Id.* at 19 (quoting *Adams*, 391 F.3d at 1225.)  The plaintiffs can have no property interest in a statutory regime.

---

[5] The plaintiffs also argue that the government unconstitutionally deprived the plaintiffs of their remedy against the Teamsters Fund by enacting 29 U.S.C. § 1085(e)(9)(B)(iii), which immunizes pension plans from liability for MPRA cuts.  (ECF 140 at 19.)  The plaintiffs raise this argument in the alternative.  (*Id.*)  The Court does not reach this issue because the plaintiffs have prevailed in demonstrating a cognizable property interest in receiving a certain level of their vested benefits.

If the right to receive unreduced pension benefits originates in contract, however, the plaintiffs do have a cognizable property interest under the fifth amendment.  "[T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment." *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003)  In general, under the fifth amendment, "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014).

The plaintiffs argue that their right to receive unreduced pension payments derives from their pension contracts with the Teamsters Fund, not from ERISA or any other statute.  (ECF 128 at 18-29.)  The plaintiffs highlight that one of the named plaintiffs began contributing to his pension prior to the enactment of ERISA and its "anti-cutback" rule.  (*Id.* at 14.)  The plaintiffs also emphasize the legal significance of vesting in pension law.  (*Id.* at 16-22.)

In response, the defendant decries the plaintiffs' effort to give "talismanic significance" to vesting and points out that the MPRA regulates primarily accrued benefits and does not alter ERISA's vesting rules.  (ECF 130 at 5, 10.)  The defendant also objects to importing cases regarding the interpretation of provisions of ERISA into a takings case: the plaintiffs "are making a statement about courts' application of a Federal statute, rather than the Fifth Amendment."  (ECF 126 at 26.)

Background principles of law are relevant to whether a cognizable property interest exists.  *See Am. Pelagic Fishing*, 379 F.3d at 1376.  In determining whether an asserted property right is cognizable under the fifth amendment, courts look to "'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law." *Id.* (quoting *Lucas*, 505 U.S. at 1030).  Those background principles "define the dimensions of the requisite property interest for purposes of establishing a takings claim." *Id.* at 1376-77.  These same principles also may inform whether a right derives from statute or contract and is therefore constitutionally incognizable or cognizable.  *See Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384-86 (Fed. Cir. 2019) (examining background principles of law to determine whether the plaintiff's property interest derived from statute or contract).

In addition to numerous sources from federal law, the plaintiffs cite various cases arising under New York state law providing that the vesting of a pension confers a property interest on plan participants.[6]  (ECF 128 at 19-20.)  The plan documents in this case provide: "The provisions of the Plan shall be construed, regulated and administered under the laws of New York except as otherwise provided by ERISA."  (ECF 129-1 at 380.)  The defendant highlights

_____

[6] *Majauskas v. Majauskas*, 61 N.Y.2d 481, 463 N.E.2d 15 (1984); *Poslock v. Tchrs.' Ret. Bd. of the Tchrs.' Ret. Sys.*, 209 A.D.2d 87, 94 (N.Y. App. Div. 1995); *Tereskiewicz v. Tereszkiewicz*, 128 A.D.2d 605, 606 (N.Y. App. Div. 1987).

that under 29 U.S.C. § 1144(a), ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." (ECF 130 at 10.)

The Court analyzes precedents in both federal pension law and takings jurisprudence in determining whether the plaintiffs have identified a cognizable property interest. The Court focuses its analysis on federal law rather than state law because ERISA may pre-empt the cases arising under New York law cited by the plaintiffs. Moreover, federal law alone amply supports the plaintiffs' contention that they have a cognizable property interest in their vested pension benefits arising under their pension contracts.

Supreme Court precedent supports the conclusion that participants whose pension benefits have vested have a contractual entitlement to those benefits, and that this entitlement stems from the participants' contracts with the pension plans themselves, not from ERISA.

In *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), the Supreme Court examined whether ERISA pre-empted a New Jersey statute. The Supreme Court identified a "threshold issue":

> [W]hat defines the content of the benefit that, once vested, cannot be forfeited? ERISA leaves this question largely to the private parties creating the plan. That the private parties, not the Government, control the level of benefits is clear from the statutory language defining nonforfeitable rights as well as from other portions of ERISA.

*Id.* at 511. ERISA merely sets outer bounds on the accrual and vesting of benefits; benefit levels and formulas vary from plan to plan and from participant to participant. *Id.* at 513-14. The fact that a participant's benefits have vested and are thus nonforfeitable under ERISA does not itself "guarantee a particular amount or a method for calculating a benefit." *Id.* at 512.

The inference to be drawn from the Supreme Court's analysis in *Alessi* supports the conclusion that the plan documents, *i.e.*, the contract between the plan and its participants, and not ERISA, determine what level of benefits the plaintiffs are entitled to when their pensions vest. Indeed, the plan documents of the Teamsters Fund provide a lengthy, detailed, and complex formula for the calculation of participants' pension benefits.[7] (ECF 129-1 at 349-63.)

---

[7] The approach taken in *Black v. Pension Benefit Guaranty Corp.*, 983 F.3d 858, 865 (6th Cir. 2020), *cert. denied*, 144 S. Ct. 874 (2022) also supports focusing on the plan documents as the source of participants' interest in the amount of their benefits. In *Black*, the Sixth Circuit analyzed the language of the relevant plan documents and found that the plan documents provided that only funded benefits were nonforfeitable and therefore protected by the fifth amendment. *Id.* at 868-70. The Teamsters Fund at the heart of this case is, at present, funded and solvent. The language in the plan documents of the Teamsters Fund is distinct from that of

The plan documents, not ERISA, also determine when a participant's benefits have "vested." (*Id.* at 339 ("'Vested' means that a Participant has (a) met the minimum service requirements . . . and has acquired a non-forfeitable right to a pension benefit under the Plan, or (b) attained Normal Retirement Age.").)

Although ERISA regulates the Teamsters Fund and the operation of its plan documents, no statutory provision provides a similar level of detail in determining a particular plan participant's entitlement to a specific and determinable level of benefits.

In addition, the MPRA itself recognizes the centrality and controlling nature of the plan documents as the source of beneficiaries' entitlement. The MPRA provides that "the plan sponsor of a plan in critical and declining status may, *by plan amendment*, suspend benefits which the sponsor deems appropriate." 29 U.S.C. § 1085(e)(9)(A) (emphasis added). Reductions to pension benefits under the MPRA could not come into effect unless the plan documents themselves were amended.

Other ERISA provisions also emphasize that the plans themselves are the source of the calculation of benefits to which participants are entitled. For example, 29 U.S.C. § 1053(a) provides, "Each *pension plan* shall provide that an employee's right to his normal retirement benefit is nonforfeitable . . . ." (Emphasis added.) Similarly, 29 U.S.C. § 1054 provides, "Each *pension plan* shall satisfy the requirements" of the benefit-accrual minimums. (Emphasis added.) ERISA also defines a "nonforfeitable" benefit as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit *under a pension plan* which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19) (emphasis added).

The calculation of the plaintiffs' benefits therefore depends here on the plan documents and not ERISA. The plaintiffs' rights stem from the plan documents and, as previously noted, the plan documents provide that pension benefits are paid "for the life of the Pensioner." (ECF 129-1 at 364.)

### a.      Vesting

The Supreme Court has equated the vesting of pensions under a plan to property ownership. In *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020), the Supreme Court noted that vested participants in a private defined-benefit pension plan, such as the Teamsters Fund, were "legally and contractually entitled to receive [the] same monthly payments for the rest of

---

the plan documents in *Black*, so that case is distinguishable in important respects. Nonetheless, the Sixth Circuit's reliance in its analysis on the language of the plan documents is instructive.

their lives."[8]  The plaintiffs in *Thole* were pension-plan participants alleging that the trustees of the plan had mismanaged the fund's assets.  The Supreme Court held that the plaintiffs lacked standing because the alleged mismanagement of the fund had caused the plaintiffs no injury.  *Id.* at 1622.  The plaintiffs had received all their vested benefits and did not allege that the mismanagement had jeopardized the fund's future ability to pay their benefits.  The Supreme Court nonetheless opined that if the plaintiffs "had not received their *vested benefits*, they would of course have Article III standing to sue and a cause of action under ERISA § 502(a)(1)(B) to recover the benefits due to them."  *Id.* at 1619 (emphasis added).

The defendant argues that *Thole* "does not stand for the principle that benefit levels in vested pensions are inviolable," given that the Supreme Court acknowledged that a defined-benefit plan could fail.  (ECF 130 at 9.)  In the discussion relied on by the defendant, the Supreme Court identified the remedies that would be available to vested participants whose benefits were not paid in full: employers and their shareholders could "root out" fiduciary misconduct; the Department of Labor can enforce the plan's fiduciary obligations under ERISA; the PBGC "is required by law to pay the vested pension benefits of the retirees, often in full"; and fiduciaries of the plan could sue each other.  *Thole*, 140 S. Ct. at 1621.  Accordingly, the prospect that a defined-benefit pension fund could fail does not eviscerate the plaintiffs' property interests when there are remedies available to the plaintiffs to recoup the vested benefits due to them.  In *Thole*, the Supreme Court's acknowledgement of the availability of remedies when plan participants are not paid their vested benefits in full reinforces the importance of vesting and supports the plaintiffs' right to receive a certain level of benefits when their benefits have vested.

Like the plaintiffs in *Thole*, the plaintiffs in this case are vested participants in a defined-benefit plan.  Even though they may not have a property interest in the pooled assets of the

---

[8] The Supreme Court in *Thole*, 140 S. Ct. at 1618, explained the difference between defined-benefit and defined-contribution plans:

> In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions.  By contrast, in a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.

The Department of Labor also provides guidance on the differences between a defined-benefit plan and a defined-contribution plan.  U.S. Dep't of Labor, Types of Retirement Plans, https://www.dol.gov/general/topic/retirement/typesofplans (last visited Jan. 28, 2022).  In a defined-benefit plan, a participant's level of benefits is commonly calculated through a formula considering time of service, and the benefits may be federally insured by the PBGC.

Teamsters Fund (*see* ECF 126-1 at 145), the plaintiffs are "legally and contractually entitled" to receive a set level of benefits for their lifetimes.  *Thole*, 140 S. Ct. at 1618.

In *Central Laborers' Pension Fund v. Heinz*, the Supreme Court noted that through vesting, "an employee's already-accrued pension account becomes irrevocably his *property*." 541 U.S. 739, 749 (2004) (emphasis added).  The Supreme Court determined in *Heinz* that the amendment of the plan documents of a private pension fund to curtail already-accrued, early-retirement benefits violated the "anti-cutback" rule of ERISA.  The Supreme Court discussed the difference between ERISA's provisions applying to accrued benefits and its provisions applying to vested benefits: "To be sure, the concepts [of accrual and vesting] overlap in practical effect, and a single act by a plan might raise both vesting and accrual concerns."  *Id.*

Because the plaintiffs' pensions have vested, their pension benefits have become "irrevocably" their "property."  *See id.*  The defendant argues that the plaintiffs improperly conflate vested pensions with accrued benefits.  (ECF 130 at 13.)  Notably, all benefits—accrued, vested, or otherwise—may be suspended under the MPRA.  *See* 29 U.S.C. § 1085(e)(9)(B)(i).  Article X of the Teamsters Fund plan documents limits the ability of plan trustees to reduce accrued benefits and does not expressly limit the reduction of vested benefits. (ECF 129-1 at 383.)  The MPRA-authorized reductions to the plaintiffs' pensions affected both accrued and vested benefits.  *See Heinz*, 541 U.S. at 749.  The plaintiffs' benefits, however, have vested.  Accordingly, the property implications of vesting are relevant to this case.  The defendant's distinction between accrued and vested benefits is nonetheless well-taken, and the Court limits its finding of a property interest only to vested benefits.

The principle in *Heinz* and *Thole* that plan participants have a property right in their vested benefits is echoed in a publication by the Internal Revenue Service:

> "Vesting" in a retirement plan means ownership. This means that each employee will vest, or own, a certain percentage of their account in the plan each year.  An employee who is 100% vested in his or her account balance owns 100% of it and the employer cannot forfeit, or take it back, for any reason.

Internal Revenue Service, *Retirement Topics – Vesting* (June 3, 2021), https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-vesting (last visited Feb. 23, 2022).

The plaintiffs have demonstrated under federal pension law that their right to a specific level of pension benefits stems from the plan documents, *i.e.*, their contracts with the Teamsters Fund, and that vesting conferred ownership of the benefits and a concomitant property interest in the amount of those benefits on the plaintiffs.

b.      **Pension Plans as Contracts**

The defendant argues that even if the plan documents are the source of binding commitments, these documents are not truly "contracts" because of their dependence on ERISA. (ECF 130 at 3 n.1.)

That argument is inconsistent with the language the Supreme Court has employed in construing pension-plan documents.  In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court decided on the appropriate standard of judicial review for benefit determinations made by plan fiduciaries under ERISA.  The petitioner advocated for an arbitrary and capricious standard, while the respondent advocated for de novo review.  *Id.* at 111-12.  The Supreme Court held that, as with judicial review of contracts, de novo review applied:

> Actions challenging an employer's denial of benefits before the enactment of ERISA were governed by principles of contract law. If the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.

*Id.* at 112-13.  The Court declined to "impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.* at 114.

*Firestone* reflects that, both before and since the enactment of ERISA, courts must consider provisions of pension-plan documents as contractual agreements.  Furthermore, the enactment of ERISA and exceptions to the "anti-cutback" rule did not abrogate otherwise valid pension contracts.  *See id.*

In addition, the Supreme Court has consistently explained that participants in a pension plan are contractually entitled to the level of benefits promised by the plan.  For example, in *Massachusetts Mutual Life Insurance Co. v. Russell*, the Supreme Court noted that the plaintiff was "entitled to benefits under the provisions of the plan *contract* . . . ."  473 U.S. 134, 147 (1985) (emphasis added).

The petitioner in *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 370 (1980) conceded that "its employees' benefits are 'vested in a contractual sense.'"  In his dissent in *Nachman*, Justice Powell noted a point of agreement between the parties and justices: "Everyone concedes that the plan is a valid contract enforceable according to its terms, except to the extent that ERISA provides otherwise."  *Id.* at 396.

In *U.S. Airways, Inc. v. McCutchen*, the Supreme Court noted that "[c]ourts construe ERISA plans, as they do other *contracts*, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'"  569 U.S. 88, 102 (2013) (emphasis added) (quoting

17

*Firestone Tire*, 489 U.S. at 113).  In *Thole*, the Supreme Court again noted that "a defined-benefit plan is more in the nature of a contract."  140 S. Ct. at 1620.

The Corpus Juris Secundum on Pensions and Retirement Plans and Benefits also explains that pension plans are akin to contracts: "The rights and obligations associated with a pension are contractual in nature.  Whether a pension is public, established by a collective bargaining agreement, or voluntarily funded by an employer, it is contractual in nature."  70 C.J.S. *Pensions* § 2 (footnotes omitted).

The defendant's effort to tie the entire pension edifice to ERISA proves too much.  In an abstract sense, all contracts are dependent on the law to some degree.  A "contract" is defined as "a promise or a set of promises for the breach of which the *law* gives a remedy, or the performance of which the *law* in some way recognizes as a duty."  Restatement (Second) of Contracts § 1 (1981) (emphasis added).  Despite their dependence on the law, contractual rights may still constitute property under the fifth amendment, and the federal government is not always free to take contractual rights for its own benefit without paying just compensation.  *See Lynch*, 292 U.S. at 579.

ERISA provides a statutory backstop, and since its enactment pension plans must be ERISA-compliant at a minimum, but pension plans may also provide greater entitlement than ERISA demands.  In this case, a particular plan participant's entitlement to a specific level of benefits depends upon the operation of plan documents contractually setting the rates for the accrual of benefits and vesting.  Considering the ample precedent supporting the Court's reading of the pension plan as a contract, the Court finds that the plaintiffs' vested benefits under the pension plan give them a contractual entitlement to those benefits.

Other federal courts have also found that vested pension benefits give rise to a property interest under the fifth amendment, even though the plaintiffs in those cases participated in public rather than private pension plans.  *See Mallette v. Arlington Cnty. Empls.' Supplemental Ret. Sys. II*, 91 F.3d 630, 636 (4th Cir. 1996) (finding that the plaintiffs had a property interest in their vested disability retirement benefits under the due process clause); *Coffman v. New Mexico*, No. 10-cv-1027, 2011 WL 13284465, at *13 (D.N.M. Sept. 12, 2011) ("Plaintiffs correctly contend that their vested and matured pension benefits are constitutionally protected property interests . . . ."); *Bloch v. Powell*, 227 F. Supp. 2d 25, 38 (D.D.C. 2002) (noting that "courts consistently find property rights when an employer's pension system clearly gives its employees a vested right in retirement annuities" but holding that the plaintiff was not qualified for the annuity "and therefore had no cognizable property rights").[9]

---

[9] The plaintiffs in this case would be in a more difficult position if their pensions were publicly funded rather than privately funded.  The Supreme Court has held that a disabled veteran had no vested legal right to his military pension.  *United States v. Teller*, 107 U.S. 64, 68 (1883); *see also Lynch*, 292 U.S. at 576-77 (1934) (providing that pensions for veterans were

In *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986), the Supreme Court left open the possibility that contractual provisions unrelated to vested benefits in pension plans could constitute property interests under the takings clause.  The Supreme Court reviewed a decision holding that a withdrawal provision in a contract between an employer and a pension fund did not constitute property for purposes of a claim under the takings clause.  *See Connolly v. Pension Benefit Guar. Corp.*, 631 F. Supp. 640, 645 (C.D. Cal. 1984) ("[T]he contractual right which insulates employers from further liability to the pension plans in which they participate is not 'property' within the meaning of the takings clause."), *direct appeal granted*, 472 U.S. 1006 (1985).  The appellants switched arguments at the Supreme Court and focused on the property interest of the money that would be due to a fund upon employer withdrawal.  475 U.S. at 221.  The Supreme Court thus did not review the district court's original holding finding no property interest and affirmed instead on the grounds that there was no regulatory taking.

The Federal Circuit has not determined whether benefits of a vested private pension plan may constitute property interests under the fifth amendment.  In *Zucker v. United States*, 758 F.2d 637, 639 (Fed. Cir. 1985), the Federal Circuit opined in dicta that former government employees may have a property interest in "the payment of an annuity upon retirement."  The Federal Circuit ultimately did not decide that issue, however, and limited its holding to the principle that the retirees lacked cognizable property interests in post-retirement cost-of-living-adjustment benefits.  Unlike the pension plan in *Zucker*, the pension plan in this case is private.  Notably, "'courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel.'"  *Id.* at 640 (quoting *Kizas*, 707 F.2d at 536).  While the rights of government employees to retirement benefits are "determined by reference to the statute and regulations governing these benefits," the rights of participants in private pension plans are determined by reference "to ordinary contract principles."  *Id.*

In sum, the plaintiffs' entitlement to a specific level of benefits stems not from ERISA or a rule of law, but from the pension contracts between the plaintiffs and the Teamsters Fund.  The plaintiffs are "legally and contractually" entitled to receive those vested benefits.  *Thole*, 140 S. Ct. at 1618.

Given that the plaintiffs have a property interest arising from the pension-plan documents, applicable precedents support the existence of an enforceable property interest even

---

"gratuities" creating no vested legal right because they involved "no agreement of parties").  Under federal-employment law, "courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel."  *Kizas v. Webster*, 707 F.2d 524, 535 (D.C. Cir. 1983).  As employees in the private sector, the plaintiffs have a stronger right to their pension benefits arising from the plan documents than the public-sector employees had in *Mallette*, *Coffman*, and *Bloch*.

in the face of extensive government regulation.  This case is also distinct from Federal Circuit and Supreme Court cases finding no property interest in a rule of law.

### 2.   Analogy to Federal Circuit Precedents

The Federal Circuit has consistently identified constitutionally cognizable property interests in cases, like this one, when the asserted interest stems from contract or quasi-contract but is somewhat dependent on the operation of law.

In *Cienega Gardens*, 331 F.3d at 1324, the plaintiffs had entered into mortgage agreements with the U.S. Department of Housing and Urban Development ("HUD").  The agreements provided that the plaintiffs had the right to prepay their 40-year mortgages without HUD approval after 20 years.  *Id.* at 1325.  Portions of the agreements referenced relevant statutory and regulatory provisions, and, under HUD regulations, the agreements could be amended.  *Id.* at 1325-26.  A federal law later annulled the provision of the plaintiffs' agreements permitting mortgagors to prepay their mortgages without HUD approval after 20 years.  *Id.* at 1326.  The trial court ruled that the plaintiffs lacked a cognizable property interest because HUD could have amended the regulations at any time, and the government advanced a similar argument on appeal.  *Id.* at 1330-32.  The Federal Circuit reversed because it refused to "read into private contracts limitations that are not even hinted at in their text."  *Id.* at 1331.  The Federal Circuit held that the plaintiffs had a cognizable property interest in their contractual right to prepay their mortgages.  *Id.* at 1330.

Like the mortgage agreements in *Cienega Gardens*, the plan documents provided the plaintiffs with a contractual right.  The plan documents of the Teamsters Fund promised participants benefits at a particular level for life.  The plan documents also referenced various statutory provisions in ERISA and the Tax Code, which Congress retains the power to amend.  Under *Cienega Gardens*, he possibility that those statutes would be amended in the future does not defeat an otherwise valid property interest that finds its source in the plan documents.  The plan documents contain no hint of a limitation that vested benefits could be suspended while the plan remained funded.[10]

The Federal Circuit later relied on and reinforced *Cienega Gardens* in *Piszel v. United States*, 833 F.3d 1366, 1375 (Fed. Cir. 2016).  In *Piszel*, the plaintiff, an executive at Freddie Mac, had an employment contract providing that, in the event of his termination without cause, he was to receive a $7 million "golden-parachute" payment.  Under new statutes and regulations restricting golden-parachute payments following the 2008 financial crisis, the plaintiff was terminated without cause and denied the golden-parachute payment he was due under his

---

[10] The plaintiffs assert that the Teamsters Fund remained fully funded when it applied to Treasury for relief under the MPRA.  (*See* ECF 138 at 117:18–118:3 (arguing that the actuarial assumptions of the Teamsters Fund's MPRA applications were erroneous).)  The defendant has not disputed the plaintiffs' contention that the Teamsters Fund was still solvent at the time it suspended the plaintiffs' benefits.

employment contract. *Id.* at 1371-72. A judge of this court dismissed the plaintiff's takings claim, finding in part that the plaintiff lacked a cognizable property interest in his employment agreement. *Id.* at 1372-73. On appeal, the government argued that the plaintiff could not have a property interest in the golden-parachute payment because "Freddie Mac operated in an environment of pervasive federal regulation." *Id.* at 1374. The Federal Circuit opined that the plaintiff may have lacked a cognizable property interest and a claim for the alleged taking of that interest if the law and regulations restricting golden-parachute payments had existed at the time the plaintiff formed his employment contract; in that case, the limitation on the property interest would have inhered in his title to the contractual right. *Id.* The Federal Circuit held, however, that, as to the post-contract changes to the governing legal landscape, "the existence of government regulation does not defeat a property interest." *Id.* at 1375. Instead, the Federal Circuit concluded that the plaintiff had a constitutionally cognizable property interest in the golden-parachute payments under his employment contract. *Id.*

This case is similar to *Piszel*. Like the plaintiff in *Piszel*, the Teamsters Fund and, by extension, the plan participants operate in a highly regulated environment. The plaintiffs' receipt of the benefits they are due under the plan documents is regulated and determined to some degree by ERISA and its regulatory landscape. At the time that the plaintiffs' pensions vested under the plan, however, the MPRA did not exist. When the plaintiffs' pensions vested, the plaintiffs' entitlement to their benefits contained no restriction that their benefits could be reduced even when the Teamsters Fund remained solvent and funded. That restriction therefore did not inhere in the plaintiffs' contractual rights. *See id.* at 1374. The fact that, like the management of Freddie Mac, pension plans are highly regulated under ERISA does not defeat an otherwise valid property interest deriving from the pension contract between the Teamsters Fund and plan participants.

The Federal Circuit has clarified when a challenged government action inheres in an agreement. In *A & D Auto*, the plaintiffs were former car dealers for auto manufacturers who terminated the plaintiffs' franchise agreements during bankruptcy proceedings. 748 F.3d at 1147. The plaintiffs alleged that the agreements were terminated because the federal government had conditioned financial assistance to the manufacturers on their termination of excess dealership franchises. *Id.* at 1153. The plaintiffs argued that their franchise agreements constituted a cognizable property interest. *Id.* at 1152. The government argued that the bankruptcy-law principle permitting the termination of franchise agreements in bankruptcy "inhered" in the plaintiffs' contractual rights and therefore prevented the plaintiffs from demonstrating a valid property interest under the fifth amendment. *Id.* The Federal Circuit held that "[i]f a challenged [government] restriction was enacted after the plaintiff's property interest was acquired, it cannot be said to 'inhere' in the plaintiff's title." *Id.*; *see also Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313, 321-24 (2001) (describing when state-law principles inhere in a contractual property interest). Existing bankruptcy law inhered in the plaintiffs' franchise agreements, and the plaintiffs did not challenge the bankruptcy law that franchise agreements can be terminated in bankruptcy. *A & D Auto*, 748 F.3d at 1153. Instead, the plaintiffs challenged the government's action of requiring the terminations as a condition of financial assistance, an action postdating the franchise agreements. Accordingly, the Federal Circuit held that the franchise agreements constituted "valid and compensable property interests." *Id.*

21

The parties here do not dispute that ERISA provisions, especially the "anti-cutback" rule as it was prior to its amendment in the MPRA, inhered in the plaintiffs' entitlement to receive a certain level of benefits. For example, the plaintiffs do not argue that if the Teamsters Fund were to become insolvent, it could not reduce the plaintiffs' vested benefits. (*See* ECF 138 at 74:12-16.) The challenged government conduct in this case—the enactment of the MPRA and government authorization to reduce the plaintiffs' vested benefits—postdates the vesting of the plaintiffs' pensions. As a result, the existence of an extensive and evolving regulatory framework cannot defeat the plaintiffs' preexisting property interest in the specific level of pension benefits determined and payable in accordance with the plan documents.

In all three cases (*Cienega Gardens*, *Piszel*, and *A & D Auto*), the property interests at stake depended at least in part on an assumption that the law would not change. The plaintiffs in all three cases operated in highly regulated environments. Those facts did not eliminate, as a matter of law, the plaintiffs' otherwise cognizable property interests under the fifth amendment, even when the governing legal framework did change. Accordingly, the plan documents' dependence on ERISA and the Tax Code does not eviscerate the plaintiffs' property rights under the fifth amendment and thereby eliminate the premise of their claims for the taking of those rights.

The defendant has analogized this case to other cases in which the Supreme Court and Federal Circuit found no cognizable property interest. Those cases present factual circumstances differing from those in the present case; none of the cases alter the Court's analysis that contracts—even heavily regulated contracts—between private parties can give rise to property interests under the fifth amendment.

The defendant relies primarily on *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 49-50 (1986). In *Bowen*, the State of California and some of its public agencies claimed that a Social Security termination provision in their employment agreements constituted a cognizable property interest and that Congress's amendment of the provision of law upon which the agreements relied constituted a taking. The Supreme Court held that the termination provision in the contracts did not constitute property under the fifth amendment. The termination provision "exactly tracked the language of the statute, conferring no right on the State beyond that contained in [the statute] itself." *Id.* at 55. The termination provision was not unique to those employment agreements, and California had not bargained or provided consideration for inclusion of that provision in its employment agreements. *Id.* The termination provision therefore did not constitute property under the takings clause because it derived entirely from statute.

The contractual provisions at issue in the present case differ from those at issue in *Bowen*. The calculation of benefits under the plan documents is unique to the Teamsters Fund; it has no basis in statute and therefore does not track the language of ERISA. Additionally, the plan documents confer rights on the plaintiffs that ERISA and the Tax Code do not. The plaintiffs' rights stem from a private contractual relationship that is regulated by the government, not a statutory scheme conferring a benefit to government employees. The plaintiffs also provided consideration for the level of their benefits in the form of their labor at UPS. They accepted lower wages during their employment in return for an income stream in retirement, and the

amount of their contributions and the calculation of the amount of the income stream are both spelled out not in ERISA but in the plan documents. Accordingly, the plaintiffs' interest in unreduced pension benefits differs from the plaintiffs' interest in *Bowen*.

The defendant also points to several decisions from the Federal Circuit to support its position. In *Adams*, 391 F.3d at 1220, the plaintiffs, a group of federal employees, claimed a property interest under the fifth amendment in underpaid overtime compensation that was due to them under the Fair Labor Standards Act. The plaintiffs argued that vested property rights could arise either by statute or by contract. *Id.* at 1219. The Federal Circuit held that the *Adams* plaintiffs did not have a compensable property interest under the fifth amendment. *Id.* at 1225. "The terms of [the plaintiffs'] employment and compensation . . . were governed exclusively by statute, not contract." *Id.* at 1221. The Federal Circuit highlighted that when the government contracts with private parties, "[t]he express rights under this contract are just as concrete as the inherent rights arising from ownership of real property, personal property, or an actual sum of money." *Id.* at 1221-22. The Federal Circuit concluded that "a statutory right to be paid money, at least in the context of federal employee compensation and benefit entitlement statutes, is not a property interest for purposes of the Takings Clause." *Id.* at 1225.

Unlike the plaintiffs in *Adams*, the plaintiffs in this case are not claiming a property interest arising solely in a statute. This case would be like *Adams* only if the calculation of the plaintiffs' benefits and vesting rights were based solely on the text of ERISA, the Tax Code, or some other statutory scheme of entitlement. Because the plaintiffs' vested interest in a certain and specific level of benefits derives from the plan documents themselves, the rationale of *Adams* does not apply.

In *Acceptance Insurance*, 583 F.3d at 850, the plaintiff alleged that the government had violated the fifth amendment when the Department of Agriculture blocked the plaintiff's sale of crop-insurance assets to a third party. The Federal Circuit held that the plaintiff had no constitutionally cognizable property interest in its ability to sell insurance policies without government approval. *Id.* at 858. Under rules existing at the time the plaintiff entered the crop-insurance business, the plaintiff could not freely transfer the policies at issue. *Id.* at 857. The Department of Agriculture had always had the authority to block transactions. *Id.* at 858. The plaintiff therefore lacked a cognizable property interest in the ability to transfer insurance policies freely because statutory and regulatory requirements had inhered in the plaintiff's property interest. *Id.*

Until the MPRA, the government had little involvement in the calculation of the specific level of benefits each plaintiff received when the Teamsters Fund was solvent. The defendant has not asserted that the government dictated the exact sum of money that the plaintiffs were to receive each month. Similarly, the defendant does not argue that the vesting of plaintiffs' benefits was subject to government approval. This case is more like *A & D Auto* than it is like *Acceptance* because the MPRA cuts postdated the vesting of the plaintiffs' benefits from the Teamsters Fund. The MPRA-based restrictions on the plaintiffs' entitlement to their contractual rights thus did not inhere in the plaintiffs' property interests.

The defendant also cites *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001). The plaintiffs in that case alleged that a law imposing monetary liability on utilities for uranium cleanups constituted a taking. There was no taking in that case because the law merely imposed an obligation to pay money. *Id.* at 1339-40. The Federal Circuit held that "while a taking may occur when a specific fund of money is involved, the mere imposition of an obligation to pay money, as here, does not give rise to a claim under the Takings Clause of the Fifth Amendment." *Id.* at 1340.

The Federal Circuit did not hold that monetary benefits cannot constitute a property interest, as the defendant suggests. (ECF 126 at 18 n.10.) Rather, the Federal Circuit acknowledged that a taking may arise "when a specific fund of money" is involved. *Commonwealth Edison*, 271 F.3d at 1340. In this case, the plaintiffs claim a right to receive the unreduced benefits of their vested pensions. *Commonwealth Edison* is distinct; the monetary obligation in that case was more akin to a tax or user fee.

Finally, the defendant analogizes this case to *McCutchen v. United States*, 14 F.4th 1355 (Fed. Cir. 2021). In *McCutchen*, the plaintiffs claimed that a federal regulation requiring the destruction or surrender of their bump-stock devices constituted a taking under the fifth amendment. *Id.* at 1357. The Federal Circuit held that the plaintiffs lacked a compensable property right in the continued possession and transferability of their bump-stock devices. *Id.* at 1370. A bump-stock device allows a semi-automatic firearm to fire rapidly, in the manner of a machine gun. Prior to the adoption of the federal regulation at issue, a statute already prohibited the possession and transfer of "machineguns" and authorized agency implementation of that statute. *Id.* at 1365-66. The Federal Circuit noted that "the federal-law prohibition on possession and transfer, together with a congressional grant of implementation authority, predated the existence, let alone plaintiffs' possession, of the bump-stock-type devices that plaintiffs were compelled to destroy or surrender." *Id.* "And valid preexisting federal-law limitations on what otherwise would be state-law property rights are among the limitations that may inhere in title so as to limit compensable property rights." *Id.* at 1355. The plaintiffs' demonstration of a compensable property interest depended on the application of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to the regulation to determine whether bump-stock devices fell within the definition of "machinegun" and thus inhered in the plaintiffs' entitlement to possess and transfer bump-stock devices. 14 F.4th at 1366. Ultimately, the Federal Circuit rejected the plaintiffs' claim in *McCutchen* because the preexisting law limiting title to "machineguns" had inhered in the plaintiffs' rights to those devices, as defined by future valid agency interpretations of "machinegun." *Id.* at 1367-68.

Unlike the situation in *McCutchen*, prior to the enactment of the MPRA no other statute would have authorized the Teamsters Fund to reduce the plaintiffs' vested benefits when the Teamsters Fund remained solvent. The plaintiffs' interest in a certain level of pension benefits predated the enactment of the MPRA. The restrictions on the plaintiffs' pension benefits imposed by the MPRA did not inhere in the plaintiffs' rights to their unreduced and vested pension benefits. There is also no *Chevron* issue presented in this case. Therefore, *McCutchen* is inapposite.

In sum, the Court's finding that the plaintiffs have demonstrated a cognizable property interest is consistent with Supreme Court and Federal Circuit precedents.

### 3.      Reduction of Benefits Under the Plan

The defendant argues that the plaintiffs' rights under the Teamsters Fund pension plan are still limited by Article X of the plan documents.  As already noted above (at 5-6), Article X provides:

> The provisions of the Plan may be modified or amended, retroactively if necessary, to bring the Plan into conformity with statutory or regulatory requirements to preserve the qualified status of the Plan under section 401 of the [Tax] Code and the exempt status of the Trust under section 501 of the [Tax] Code.  In no event, however, shall any modification or amendment of the provisions of the Plan make it possible for any part of the funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of Pensioners, Participants and Survivors, or have the effect of decreasing a Participant's Accrued Benefit in violation of section 411(d)(6) of the [Tax] Code.

(ECF 129-1 at 330.)  The defendant highlights that "there is no plan-based prohibition on accrued benefit reductions that *do not* violate section 411(d)(6)" of the Tax Code.  (ECF 126 at 23 (emphasis in original).)  Because amendments to the plan documents under the MPRA did not violate § 411(d)(6), the amendment did not violate the terms of the Teamsters Fund pension plan.  Accordingly, the defendant argues, "the plan document does not provide an unqualified contractual right to unreduced accrued benefits."  (*Id.* at 24.)  Rather, the plaintiffs' right to unreduced pension benefits is protected only to the extent that ERISA and the Tax Code protect them.

The plaintiffs highlight that Article X does not provide the trustees of the Teamsters Fund with authority to "amend the provisions in any way or without limitation or even for benefits already earned decades earlier."  (ECF 128 at 26 (emphasis omitted).)  Instead, Article X limits the trustees' power to amend the plan documents "retroactively, if necessary, to bring the Plan into conformity with statutory or regulatory requirements . . . ." *Id.*  Article X is therefore best read as limiting the trustees' power to amend the plan in situations in which the provisions of the plan violated federal law.  *Id.*

The Federal Circuit held in *Cienega Gardens* that Congress's ability to amend or abrogate statutes or regulations to which contracts refer does not defeat an otherwise cognizable property interest under the fifth amendment.  331 F.3d at 1334.  In *Cienega Gardens*, the regulatory agreements between HUD and the plaintiffs referenced sections 221(d)(3) and 236 of the National Housing Act and those provisions' corresponding regulations but were otherwise silent about the power to amend the agreements.  *Id.* at 1326, 1332.  One HUD regulation provided that the regulatory agreements could be amended so long as the amendment would not

prejudice the lenders.  *Id.*  The Federal Circuit held that the plaintiffs had a cognizable property interest in their contractual rights to prepay their mortgages.  The plaintiffs' rights were not:

> subject to divestiture simply because of their voluntary participation in a housing program under government control.  To hold otherwise would mean that Congress could have changed the mortgage contracts in *any* way to affect *any* of the rights established by the contracts—including changing the contracts to extend their term from forty to, for example, eighty years—and the [plaintiffs] would be without a remedy.  Again, this is not and cannot be the law.

*Id.* at 1334 (emphasis in original).

Like the mortgage contracts in *Cienega Gardens* referencing statutes and regulations, the plan documents in this case explicitly referenced provisions of ERISA and the Tax Code.[11]  The plan documents also allow the trustees of the Teamsters Fund to amend the plan documents but limit such authority: the trustees may only amend the plan documents to bring the Teamsters Fund into conformity with the law and cannot otherwise reduce participants' accrued benefits in violation of § 411(d)(6) of the Tax Code.  While Congress retained the power to amend § 411(d)(6), only the pre-MPRA version of § 411(d)(6) had inhered in the plaintiffs' property interest.  *See A & D Auto*, 748 F.3d at 1152 ("If a challenged restriction was enacted before the property interest was acquired, the restriction may be said to inhere in the title.  If a challenged restriction was enacted after the plaintiff's property interest was acquired, it cannot be said to 'inhere' in the plaintiff's title." (internal footnote omitted)).  Consequently, the trustees' power to amend the plan documents to conform with evolving requirements in ERISA and the Tax Code under Article X of the plan documents does not abrogate the plaintiffs' rights.

Accepting the defendant's argument and holding in this case that the plaintiffs do not have a constitutionally cognizable property interest in the level of their vested pension benefits would lead to absurd consequences.  The plaintiffs would not be able to state a claim for a taking even if the government directly appropriated the plaintiffs' pension benefits.  For example, Congress hypothetically could amend § 411(d)(6) to allow the Treasury to take all but $0.01 of the plaintiffs' monthly benefits directly, and the plaintiffs would have no recourse under the fifth amendment.  "[T]his is not and cannot be the law."  *See Cienega Gardens*, 331 F.3d at 1334.

---

[11] In *Cienega Gardens*, the contracts at issue were between the government and private parties.  331 F.3d at 1323.  In this case, by contrast, the contract at issue is between private parties.  The distinction is immaterial because "'[v]alid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.'"  *Id.* at 1329-30 (quoting *Lynch*, 292 U.S. at 579).

### 4.    Pervasive Government Control

The defendant has moved for summary judgment on the ground that "[g]iven [ERISA's] pervasive regulatory regime, in which plaintiffs *have chosen* to participate for decades, there can be no cognizable Fifth Amendment property interest in rights created by the plan." (ECF 126 at 22 (emphasis in original).)  The defendant argues that the plaintiffs' right to a specific, irreducible amount of their pensions is "wholly set" within Congress's legislative scheme and that the enactment of the MPRA was "simply a limited adjustment" of that scheme.  (*Id.*)

The defendant relies primarily on three cases: *Connolly*, 475 U.S. 211; *Bowen*, 477 U.S. 41; and *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993).

*Connolly*, as the defendant argues, may ultimately prove relevant to the present case.  In *Connolly*, Congress had amended ERISA to require employers withdrawing from a pension plan to pay a proportionate share of the plan's unfunded vested benefits to the pension plan.  475 U.S. at 217.  Employers filed suit, alleging that their contractual limitations of liability upon withdrawal constituted property under the fifth amendment.  *Id.* at 221.  The district court found that those contractual provisions did not constitute property under the fifth amendment, but the Supreme Court instead affirmed on the grounds that the plaintiffs had not demonstrated a regulatory taking under the factors of *Penn Central*.[12]  *Id.* at 221-28.  The Supreme Court explained:

> [T]he fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation.  But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.

*Id.* at 224 (internal citations omitted).  In *Connolly*, the Supreme Court did not hold that contractual rights under ERISA are never property rights and that no taking could ever arise under ERISA.  Instead, the Court engaged in an "ad hoc, factual inquir[y]" into the circumstances of the alleged taking.  *Id.*  Despite the defendant's reliance on it, *Connolly* does not preclude the plaintiffs from claiming a valid property interest in this case.  Instead, if the

---

[12] In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the Supreme Court articulated a test for determining when a regulation may give rise to a taking. The Supreme Court identified three salient factors: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."  *Id.* at 123-24; *see also Connolly*, 475 U.S. at 212 (noting the *Penn Central* factors).

plaintiffs' claims are to be resolved under the *Penn Central* test applicable to regulatory takings, *Connolly* counsels in favor of a fact-specific inquiry.

*Bowen* has already been analyzed and distinguished above (at 22), but one aspect of the Supreme Court's decision, as well as the defendant's reliance on it, warrants additional discussion. The Supreme Court distinguished *Bowen* from other situations in which it had identified a cognizable property interest. In particular, the Court in *Bowen* quoted *Union Pacific Railroad Co. v. United States* (*Sinking-Fund Cases*), 99 U.S. 700, 702 (1878) for the proposition that the power Congress reserved to itself to amend a railroad charter could not be used to "'take away property already acquired under the operation of the charter . . . .'" 477 U.S. at 55. The Court in *Bowen* thus acknowledged that a property interest could still be found even in an area subject to pervasive government regulation. Thus, *Bowen* too does not foreclose the plaintiffs' claims, at least in terms of the existence of a property right subject to a takings analysis.

In *Mitchell Arms*, the plaintiff claimed that the government unconstitutionally took its property by prohibiting it from importing rifles it had acquired to the United States. 7 F.3d at 215. After the plaintiff had received an advanced notice that its license to import rifles would be suspended, the plaintiff proceeded to purchase more rifles from a foreign third party to attempt to import them into the United States. *Id.* at 214. The plaintiff's license was then suspended, and the importation of the rifles was blocked. The plaintiff sued, arguing that its contractual agreement with the third party in addition to its import license still valid at the time it acquired the rifles constituted cognizable property interests under the fifth amendment.

In rejecting the plaintiff's claim in *Mitchell Arms*, the Federal Circuit analyzed *Bowen* to conclude that "'enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive government control.'" *Id.* at 216 (quoting *Mitchell Arms v. United States*, 26 Ct. Cl. 1, 5 (1992)). The Federal Circuit explained that the government had withdrawn its prior authorization for the plaintiff to import rifles to the United States, but the plaintiff otherwise retained full control and possession over the rifles. *Id.* at 217. The plaintiff's contract with the third party also had not been "taken," because the plaintiff had acquired the rifles for which it paid. *Id.* The Federal Circuit explained that the plaintiff's "collateral interest" in "the ability to realize an expectation in the ultimate market disposition of the rifles" was not property protected by the fifth amendment. *Id.*

In *Cienega Gardens*, the Federal Circuit declined to extend *Mitchell Arms*. The Federal Circuit clarified that in *Mitchell Arms*, the plaintiff's "expectation of selling the assault rifles in domestic commerce 'was not inherent in its ownership of the rifles.'" 331 F.3d at 1336 (quoting *Mitchell Arms*, 7 F.3d at 217). "The holding that there was no property interest in *Mitchell Arms* is, thus, limited to those cases in which the interest at issue does not inhere to some property that the plaintiff owns independently." *Id.* Because the plaintiffs in *Cienega Gardens* owned their property not by any "grant by the government," the Federal Circuit found that the holding of *Mitchell Arms* did not apply. *Id.*

The Federal Circuit further clarified the application of *Mitchell Arms* and *Cienega Gardens* in *Piszel*. 833 F.3d at 1374-75. "In *Cienega Gardens*, we rejected the government's

position that 'enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive government control.'" *Id.* at 1375 (quoting *Cienega Gardens*, 331 F.3d at 1330). The Federal Circuit clarified that *Mitchell Arms* applied only to regulatory takings:

> The government is nonetheless correct that the background regulatory environment is relevant to a takings analysis. When the government acts in a highly regulated environment to bolster restrictions or eliminate loopholes in an existing regulatory regime, the existence of government regulation does not defeat a property interest, but is relevant to whether there were investment-backed expectations under the *Penn Central* test.

*Id.* at 1374-75. The Federal Circuit also acknowledged that *Connolly* applied only to the question of whether the government interfered with a plaintiff's reasonable investment-backed expectations in an alleged regulatory taking. *Id.* at 1375.

In short, *Bowen*, *Mitchell Arms*, *Connolly*, *Cienega Gardens*, and *Piszel* are consistent. The fact that a property interest arises in a highly regulated environment does not per se render that property interest incognizable under the fifth amendment. The extent of the government regulation is, however, relevant to a court's analysis of whether a taking has occurred under the *Penn Central* factors, if the test for a regulatory taking applies to the plaintiffs' claims.

The defendant makes a compelling argument that the plaintiffs assumed some risk of reduction in benefits through their participation in a heavily regulated pension plan, and the plaintiffs may eventually face an uphill battle to distinguish their case from *Mitchell Arms* and *Connolly* in terms of whether a taking of the plaintiffs' property actually occurred. The defendant errs, however, in tying this issue to the preliminary question of whether the plaintiffs have identified a cognizable property interest.

In sum, binding precedents preclude the application of *Connolly* and *Mitchell Arms* to the question of whether a compensable property interest exists. *See Piszel*, 833 at 1374-75; *Cienega Gardens*, 331 F.3d at 1336. Moreover, the question of whether a physical-takings test or a regulatory-takings test should apply to the facts presented in this case remains unresolved and specifically reserved for future consideration. Applying elements of the regulatory-takings test under *Penn Central* is therefore premature. Accordingly, all this Court concludes for now is that the existence of a robust regulatory framework in ERISA and the Tax Code does not defeat the plaintiffs' property interest in their unreduced pension benefits.

## B.    Government Action

The defendant argues that even if the plaintiffs have a cognizable property right to retain the pre-MPRA level of their pension benefits, the government did not act in a way that gives rise to a taking by simply approving the Teamsters Fund's MPRA application. The defendant asserts three rationales to support this argument. First, under *Omnia*, 261 U.S. 502, the effects of the government's action were indirect or collateral. Second, government authorization to the

Teamsters Fund does not give rise to a taking for which the government is responsible.  Third, the plaintiffs have not demonstrated that the government coerced the Teamsters Fund to apply under the MPRA or that the Teamsters Fund acted as the government's agent in applying for relief under the MPRA.

The Court notes at the outset of this analysis that it is constrained by the present stage of litigation in analyzing the defendant's arguments because no decision has yet been made as to whether the per se physical-takings test or the more flexible regulatory-takings test should apply to this case.  Given the enactment of the ARPA and its potential impact on the plaintiffs' pensions, the defendant has reserved that issue for a later stage in the litigation.  (*See* ECF 126 at 5 n.1; ECF 99 at 22-33.)

In *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322-23 (2002), the Supreme Court clarified the distinction between physical takings and regulatory takings:

> This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a "regulatory taking," and vice versa.  For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims.  Land-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways.  Treating them all as per se takings would transform government regulation into a luxury few governments could afford.

*Id.* at 323-24 (internal footnote omitted).  The Supreme Court reiterated the inappropriateness of applying the physical-takings test to regulatory takings and the regulatory-takings test to physical takings in *Horne v. Department of Agriculture*, 576 U.S. 350, 361 (2015).  *See also Penna v. United States*, 153 Fed. Cl. 6, 18-19 (2021) (discussing the two discrete paradigms for takings cases).

In short, the Court must compare apples to apples and oranges to oranges.  The Court cannot dispositively decide that the plaintiffs have or have not demonstrated sufficient government action to give rise to a taking when the parties have not yet argued (and the Court has not decided) which takings test applies to this case.  Instead, the Court decides only whether the plaintiffs have successfully demonstrated that the government acted in a manner that *could* potentially give rise to a taking, depending on the applicable test, or whether the defendant has successfully demonstrated that the government did not act in a way that could ever constitute a taking, no matter which test is applied to the plaintiffs' claims.

### 1.      Directness of Government Action

The parties dispute whether the reduction of the plaintiffs' benefits is at all attributable to the government under the fifth amendment.

The defendant cites *Alves v. United States*, 133 F.3d 1454 (Fed. Cir. 1998) for the argument that the action resulting in the deprivation of the plaintiffs' property must be the result of government action and not the action of a private party. (ECF 126 at 28.) In *Alves*, the plaintiff alleged that the Bureau of Land Management's failure to prevent a third party from trespassing onto the plaintiff's property constituted a taking of the plaintiff's grazing permits. 133 F.3d at 1455-56. The Federal Circuit held that no taking had occurred because "there was no governmental action . . . at all." *Id.* at 1458. The trespass was committed by a third party, and the government had attempted to prevent the trespass for years. *Id.* The government's failure to do so successfully did not constitute a taking under the fifth amendment. *Id.*

In this case, although the Teamsters Fund applied to suspend benefits and amended the plan documents to implement the benefits, Treasury, the PBGC, and Labor authorized those cuts. The plaintiffs challenge the government's authorization to the Teamsters Fund to reduce the plaintiffs' vested benefits. This case is therefore distinct from *Alves* because there is government action to challenge. Authorization to a third party alone can confer liability on the government even when the third party technically executes the taking. *See*, *e.g.*, *Cedar Point*, 141 S. Ct. 2063 (holding that a state regulation granting labor organizations access to agricultural employers' property constituted a per se physical taking).

The parties also dispute whether *Omnia*, 261 U.S. 502, and a line of Federal Circuit cases applying *Omnia* preclude the plaintiffs' claims. The Court ordered supplemental briefing on this issue. (ECF 132.) The Federal Circuit has analyzed and applied *Omnia* to both regulatory-takings and physical-takings claims. *See Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1210, 1216 (Fed. Cir. 2005) (applying *Omnia* in a regulatory-takings case); *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1578, 1581 (Fed. Cir. 1995) (applying *Omnia* in a physical-takings case). *Omnia* thus stands as a preliminary barrier to all varieties of takings claims, and the Court may consider whether *Omnia* and its progeny bar a claim for a taking without deciding which takings test applies.

### a.      *Omnia* and *Brooks-Scanlon*

In May 1917, the plaintiff Omnia acquired a contract that gave it the option of buying steel plates at below-market prices from a steel mill. *Omnia*, 261 U.S. at 507. In October 1917, the federal government requisitioned the steel mill's entire production of steel plates for the year 1918. *Id.* The government directed the steel mill not to fulfill its contract with Omnia, threatening to take over the entire steel mill under a federal statute if the steel mill sold any steel to a third party. *Id.* Omnia argued that the government's actions gave rise to a taking. *Id.* at 507-08.

The Supreme Court held that no taking had occurred. Even though the contract between the steel mill and *Omnia* constituted property under the fifth amendment, the destruction of

property does not always give rise to a taking. *Id.* at 508-09. Many laws may affect the value of property without giving rise to a taking, such as zoning regulations, the culling of diseased cattle, or the quarantine of potentially diseased agricultural products. *Id.* The Supreme Court analogized those laws to the government's action in *Omnia* and concluded that "for *consequential* loss or injury resulting from lawful government action the law affords no remedy." *Id.* at 510 (emphasis added).

"If, under any power, a contract or other property is *taken* for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable." *Id.* (emphasis in original). The Supreme Court distinguished the taking of a contract from the taking of the subject matter of a contract: if the government had taken Omnia's contract with the steel mill, it would be required to pay just compensation under the fifth amendment. *Id.* Under the facts, however, Omnia had retained its contractual purchase rights, whatever the value of those purchase rights may be. *Id.* Furthermore, if the steel mill had sold plates to Omnia, there would have been no remedy available to Omnia; the government simply would enforce the wartime statute to requisition the entire steel mill, and the impact on Omnia would have been the same. *Id.* at 511.

In short, "[f]rustration and appropriation are essentially different things." *Id.* at 513. The Supreme Court cautioned that if it adopted Omnia's argument, the government would be liable for "an appalling number of existing contracts for future service or delivery" given the number of "railroads, steel mills, shipyards, telephone and telegraph lines, [and] the capacity output of factories" that the government had acquired during World War I. *Id.*

A year after it had found no taking when it decided *Omnia*, the Supreme Court found a taking in another alleged wartime interference with a contract. *Brooks-Scanlon Corp. v. United States*, 265 U.S. 106 (1924). The Emergency Shipping Act empowered the President (and, pursuant to a presidential delegation, the U.S. Shipping Board Emergency Fleet Corporation) to requisition any ship under construction or to requisition contracts for the building of ships. *Id.* at 115. Brooks-Scanlon Corporation had a contract with a shipyard for the construction of a ship. *Id.* at 115-16. The Fleet Corporation requisitioned the ship while it was under construction. *Id.* at 116. Prior to the appropriation, Brooks-Scanlon had hired an architect and an inspector, provided the shipyard with blueprints of the vessel, and paid approximately half of the contract price in installments. *Id.* The construction of the ship was already about 19 percent completed when it was appropriated by the government. *Id.* Although the Fleet Corporation had paid for the ship, Brooks-Scanlon was unsatisfied with the amount it had received and sued for the taking. *Id.* at 118-19.

As a preliminary issue, the Supreme Court analyzed whether the United States had "taken" Brooks-Scanlon's contract and held that there had been a taking of Brooks-Scanlon's property. *Id.* at 119-21. The orders the Fleet Corporation gave to the shipyard "show that expropriation of claimant's contract and rights was *intended*." *Id.* at 120 (emphasis added). The government ultimately used the contract-price installments Brooks-Scanlon had paid, the vessel's blueprints, and the benefits of the inspector and architect's labor. *Id.* "The *direct* and *immediate* result of the requisition orders and acts of the Fleet Corporation was to take from claimant its contract and its rights thereunder." *Id.* (emphasis added).

32

The Supreme Court distinguished *Omnia*. The Court explained that, in *Omnia*, no steel plate "had been appropriated to the contract," and Omnia had not paid any part of the purchase price to the steel mill. *Id.* at 120-21. The contract between Omnia and the steel mill was not used in any way in the transactions between the government and the steel mill, and none of the benefits to the plaintiff had been taken. *Id.* Any injury to Omnia was "too remote." *Id.* at 121.

Thus, the Supreme Court has left courts and litigants with two discrete and distinct paradigms. The question thus becomes focused in this case: under which paradigm do the plaintiffs' claims fall? Was the effect of the government's action toward the plaintiffs unintended or collateral as in *Omnia*, or was it intended and direct as in *Brooks-Scanlon*?

This case tracks *Omnia* in some ways. For example, as in *Omnia*, enforcement of the plaintiffs' claims depends in part on the operation of a statute. Had the steel mill in *Omnia* failed to comply with the government's orders, the government could have seized the steel mill by statute. 265 U.S. at 511. In this case, the plaintiffs' claim challenging a reduction of benefits against the plan would ordinarily arise under ERISA. *See* 29 U.S.C. § 1132(a)(3) (empowering participants and beneficiaries to bring a civil action to enjoin fund actions that violate the terms of the plan or statute). The plaintiffs' only available remedy in this case is against the government because the MPRA immunizes the Teamsters Fund, and other plans that receive approval under the MPRA to reduce benefits, from liability to plan participants for the reduced benefits. *See id.* § 1085(e)(9)(B)(iii). The MPRA also denies participants and beneficiaries affected by suspensions of benefits a cause of action under the MPRA. *See id.* § 1085(e)(9)(I)(iii). The law therefore affords the plaintiffs "no remedy." *Omnia*, 261 U.S. at 510. Given that the plaintiffs challenge the immunity conferred on the Teamsters Fund as part of the taking, however, the analogy is less apt. (*See* ECF 140 at 19.)

This case is also distinct from *Omnia* in several key respects. While in *Omnia* the contract at issue remained intact, the pension plan documents were necessarily amended in this case to implement the suspension of benefits following the government's approval of the Teamsters Fund's MPRA application. The government's action in this case was also more "direct" and "intended" than in *Omnia*. The goal of the government's action in approving the Teamsters Fund's MPRA application was to bolster the viability of the Teamsters Fund by reducing the plaintiffs' benefits. Curtailment of the plaintiffs' vested pension benefits was specifically "intended." By comparison, in *Omnia*, the government intended to interact only with the steel mill. 261 U.S. at 511. In this case, the government authorized exactly which participants could retain what percentage of their benefits based on several statutory factors. *See* 29 U.S.C. § 1085(e)(9)(D). The plaintiffs and other Teamsters Fund plan participants were the targets of the Teamsters Fund's MPRA application and of the government's approval of that application. Government action toward the plaintiffs was therefore more "direct" than in *Omnia*, in which the government did not target the plaintiff directly; it merely ordered the steel mill not to sell steel plates to any other parties. 261 U.S. at 510.

These distinctions are made even more material by the Supreme Court's ruling in *Brooks-Scanlon*. The plaintiffs in this case assert that they acted in detrimental reliance on the promise that they would receive their unreduced vested pension benefits for life, and the defendant does not challenge those assertions. For example, the plaintiffs aver that they maintained employment

with UPS instead of looking for other jobs, they worked a certain number of hours annually to qualify for their pension benefits, and they retired at a certain age in reliance on their continued receipt of their pension benefits under the pre-MPRA plan documents and benefit amounts. The plaintiffs also have paid substantial consideration for the rights to their benefits in the form of their labor and wages foregone in return for employer contributions to the plan. The plaintiffs' reliance interests in their pre-MPRA pension benefits are akin to Brooks-Scanlon's hiring of various personnel to carry out the contract.

Also, the plaintiffs received their unreduced vested pension benefits for several years until the MPRA-authorized reductions took effect. As in *Brooks-Scanlon*, the plaintiffs were already benefiting from the implementation of their contract with the Teamsters Fund at the time the challenged government action occurred. In this case, the plaintiffs' benefits had already "been appropriated to the contract" through vesting. *Brooks-Scanlon*, 265 U.S. at 120-21. The direct and immediate effect of the Teamsters Fund's MPRA application and Treasury approval of the application was amended plan documents and reduced benefits.

The defendant argues that, notwithstanding the elements that make the plaintiffs' claims more like those of the plaintiff in *Brooks-Scanlon*, this case is more like *Omnia* because the government "took nothing for its own use (unlike in *Brooks-Scanlon*)." (ECF 139 at 8.) That distinction is relevant, as it is unclear what benefit the government appropriated for itself in this case.

Takings jurisprudence, however, has changed since the Supreme Court decided *Omnia*. *Omnia* was decided within three months of the Supreme Court first holding that a regulation could result in a taking in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922). "Traditional takings doctrine" had previously been based "on the indicia of physical occupation of land." *Hendler v. United States*, 952 F.2d 1364, 1371 (Fed. Cir. 1991). After *Pennsylvania Coal*, the Supreme Court did not "re-enter[ ] the debate about when regulations went 'too far'" until it decided *Penn Central* more than 50 years later. *Hendler*, 952 F.2d at 1372 (quoting *Pa. Coal*, 260 U.S. at 415).

In *Tahoe-Sierra Preservation Council*, the Supreme Court explained:

> Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by "essentially ad hoc, factual inquiries," . . . designed to allow "careful examination and weighing of all the relevant circumstances."

535 U.S. at 322 (internal citations omitted) (quoting *Penn Central*, 438 U.S. at 124; *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)). In short, when *Omnia* was decided, the distinction between per se takings and regulatory takings had not yet crystallized, and the Supreme Court had not articulated a test for regulatory takings.

The argument made by the defendant that the taking here did not inure to the benefit of the government and that, as a result, *Omnia* is most applicable to this case, has a starkly different implication today than the *Omnia* and *Brooks-Scanlon* Court would have understood. Given the evolving doctrine governing regulatory takings, this prong of the defendant's argument is best considered not in evaluating whether there is sufficient government action to constitute a taking, but rather is best considered in evaluating which takings test applies. *See, e.g.*, *E. Enters. v. Apfel*, 524 U.S. 498, 522-23 (1998) (contrasting the government's direct appropriation of private property with the adjustment of a public program).

### b.      The Federal Circuit's Application of *Omnia*

Analogy to the Federal Circuit's precedents applying *Omnia* supports the conclusion that *Omnia* does not defeat the plaintiffs' claims. The Federal Circuit has frequently cited *Omnia* for the proposition that the government's frustration of a business expectation does not give rise to a taking. More to the point here, however, the Federal Circuit has held that when a contractual right has been directly and intentionally abrogated by the government, *Omnia* does not apply to preclude a taking.

In *Cienega Gardens*, the Federal Circuit declined to apply *Omnia*. 331 F.3d at 1334-35. The trial court had "implied that, under *Omnia*, if the government is not party to a contract, the effect of legislation on a private contract can only be consequential and there can be no taking of a contract right." *Id.* The Federal Circuit corrected this conclusion, noting "[t]he proposition in *Omnia* about consequential loss or injury refers to legislation targeted at some public benefit, which incidentally affects contract rights, not, as in this case, legislation aimed at the contract rights themselves in order to nullify them." *Id.* at 1335. The Federal Circuit held that *Omnia* therefore did not apply when the enactment and enforcement of a statute specifically abrogated the plaintiffs' rights under their contracts with private lenders. *Id.*

The MPRA did not *incidentally* affect the plaintiffs' rights under their pension plans. Rather, the law targeted multiemployer plans in "critical and declining" status specifically to abrogate the rights of participants of those plans. 29 U.S.C. § 1085(e)(9)(A). The relevant factors in *Cienega Gardens* entitling those plaintiffs to relief are applicable here: the MPRA was aimed at the contract rights themselves. The implication of *Cienega Gardens* is that *Omnia* does not bar the plaintiffs' claims.

The Federal Circuit also declined to apply *Omnia* in *A & D Auto*. 748 F.3d at 1154-55. It held that government action was "collateral or unintended" under *Omnia* when "the challenged government action was of general application and the plaintiff was but one member of an affected class of persons." *Id.* When the government allegedly conditioned financing on a third party's termination of the plaintiffs' franchise agreements, *Omnia* did not apply. *Id.*

Similarly, the government action here was not "of general application." Section 1085(e)(9)(A) of Title 29 applies only to funds in "critical and declining status." Within the Teamsters Fund, the MPRA-authorized suspension of benefits is unequal: active participants suffered a smaller cut in their accrued benefits; retirees, like the plaintiffs, suffered a larger cut; and participants over the age of 80 or disabled faced no cuts at all. *See* 29 U.S.C.

§ 1085(e)(9)(D)(ii), (iii). Thus, the plaintiffs are uniquely situated relative to other plan participants in terms of how government action affected their property interests, and this fact is another reason that *Omnia* does not apply.

The Federal Circuit held that *Omnia* did apply in *Air Pegasus*, 424 F.3d at 1216. In that case, the plaintiff operated a heliport on a rented property in Washington, D.C. *Id.* at 1209. The plaintiff did not own or operate any of the helicopters that used the heliport. *Id.* at 1216. After the terrorist attacks of September 11, 2001, the Federal Aviation Administration restricted air travel within 25 miles of Washington, D.C., including in the area where the plaintiff operated its business. *Id.* at 1209. The plaintiff subsequently abandoned its lease. *Id.* at 1210. The Federal Circuit found that the economic injury to the plaintiff was not the result of the government taking the plaintiff's property, but rather the "more attenuated result of the government's purported taking of other people's property." *Id.* at 1215. The plaintiff did not own or operate any of the helicopters, and it did not allege that the Federal Aviation Administration regulated the plaintiff's own operations under the lease. *Id.* at 1216. The plaintiff's lease remained intact after the challenged regulations took effect. *Id.* Like the government in *Omnia*, the government in *Air Pegasus* did not take the plaintiff's contract but merely frustrated its performance. *Id.*

Because the plaintiffs here have been found to have a constitutionally cognizable property interest in receiving a certain level of their vested pension benefits, *Air Pegasus* is distinguishable. *See id.* at 1215. Additionally, in this case, the defendant does not argue that the government in fact took the property of the Teamsters Fund or another third party. The MPRA and government action authorizing the reductions to the plaintiffs' benefits directly regulate the plaintiffs' access to their benefits at a specific amount under the pension plan. The pension plan documents were altered to that effect, and the plaintiffs' contractual rights were diminished after the challenged government action. This case is therefore distinct from *Air Pegasus*.

The Federal Circuit also applied *Omnia* in *Huntleigh USA Corp. v. United States*, 525 F.3d 1370 (2008). The plaintiff in *Huntleigh* was a private-security contractor that performed passenger and baggage screening at airports. *Id.* at 1374. After the September-11 terrorist attacks, Congress enacted a law requiring security screening at domestic airports to be performed by a new federal agency, the Transportation Security Administration. *Id.* at 1374-75. The law did not explicitly forbid the plaintiff from operating but effectively eliminated the market for the plaintiff's services. *Id.* All contracts between the plaintiff and various airlines were either allowed to expire naturally or paid out under termination clauses. *Id.* at 1375-76. The plaintiff sued the federal government, alleging that the government had taken its going-concern value and goodwill. *Id.* at 1376. Applying *Omnia* and *Air Pegasus*, the Federal Circuit held that the plaintiff had not demonstrated a taking. *Id.* at 1382. Congress had not regulated the plaintiff directly; rather, it had merely frustrated its business expectations. *Id.* at 1380.

The facts of *Huntleigh* differ from the facts of this case. In *Huntleigh*, the plaintiff's contractual rights remained unchanged: the plaintiff received compensation for the premature termination of its contracts, or the contracts had expired under their own terms. The plaintiffs' contractual rights in this case, by contrast, were altered to the plaintiffs' detriment. Additionally, the plaintiff's property interest in *Huntleigh* was nothing more than a business expectation

arising out of the existence of the plaintiff's contracts.  Here, the plaintiffs' property interest is a contractual right itself.  Accordingly, *Huntleigh* is inapposite.

In *Palmyra Pacific Seafoods, L.L.C. v. United States*, 561 F.3d 1361 (2009), the Federal Circuit again applied *Omnia* to hold that there had been no taking.  The plaintiffs were commercial fishing businesses operating in the Palmyra Atoll, "a tiny island in an empty portion of the Pacific Ocean."  *Id.* at 1363.  The plaintiffs possessed commercial fishing licenses and contractual rights to use certain facilities on the island.  *Id.* at 1364.  The Secretary of the Interior designated Palmyra's tidal lands and waters out to 12 nautical miles from the shore as a wildlife refuge.  *Id.*  The plaintiffs alleged that the government had committed a taking by rendering their fishing licenses worthless and by frustrating the purpose of their contractual rights to the facilities on the island.  *Id.*  The Federal Circuit analogized *Palmyra* to *Omnia*, reasoning that "the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights."  *Id.* at 1365.  The Secretary of the Interior had not prohibited commercial-fishing operations on Palmyra; it prohibited commercial fishing in the surrounding waters.  *Id.* at 1366.  The plaintiffs' contractual rights on the island therefore remained unaltered.  *Id.*  The Federal Circuit also relied on precedent establishing that commercial fishing licenses do not constitutehad cognizable property interests.  *Id.* at 1366 n.1.

This case is distinct from *Palmyra* because the plaintiffs' contractual rights have been altered pursuant to and consistent with the challenged government action, and the Court has found that the plaintiffs have a cognizable property interest in their unreduced vested pension benefits.

This review of the Federal Circuit's precedents discloses that the defendant's arguments based on *Omnia* and its progeny do not support summary judgment.[13]

---

[13] The defendant also cites precedents from the Federal Circuit applying *Omnia* in cases involving national security.  (ECF 139 at 13-14); *see Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002); *767 Third Ave. Assocs.*, 48 F.3d 1575; *Chang v. United States*, 859 F.2d 893 (Fed. Cir. 1988).  The Federal Circuit in *Paradissiotis* cited *Omnia* for the proposition that "valid regulatory measures taken to serve *substantial national security interests* may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes."  304 F.3d at 1275 (emphasis added).  In *767 Third Avenue Associates*, the Federal Circuit invoked *Omnia* when, upon the federal government's ordering the closure of the consulate of a foreign government, that foreign government failed to pay its rent to the plaintiff, a private real estate company.  48 F.3d at 1576, 1581.  The Federal Circuit in *Chang* applied *Omnia* to President Reagan's imposition of sanctions on Libya as a part of his declaration of a national emergency.  859 F.2d at 895-96.  The defendant has appropriately not argued that this case presents any national-security issues.  *Paradissiotis*, *767 Third Avenue Associates*, and *Chang* do not alter the conclusion that *Omnia* does not apply when contractual rights are directly amended, not merely frustrated.

c.        Other Supreme Court Precedents[14]

The defendant relies on *Norman v. Baltimore & Ohio Railroad Co.*, 294 U.S. 240 (1935) in arguing that private contracts "'cannot fetter the constitutional authority of the Congress.'" (ECF 139 at 4-5 (quoting *Norman*, 294 U.S. at 307-08).)  In *Norman*, the plaintiffs had private contracts requiring payment in gold.  294 U.S. at 292-93.  After the contracts had been signed, Congress fixed the value of the dollar relative to gold and prohibited the enforcement of gold clauses in existing contracts.  *Id.* at 291-97.  The plaintiffs argued that this prohibition was unlawful under the fifth amendment, tenth amendment, and article I of the Constitution.  *Id.* at 293.  The Supreme Court first found that the plaintiffs' gold clauses were nothing more than "contracts for the payment of money."  *Id.* at 302.  The Supreme Court only briefly analyzed the plaintiffs' claims as they related to the fifth amendment and held that there was no taking because the fifth amendment "referred only to a direct appropriation."  *Id.* at 305.  In analyzing Congress's power to invalidate existing contracts, the Supreme Court provided: "Contracts may create rights of property, but, when contracts deal with subject-matter which lies within the control of the Congress, they have a congenital infirmity.  Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Id.* at 307-08.

The Supreme Court quoted that passage from *Norman* in *Connolly*.  475 U.S. at 224.  The Supreme Court then clarified:

> If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions.  For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. . . .  This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation.

*Id.* (internal citations omitted).  The Supreme Court "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment" and identified salient factors under *Penn Central*.  *Id.*

The Supreme Court's assertion in *Norman* that the takings clause applies only to cases of direct appropriation is no longer true.  *See, e.g.*, *Tahoe-Sierra*, 535 U.S. at 326 ("After *Mahon*, neither a physical appropriation nor a public use has ever been a necessary component of a

---

[14] The defendant relies on the cases discussed in this section as illustrative of Congress's ability to regulate pension plans under ERISA without effecting a taking.  (ECF 139 at 4-5); *see Norman v. Balt. & Ohio R.R. Co.*, 290 U.S. 240 (1935); *Connolly*, 475 U.S. 211.  The defendant connects them to *Omnia* because they cite *Omnia* and find no taking.  The Court finds the link between *Omnia* and these cases somewhat attenuated but nonetheless addresses the issues raised by the defendant to highlight remaining issues and unresolved questions.

'regulatory taking.'").  The brief reasoning in *Norman* addressing the takings clause remains of questionable validity.

The Supreme Court in *Connolly* quoted *Norman* for the proposition that parties cannot contract around the regulatory powers of Congress.  This proposition still stands, and the plaintiffs agree with this argument.  (*See* ECF 143 at 6 ("For instance, Congress can set a speed limit on federal highways; NASCAR cannot sidestep those limits by executing an agreement with its drivers to race one [another] on I-95.").)

The defendant also cites *Norman* for the implication that if Congress is constitutionally empowered to regulate a specific subject, no taking can result.  (ECF 139 at 8.)  The Supreme Court in *Connolly* seems to have rejected that implication by clarifying that although legislation affecting contractual rights "does not always" constitute a taking, it sometimes might.  475 U.S. at 244.  Moreover, a deeper factual inquiry is needed.  *See id.*

The defendant also analogizes this case to *Connolly* because "the Government 'has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.'" (ECF 139 at 8 (quoting *Connolly*, 475 U.S. at 224).)  In *Connolly*, the Supreme Court held that there was no taking when Congress amended ERISA to retroactively impose liability on employers withdrawing from a pension plan.  475 U.S. at 227-28.  The Court agrees with the defendant that this case presents circumstances like those in *Connolly*, and the Supreme Court's judgment in *Connolly* is highly relevant to this case.

The Court rejects, however, the defendant's suggested application of *Connolly* at this stage of the case.  The defendant implies that *Connolly* applies to government action in both physical and regulatory takings, as the Supreme Court stated that the factors from *Penn Central* merely "reinforce[d]" its view that no taking had occurred.  475 U.S. at 225.

The defendant's proposed application of *Connolly* cannot be squared with subsequent precedents.  Since the Supreme Court decided *Connolly*, it has discussed *Connolly* exclusively when analyzing regulatory takings.  *See E. Enters*, 524 U.S. at 522-23; *Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 642-43 (1993); *Bowen v. Gilliard*, 483 U.S. 587, 606 (1987).  Federal Circuit cases also make clear that *Connolly* applies only to regulatory takings.  *See Chang v. United States*, 859 F.2d at 896 n.2 ("[T]he multifactor test outlined in *Connolly* is not invoked when there is a permanent physical occupation of property, which can be viewed as a *per se* taking . . . ."); *Piszel*, 833 F.3d at 1375 (holding that *Connolly* was relevant to analysis under *Penn Central* rather than the identification of a property interest).

The pending motion is limited to the issues the defendant has raised and by the still-evolving facts underlying the litigation.  The scope of the alleged taking remains to be settled.  Until it is, the question remains whether the alleged taking here must be analyzed as a per se taking or a regulatory taking.  The resolution of that question will determine which line of precedents should be applied to the plaintiffs' claims.  At this stage, *Norman* and *Connolly* do

not defeat the plaintiffs' claims, although they may well do so if it is determined that the plaintiffs' claims are subject to a regulatory-takings analysis.

The government action in this case is direct enough to allow the plaintiffs' claims to survive *Omnia* and the Federal Circuit's application of *Omnia*. The government action in this case is more akin to the actions in *Brooks-Scanlon*, *Cienega Gardens*, and *A & D Auto* than it is to *Omnia*, *Huntleigh*, and *Air Pegasus*.

### 2.      Authorization

In addition to showing that their claims are not barred by *Omnia*, the plaintiffs must demonstrate government action giving rise to a taking. *See generally Cedar Point*, 141 S. Ct. at 2071-72 (describing the ways in which government action may give rise to a regulatory or a per se taking). The plaintiffs argue that government authorization to a third party to appropriate a property interest is sufficient to confer potential liability on the government. (ECF 128 at 30-33.)

The Supreme Court recently held that the government was responsible for a taking when it authorized a third party to intrude on the plaintiffs' real property. *Cedar Point*, 141 S. Ct. 2063. A California regulation permitted labor organizations to "take access" to agricultural employers' property to meet with agricultural employees and solicit them to join the union. *Id.* at 2069. The regulation required labor organizers to file written notice with the state and serve a copy of the notice on the employer. *Id.* Labor organizers could access the property for one hour before work, one hour during lunch, and one hour after work. *Id.* An employer interfering with the organizers' right of access could be subject to sanctions. *Id.* Agricultural employers sued, alleging that the regulation created a per se taking by appropriating an easement for union organizers. *Id.* at 2070.

The Supreme Court held that the regulation produced a physical taking. *Id.* at 2072. The Supreme Court emphasized the importance of the right to exclude as an integral part of the ownership of real property and characterized the property interest taken as a servitude or easement. *Id.* at 2073. The Court summarized a long line of precedent as establishing a rule that "government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." *Id.* at 2074. It made no difference to the outcome of the case that California had tailored the regulation so that the labor organizers' right to access the property of an agricultural employer would not constitute a true easement in gross under California law. *Id.* at 2075-76. The Supreme Court quoted *Horne* for the proposition that "property rights 'cannot be so easily manipulated.'" *Id.* at 2076 (quoting *Horne*, 576 U.S. at 365).

The plaintiffs analogize this case to *Cedar Point* because the government authorization has the effect of reducing the value of their property interest: the MPRA authorized the Teamsters Fund to make cuts to the plaintiffs' vested pension benefits despite the plaintiffs' allegation that the Teamsters Fund was and would remain solvent even without the benefit reductions being sought under the MPRA. The Supreme Court in *Cedar Point* confirmed that authorization of a third party's limited appropriation of a plaintiff's property could constitute a

taking.  Under *Cedar Point*, it also would not matter that the government tailored the benefit reductions to comply with existing law, *i.e.*, ERISA.

The Supreme Court in *Cedar Point* relied in part on *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).  In *Loretto*, the Supreme Court held that "a minor but permanent physical occupation of an owner's property *authorized by government* constitutes a 'taking' of property . . . ."  *Id.* at 421 (emphasis added).  A New York law required landlords to permit cable-television companies to install cables on landlords' property.  *Id.* at 423-24.  Although the cable company would be financially liable for any damage caused by the installation, the landlord would normally be entitled only to a one-time payment of $1.  *Id.*  The Supreme Court asserted a "very narrow" holding that "a permanent physical occupation of property is a taking" for which the fifth amendment requires compensation.  *Id.* at 441.

The Federal Circuit has also held that government authorization for a third party to intrude on private property may give rise to a taking.  For example, in *Hendler*, 952 F.2d at 1367, the Environmental Protection Agency and State of California installed ground-water wells on the plaintiffs' property.  The Federal Circuit determined that California's actions were attributable to the federal government.  *Id.* at 1379.  The trial court had required the plaintiffs to demonstrate a common-law agency relationship between California and the federal government.  *Id.* at 1378.  The Federal Circuit rejected that requirement:

> Common law agency is one test for determining the Government's responsibility, but it is not the only basis for establishing the Government's liability for the State's activities.  The activities of EPA and of California were two coordinate and coordinated parts of the same undertaking.  It is a basic principle of eminent domain law that government officials—executive branch officials—derive their power to take private property for a public purpose by a grant of authority from the legislature.  Once legislative authority is obtained, authorized members of the government may determine how and when the authority will be exercised.

*Id.*  Authorization by the federal government of the acts undertaken by California thus conferred liability on the federal government.  *Id.* at 1379.

The defendant offers three rebuttals to the plaintiffs' argument.  First, the defendant argues that the government's authorization in this case did not affect any cognizable property interest.  (ECF 130 at 20.)  The Court has already found that the plaintiffs have identified a cognizable property interest that can form the basis of an alleged taking and, accordingly, rejects the defendant's first rebuttal.

Second, the government highlights that the Teamsters Fund voluntarily and independently chose to suspend benefits.  (ECF 130 at 1-2.)  The Court also rejects the defendant's second rebuttal.  The fact that the third party had a choice in how to act toward the plaintiff does not relieve the government of its liability.  In *Cedar Point*, the labor organizer made the independent and voluntary choice to enter the plaintiffs' property, but the government

was still liable for its authorization of the trespass by the labor organizer.  In *Loretto*, the cable company decided when and where to install a cable on the landlords' property, and yet a taking still occurred.  Accordingly, the fact that the Teamsters Fund chose to apply to reduce benefits under the MPRA does not alter the government's potential liability for authorizing those reductions.

Third, the defendant distinguishes *Cedar Point* and *Loretto* because those cases involved takings of real property.  (ECF 142 at 5.)  The Supreme Court, however, has declined to distinguish takings claims based solely on the type of property at stake.

In *Horne*, the Supreme Court held that a per se taking occurred when the government ordered that raisin growers set aside a percentage of their crop for government use.  576 U.S. at 361.  The Court explained that decisions like *Loretto,* dealing with interests in real property, applied to the alleged taking of raisins:

> Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property.   The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home . . . .  [The takings clause] protects "private property" without any distinction between different types.

*Id.* at 358.

Similarly, in *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 220 (2003), the Supreme Court considered whether the State of Washington's collection and use of funds derived from the interest on lawyers' trust accounts ("IOLTA") constituted a taking.  The Court ultimately held that the plaintiffs were not entitled to any compensation because they had not suffered any pecuniary loss.  *Id.* at 237.  In reaching this conclusion, the Court nonetheless hypothesized that a law requiring the transfer of interest from IOLTA funds to a different owner could be a per se taking.  *Id.* at 240.  Accordingly, under Supreme Court precedents, an authorization by the government of a third party's action can give rise to a taking whether it applies to raisins or to money in the bank, just as it can when it applies to real property.

In sum, government authorization to a third party to seize a plaintiff's property may give rise to a taking.  This rule applies to a variety of cognizable property interests, including real property, raisins, and IOLTA funds.  In this case, the government authorized a reduction of the plaintiffs' benefits by the Teamsters Fund.  This authorization may be sufficient to confer liability on the government.

The Court's holding in this respect does not mean that the plaintiffs have demonstrated government action sufficient to give rise to a physical taking.  The Court may ultimately hold *Cedar Point*, *Loretto*, and *Brown* distinguishable on some other ground.  For example, the property interests ultimately appropriated by the government in those cases are clear: easements, raisins, and money.  What, precisely, is the government appropriating here?  The plaintiffs will need to demonstrate that a per se takings test applies before the Court follows *Cedar Point*,

*Loretto*, and *Horne*.  If the regulatory-takings test applies, the mere fact that the government authorized the Teamsters Fund to reduce its benefits may not constitute a compensable taking. The issue of the appropriate test is reserved and remains to be resolved.

### 3.    Agency and Coercion

As an alternative to the government's authorization of a third party's acts as a basis for a taking, the government may be liable for a taking carried out by a third party "if the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive."  *A & D Auto*, 748 F.3d at 1154.

The defendant moves for summary judgment on the grounds that the plaintiffs cannot demonstrate that the Teamsters Fund acted as an agent of the government when it applied under the MPRA to reduce its benefit payments or that the government coerced the Teamsters Fund to seek relief under the MPRA.  The Court agrees with the defendant.  Under the physical-takings test, the plaintiffs' claims can proceed only on the authorization theory of government liability.

### a.    Agency

The Supreme Court has held that for purposes of a takings analysis, "[t]he action of the agent is 'the act of the government.'"  *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 22 (1940) (quoting *United States v. Lynah*, 188 U.S. 445 (1903), *overruled in part by United States v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 312 U.S. 592, 598 (1941)).  Accordingly, a third party's actions may give rise to a taking by the government "if the third party is acting as the government's agent . . . ." *A & D Auto*, 748 F.3d at 1154.  The plaintiffs can therefore demonstrate government action giving rise to a taking if they can show that the Teamsters Fund was acting as the government's agent in implementing the MPRA cuts.

In *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1363 (Fed. Cir. 2005), the Federal Circuit held that the government could be liable for the actions of a non-appropriated fund instrumentality, such as the Raisin Administrative Committee.  The Supreme Court had already held that non-appropriated fund instrumentalities were agents of the United States.  *Id.* (citing *Standard Oil Co. of Cal. v. Johnson*, 316 U.S. 481, 485 (1942); *United States v. Hopkins*, 427 U.S. 123, 124 (1976); *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 733 (1982)). Although Congress did not fund the Raisin Administrative Committee, members of the Raisin Administrative Committee were appointed and subject to removal or suspension by the Secretary of Agriculture.  *Id.* at 1358-59.  The Secretary had delegated his statutory authority to implement marketing orders to the Raisin Administrative Committee.  *Id.*

The present case is unlike *Lion Raisins*.  The trustees of the Teamsters Fund are not appointed by a government agency; they are selected by signatory employers and the Teamsters union.  (ECF 129-3 at 883.)  There has also been no delegation of rulemaking authority by any federal agency to the Teamsters Fund.  The Teamsters Fund applied independently under the MPRA to Treasury to reduce its benefits, and the government, acting as regulator, consented.

In *A & D Auto*, the Federal Circuit also held that an "agency relationship may exist where the third party is hired or granted legal authority to carry out the government's business." 748 F.3d at 1154. No agency relationship existed in that case when the government had allegedly conditioned financial assistance to car manufacturers on the termination of the plaintiffs' franchise agreements. *Id.*

The plaintiffs do not allege that the government hired the Teamsters Fund, such that *A & D Auto* would apply. The plaintiffs likewise do not suggest that the Teamsters Fund was engaged in or carrying out the government's business. Any alleged encouragement to the Teamsters Fund to apply to Treasury under the MPRA to reduce benefit payments is insufficient to confer an agency relationship between the Teamsters Fund and the government.

*B & G Enterprises, Ltd. v. United States*, 220 F.3d 1318 (Fed. Cir. 2000) is instructive on this issue. A federal law offered financial inducements to the states to prohibit the sale of tobacco to minors. *Id.* at 1321. A regulation implementing that law suggested that one way to limit tobacco sales to minors was to ban all vending-machine sales of tobacco or restrict the placement of tobacco-vending machines. *Id.* California opted to prohibit the sale of tobacco through vending machines unless the machines were in establishments serving alcohol and were placed at least 15 feet from such an establishment's entrance. *Id.* at 1322. The plaintiff, who owned and operated cigarette-vending machines, alleged that the federal government was liable for California's actions. *Id.* at 1322-23. The Federal Circuit ruled that no agency relationship existed because the conditioning of funds does not create an agency relationship and California was not acting under federal authority. *Id.* at 1323-25. "[I]t was California's decision to create restrictions on the placement of tobacco vending machines, not the federal government's. Congress may have provided the bait, but California decided to bite." *Id.* at 1325.

As in *B & G Enterprises*, the facts here do not support the existence of an agency relationship between the federal government and the Teamsters Fund. The government's conditioning reductions to pension benefits on approval under a statutory regime does not create an agency relationship. *Id.* at 1323-25. Congress and Treasury offered the Teamsters Fund and other multi-employer pension plans an opportunity to avoid insolvency by reducing the plaintiffs' benefits, and the Teamsters Fund availed itself of that opportunity. Those facts do not create an agency relationship. To paraphrase the Federal Circuit, Congress may have provided the bait, but the Teamsters Fund decided to bite. *See id.* at 1325. The mere offering of an incentive, however, does not create agency.

In a different context, a breach-of-contract case, the Federal Circuit adopted the Third Restatement of Agency's definition of agency. *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359-60 (Fed. Cir. 2016); *see also B & G Enters.*, 220 F.3d at 1323 (adopting in a takings case the definition of agency under the Second Restatement of Agency). That definition provides that "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006).

44

The Teamsters Fund and the government did not have an agency relationship under the Restatement. There is no fiduciary relationship between the Teamsters Fund and the government; the Teamsters Fund has no "duty of loyalty" to the government. *See id.* § 1.01 cmt. e. The Teamsters Fund did not step into the shoes of the government or act on the government's behalf. Although the government regulated the Teamsters Fund, as it does all multiemployer pension funds, the Teamsters Fund was an independent entity acting on its own behalf and, while subject to government regulation, was not subject to government control.

The plaintiffs, perhaps acknowledging that they cannot demonstrate a common-law agency relationship, propose three alternative tests for agency. First, the plaintiffs cite *Hendler*, 952 F.2d at 1378, for the proposition that there is an agency relationship when the government and a third party are "coordinate and coordinated parts of the same undertaking." As discussed above (at 41), the Court understands *Hendler* to be about authorization, not agency. The Federal Circuit's analysis focuses on the relationship between the government and the third party only after determining that agency is not the only basis to establish the government's liability for a taking. *Id. Hendler* does not support the plaintiffs' effort to create a broader test to establish an agency relationship between the government and the Teamsters Fund.

Second, the plaintiffs rely on *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004) to argue that an agency relationship arises when the government puts into play a series of events foreseeably leading to a taking. (ECF 128 at 36.) The Federal Circuit held in *Toews* that "'when the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions.'" *Id.* at 1381-82 (quoting *Presault v. United States*, 100 F.3d 1525, 1551 (Fed. Cir. 1996)). The Federal Circuit analogized the facts to those in *Hendler* because both cases involved "federal authorization of state action." *Id.* The Federal Circuit had already found in *Toews* that a taking had occurred, and the question the court was considering was whether the state or the federal government would be liable for the taking. *Id.* at 1379. The plaintiffs' reliance on *Toews* is misplaced. *Toews* does not discuss agency at all; it therefore does not suggest that an agency relationship arises whenever the government "puts into play a series of events." As in *Hendler*, the Federal Circuit held the federal government liable for its *authorization* of action taken by a state. *Toews* therefore does not support the plaintiffs' creation of a broader agency test.

Third, the plaintiffs argue that the government "required or directed" the cuts. (ECF 128 at 37-38.) The plaintiffs rely on exhibits disclosing that the trustees of the Teamsters Fund believed their only option to keep the plan solvent and adhere to their fiduciary duties was to apply for the MPRA reductions. The plaintiffs also highlight that the government provided the trustees with technical assistance in structuring the Teamsters Fund's MPRA application and in implementing the MPRA-authorized reductions in benefits.

The defendant argues that the plaintiffs' "theory is simply that, in enacting the MPRA, the Government created an opportunity that was too good to pass up." (ECF 130 at 18.) This opportunity, the defendant insists, does not create agency between the government and the Teamsters Fund to support an imposition of liability for a taking on the government:

> [T]he fact that Congress created for struggling plans a better option
> than insolvency does not mean that it required or directed *this Fund*
> to implement benefit suspensions.  The Fund obviously was free to
> proceed to insolvency—the Government could not and did not
> require the Fund to avail itself of MPRA.

(*Id.* (emphasis in original).)

The Court agrees with the defendant.  Nothing in the record before the Court or any inference to be drawn from the facts in the record suggests that the government required or directed the Teamsters Fund to apply under the MPRA for a reduction in its beneficiaries' benefits.  The government merely offered the Teamsters Fund an opportunity to avoid insolvency, and the Teamsters Fund took it.  *See* 29 U.S.C. § 1085(e)(9)(A) ("[T]he plan sponsor of a plan in critical and declining status *may*, by plan amendment, suspend benefits *which the sponsor deems appropriate*." (Emphasis added)).

None of the plaintiffs' alternative theories supports the creation of an agency test broader than the common-law test, and the plaintiffs' evidence does not meet that traditional standard.  The plaintiffs are unable to show an agency relationship between the Teamsters Fund and the government.

### b.    Coercion

The government may be liable for the actions of a third party if "the government's influence over the third party was coercive rather than merely persuasive."  *A & D Auto*, 748 F.3d at 1154.  "The line between coercion (which may create takings liability) and persuasion (which does not create takings liability) is highly fact-specific and hardly simple to determine."  *Id.*

Coercion exists when the government "either by statute, regulation, or direct order require[s]" the abrogation of contractual rights.  *Id.*  In *A & D Auto*, the Federal Circuit remanded the case to the Court of Federal Claims to determine whether the government had insisted on the termination of the franchise agreements or whether those agreements would have been terminated absent government involvement.  *Id.* at 1155.  On remand, Judge Firestone determined that there was no coercion because the third parties would have faced bankruptcy regardless of government intervention, so the third party could not have been pressured or compelled to accept the government's terms.  *Colonial Chevrolet Co., Inc. v. United States*, 145 Fed. Cl. 243, 247 (2019), *aff'd sub nom.*, *Taylor & Sons, Inc. v. United States*, 841 F. App'x 205 (Fed. Cir. 2020).

The plaintiffs assert that the Teamsters Fund was coerced to apply under the MPRA to reduce the benefits of its participants because the enactment of the "MPRA imposed a fiduciary duty on the Fund's trustees to try to narrow Plaintiffs' contractual right to a vested pension." (ECF 140 at 38.)  The plaintiffs cite depositions of trustees of the Teamsters Fund reflecting testimony that the trustees believed that their fiduciary duties required them to apply to reduce the plaintiffs' benefits under the MPRA.  (*Id.*)

Nothing in the record currently before the Court suggests that the government coerced or pressured the trustees of the Teamsters Fund to apply under the MPRA to reduce the plaintiffs' benefits. The MPRA provided an opportunity for the trustees of the Teamsters Fund to preserve fund assets at the expense of reducing the plaintiffs' benefits, and the trustees merely availed themselves of that opportunity. The fact that the government encouraged the Teamsters Fund to withdraw its first MPRA application speaks for itself. As in *Colonial Chevrolet*, the trustees here were stuck between a rock and a hard place: the Teamsters Fund allegedly faced potential insolvency on one hand, in which case the plaintiffs' benefits would also be reduced, and the definite but more limited reduction of the plaintiffs' benefits under the MPRA on the other hand.[15] *See* 145 Fed. Cl. at 247. The trustees made a choice based on their understanding of the Teamsters Fund's financial health and the law. Even if they subjectively believed that their fiduciary obligations to the Teamsters Fund required them to apply to suspend benefits under the MPRA, that subjective belief would not support any inference that the government coerced the Teamsters Fund to apply for relief under the MPRA. And the record is devoid of evidence of any direct compulsion by the government to force such an application.

The plaintiffs argue that, alternatively, "coercion exists here because MPRA and Treasury confronted the Fund with a Hobson's Choice." (ECF 128 at 39.) The Teamsters Fund faced either insolvency or benefit reductions under the MPRA, and insolvency was not a realistic option.

The plaintiffs cite *Cacciapalle v. United States*, 148 Fed. Cl. 745 (2020), *appeal filed*, No. 20-2037 (July 24, 2020) in support of their argument. In that case, the plaintiffs alleged that the amendment of a funding agreement by the conservator for the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (the "Enterprises") and Treasury gave rise to a taking. *Id.* at 754. The plaintiffs claimed that Treasury had coerced the conservator for the Enterprises into approving the amendments. *Id.* at 767. Chief Judge Sweeney held that there was no coercion for three reasons. *Id.* First, the conservator could reject the amendments without imperiling the Enterprises. *Id.* Second, the fact that the conservator did not bring suit suggests that the conservator "was an independent, willing participant in its negotiations with the Treasury." *Id.* Third, the amendments were "executed by sophisticated parties." *Id.* Chief Judge Sweeney summarized that coercion comes down to whether the third party has a choice:

> A nonfederal actor is not coerced when it can choose to go against
> the wishes of the United States, even if doing so will cause

---

[15] The plaintiffs cast doubt on the Teamsters Fund's representation that it risked insolvency, as the projected insolvency was "a decade away based on actuarial numbers that were really suspicious." (ECF 138 at 117:19-21.) The plaintiffs nonetheless conceded in their amended complaint that the defendant "engaged in this taking through *authorized* acts, including by acting through its lawfully authorized employees, agents, and agencies." (ECF 98 at 33.) In any case, the plaintiffs do not dispute that the Teamsters Fund was at risk of insolvency, even if its insolvency was not assured.

significant hardships, . . . or result in a loss of prospective
benefits . . . . But there is no choice, in any meaningful sense, when
there is only one realistic option.

*Id.* at 766 (internal citations omitted).

*Cacciapalle* undercuts the plaintiffs' argument. As was the case with the conservator for
the Enterprises there, the Teamsters Fund could have chosen not to apply to the MPRA. The
Teamsters Fund was an "independent, willing participant" in the MPRA approval process. *See*
*id.* at 767. Both the Teamsters Fund and Treasury were sophisticated parties who understood the
nature of their actions. The fact that the Teamsters Fund may have been subjected to significant
financial hardship if it had not applied under the MPRA to reduce the plaintiffs' benefits does
not, without more, give rise to coercion. There were multiple "realistic options" available to the
Teamsters Fund and its trustees. *See id.* at 766. The Teamsters Fund could have changed
financial strategies, gambled on the prospect of insolvency, or proposed reducing the benefits to
different levels in different ways in its MPRA application. The evidence supports nothing more
than the inference that the trustees of the Teamsters Fund thought that an application under the
MPRA and the commensurate reduction in benefits to current beneficiaries was the best
approach to fulfill their fiduciary responsibilities. The fact that government agencies reviewed
the Teamsters Fund's first MPRA application, worked with the trustees to reapply, and then
approved the Teamsters Fund's second application fails to show any indicia of coercion.

The plaintiffs have not demonstrated that the Teamsters Fund was coerced into seeking to
reduce the plaintiffs' benefits under the MPRA.

## VII.    SUMMARY AND ISSUES REMAINING FOR LATER RESOLUTION

The Court has reached several conclusions. First, the plaintiffs have identified a specific
cognizable property interest in receiving their unreduced and vested pension benefits. Second,
further analysis of government action in this case largely turns on which takings test applies.
Third, *Omnia* and its progeny in the Federal Circuit do not defeat the plaintiffs' claims under
either takings test. Fourth, government authorization may support a liability finding for a
compensable per se taking by the government if the physical-takings test applies, but the
regulatory-takings test requires a different type of analysis of the government action. *See, e.g.*,
*Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1307-09 (Fed. Cir. 2015) (analyzing the
character of the government action under the third prong of *Penn Central*). Fifth, under the
physical-takings test, the plaintiffs can demonstrate neither an agency relationship between the
government and the Teamsters Fund nor government coercion of the Teamsters Fund.

This opinion, however, does not mark the end of the Court's analysis regarding whether a
taking occurred. The regulatory landscape in which the plaintiffs operate continues to evolve.
Although there is no genuine *dispute* of material fact, the facts relating to government action and
the plaintiffs' potential recovery continue to change given the ARPA's avenue of potential relief.
*See* RCFC 56(a). Because the government continues to act relative to the plaintiffs' pension
benefits through the enactment and enforcement of the ARPA, a final analysis of the
government's actions regarding the plaintiff's pensions must be postponed.

The defendant reserves several of its arguments, including which takings test to apply and the application of that test, for later resolution. (*See* ECF 126 at 5 n.1; ECF 99 at 22-33.) The government's action in this case can only be evaluated after the appropriate takings test is identified and applied.

Binding precedent requires the Court to analyze government action under the correct takings test. *See Tahoe-Sierra*, 535 U.S. at 323 (holding it "inappropriate" to apply physical-takings precedent to regulatory takings and vice versa); *Horne*, 576 U.S. at 360-61 (stressing the distinction between physical and regulatory takings). One major remaining issue in this case is whether the government has "appropriated" the plaintiffs' cognizable property interest. *See Tahoe-Sierra*, 535 U.S. at 324 (clarifying that a per se taking involves direct appropriation of private property by the government). Although the parties, at the Court's request, tied this question to *Omnia* in the latest round of supplemental briefing, the issue now becomes more relevant to the determination of whether to employ the test for physical takings or the test for regulatory takings in resolving the plaintiffs' claims. *See Horne*, 576 U.S. at 360 ("[A] physical *appropriation* of property [gives] rise to a *per se* taking, without regard to other factors." (Emphasis in original)). The parties have reserved these issues.[16]

The defendant asks the Court to hold that there has been insufficient government action to give rise to a taking. The defendant cites cases involving regulatory takings, like *Connolly* (ECF 142 at 5-8), as well as cases involving physical takings, like *Cedar Point* (ECF 130 at 20). The Court cannot confirm that no government action has given rise to a taking in light of *Cedar Point*, *Brown*, and other cases applying exclusively to physical takings. At this stage of the litigation, the Court cannot decide whether it should apply *Connolly* and *Mitchell Arms* or *Cedar*

---

[16] The parties also have yet to address the legal consequence, if any, of the fact that the MPRA is a law designed to prevent multiemployer plans from going bankrupt. *See* 29 U.S.C. §§ 1085(b)(6), 1085(e)(9)(A). Congress is constitutionally empowered to regulate bankruptcy. U.S. Const. art. 1, § 8, cl. 4 ("the bankruptcy clause"). Nonetheless, "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935); *see also United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982) (interpreting a provision of bankruptcy law in a way that would not violate the takings clause). The legal landscape is unclear regarding how bankruptcy laws and government actions taken during bankruptcy proceedings should be evaluated under the takings clause. *Compare* Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship between the Fifth Amendment and the Bankruptcy Clause*, 96 Harv. L. Rev. 973 (1983) (arguing that the bankruptcy clause is the only constitutional limit on congressional power to regulate bankruptcy), *with* Forrester, *Bankruptcy Takings*, 51 Fla. L. Rev. 851 (1999) (contending that invalidating security interests in bankruptcy could give rise to a taking in some circumstances). Although the fact that the MPRA deals with insolvency issues does not alter the Court's finding that the plaintiffs have a cognizable property interest, *see A & D Auto*, 748 F.3d at 1152-53, it may affect the Court's analysis of whether a taking has occurred. The question of whether a taking has occurred has been reserved for later briefing.

*Point* and *Brown*.  The parties' excellent briefing and advocacy skills have resulted in a quagmire of potentially relevant cases to apply to the government's actions.  The Court must not put the cart before the horse, especially when the defendant explicitly reserved several issues for later briefing and resolution due to the ongoing evolution of facts in this case.  Accordingly, the government action in this case passes *Omnia*'s threshold and may confer liability on the government under the authorization doctrine laid out by the Supreme Court, but the parties and the Court will need to evaluate the character of the government action as factual and legal issues crystallize.

## VIII.  CONCLUSION

Under RCFC 56, although there are no material facts in dispute, the defendant has not demonstrated entitlement to judgment as a matter of law on all its the arguments.  The defendant has shown that the Teamsters Fund was not the government's agent and that the government did not coerce the Teamsters Fund.  Accordingly, the defendant's motion for summary judgment is granted as to the plaintiffs' claims based on agency and coercion.  With respect to the defendant's remaining arguments, the motion for summary judgment is denied.

First, the plaintiffs have demonstrated a cognizable property interest in their right to unreduced benefits under their vested pensions according to plan documents.

Second, the Court cannot currently determine whether government action has given rise to a taking.  Because of the ongoing factual developments under the ARPA and their potential legal effect on the plaintiffs' claims, the defendant has reserved much of its argument relating to government action for a subsequent dispositive motion if it did not prevail on this one.

The Court limits its government-action analysis to three holdings.  First, the plaintiffs' claims are not barred by *Omnia* and cases from the Federal Circuit applying *Omnia*, no matter which takings test applies.  Second, under the physical-takings test, Treasury's authorization of the Teamsters Fund's application under the MPRA to reduce its benefits may confer liability on the government.  Third, under the physical-takings test, the plaintiffs cannot demonstrate that the Teamsters Fund operated as an agent of the government or was coerced by the government when it applied under the MPRA to reduce the benefits it paid to plan participants.  Denial of most of the defendant's motion at this stage in no way presages the eventual outcome of the case.

The defendant's motion for summary judgment is granted in part and denied in part.  The Court will enter an order in accordance with this memorandum opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**