# In the United States Court of Federal Claims

No. 18-1115
Filed: April 28, 2023
FOR PUBLICATION*

---

**WILLIAM KING, ANTHONY GUGLIUZZA, STEPHEN DARDZINSKI, et al.,**

                           *Plaintiffs,*

**v.**

**UNITED STATES,**

                           *Defendant.*

---

*Noah A. Messing*, Messing & Spector LLP, New York, NY, for the plaintiffs, with *Phillip M. Spector* and *Jason H. Kim*, of counsel.

*Geoffrey M. Long*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

## MEMORANDUM OPINION

*HERTLING*, Judge

       In this certified class action, the plaintiffs are vested participants and beneficiaries in a pension plan. They allege that the United States, acting through the Department of the Treasury ("Treasury"), in consultation with the Department of Labor ("Labor") and the Pension Benefit Guaranty Corporation ("PBGC"), violated the takings clause of the fifth amendment of the U.S. Constitution in October 2017 by authorizing a 29-percent cut to their pension benefits under the Multiemployer Pension Reform Act of 2014 ("MPRA"). The plaintiff class members who were still alive in December 2022 saw their pension benefits restored under the American Rescue Plan Act of 2021 ("ARPA") and received lump-sum make-up payments without interest in the amount that had been withheld from them. The plaintiffs maintain their suit for interest on the amounts withheld while the benefit cuts were in effect and because the estates of the participants and

---

       * Pursuant to the protective order in this case, the Court initially filed this opinion under seal on April 20, 2023, and directed the parties to review the opinion and propose redactions of confidential or proprietary information. The parties have proposed no redactions. Accordingly, the Court hereby releases in full the memorandum opinion of April 20, 2023.

beneficiaries who died between October 2017 and December 2022 have received reduced or no make-up payments.

The parties cross-move for summary judgment under Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). The cross-motions present two issues: (1) whether the plaintiffs' claims are more appropriately resolved as a classic physical taking or under the more flexible regulatory-takings test provided in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978); and (2) the application of the appropriate takings test. This case has important implications for the constitutional limits on the ability of Congress and regulators to address the problem of multiemployer-pension-plan insolvency.

The physical-takings test is inapplicable to the plaintiffs' claims because the federal government has neither appropriated the plaintiffs' property nor occupied it. Accordingly, the regulatory-takings test provides the applicable measure for the plaintiffs' claims. Under the *Penn Central* factors, the plaintiffs have not demonstrated that a regulatory taking occurred. The defendant therefore has not violated the takings clause of the fifth amendment. The plaintiffs' motion for summary judgment is denied, and the defendant's motion for summary judgment is granted.

## I. BACKGROUND

This summary of the legal and factual background does not constitute findings of fact but is simply a recitation of the parties' representations. The facts underlying the parties' arguments are not in dispute.

When appropriate, this summary reiterates the background detailed in the opinion on the previous round of summary judgment motions, *King v. United States*, 159 Fed. Cl. 450, 456-60 (2022). Neither party has challenged any aspect of the background sections of that opinion.

### A. ERISA

The Employee Retirement Income Security Act ("ERISA") was enacted in 1974. Under ERISA, "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age . . . ." 29 U.S.C. § 1053(a).[1] A "normal retirement benefit" is statutorily defined as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." *Id.* § 1002(22). A plan participant reaches "normal retirement age" under the terms of the plan or at the later of "the time a plan participant attains age 65, or . . . the 5th anniversary of the time a plan participant commenced participation in the plan." *Id.* § 1002(24). ERISA also defines the term "nonforfeitable":

---

[1] Many of the statutes cited in this section were amended in December 2022. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4,459 (2022). The amendments do not apply to the substance of the provisions quoted.

> The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan.

*Id.* § 1002(19).

Under ERISA, pension benefits are generally protected by the "anti-cutback" rule. The "anti-cutback" rule forbids pension plans from reducing plan participants' accrued benefits unless a statutory exception applies. Section 1054(g)(1) of Title 29 of the U.S. Code provides: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title." *See also* 26 U.S.C. § 411(d)(6) (providing functionally identical language).

Section 1082(d)(2) permits a plan administrator to apply to Treasury to reduce accrued benefits as "necessary because of a temporary substantial business hardship . . . or a substantial business hardship (as so determined) in the case of a multiemployer plan," provided certain conditions are met regarding the timing of the reduction of accrued benefits and the unavailability or inadequacy of other options available to the fund. Although § 1082(d)(2) was amended in 2014, a prior version of the section also permitted pension funds to reduce accrued benefits when facing a "substantial business hardship," so long as other criteria were also satisfied. 29 U.S.C. § 1082(d)(2) (enacted Dec. 23, 2008, and effective until Apr. 6, 2014).

Section 1441(d)(1) provides: "In any case in which benefit payments under a plan which is insolvent . . . exceed the resource benefit level, any such payments which are not basic benefits shall be suspended, in accordance with this subsection, to the extent necessary to reduce the sum of such payments and such basic benefits to the greater of the resource benefit level or the level of basic benefits" guaranteed by the PBGC, a government agency that insures pension funds. [2] The PBGC may pay a guaranteed benefit to the participants and beneficiaries of an insolvent pension fund, but the level of benefits would be lower than if the fund were solvent. *Id.* §§ 1322a(c), 1322a(d).

A plan found in violation of the "anti-cutback" rule risks losing its qualified tax status under the Internal Revenue Code's minimum vesting requirements. *See* 26 U.S.C. § 411(a). Participants may also have a cause of action against a pension fund to recover benefits due under the terms of the plan or to enjoin a plan amendment that violates the "anti-cutback" rule. *See* 29 U.S.C. § 1132(a).

---

[2] The phrase "resource benefit level" is defined as "the level of monthly benefits determined . . . to be the highest level which can be paid out of the plan's available resources." 29 U.S.C. §§ 1426(b)(2), 1441(d)(2)(B).

### B.     The Fund

The New York State Teamsters Conference Pension and Retirement Fund ("the Teamsters Fund") was established in 1954, 20 years before ERISA was enacted.  (Pls.' App., ECF 165-1, at 329.)  The Teamsters Fund is a multiemployer pension plan, defined in ERISA as a plan "to which more than one employer is required to contribute," and "which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer."  29 U.S.C. § 1301(a)(3).  Approximately 78 percent of the Teamsters Fund's annual receipts come from a single employer, United Parcel Service ("UPS").  (ECF 165-6 at 1843.)

The Teamsters Fund plan agreement provides that the "general administration of the plan and the responsibility for carrying out the provisions [of the plan] are placed in the Trustees and shall be constituted in accordance with the terms of the Trust Agreement."  (Def.'s App., ECF 169-1 at 61.)  Eight trustees serve the Teamsters Fund; four are selected by the unions holding collective bargaining agreements with contributing employers, and four are selected by employers contributing to the plan.  (*Id.* at 146.)  The plan empowers the trustees to demand employer contributions, invest funds, and pay pension and retirement benefits.  (*Id.* at 142-43, 145-46.)  The corpus of money and property held by the trustees of the Teamsters Fund is the "Fund Estate," to which participants and beneficiaries have limited access.  (*Id.* at 143, 145-46.)  Participants in the Teamsters Fund pension plan may not receive parts of the employer contributions instead of pension benefits, and they can neither assign nor sell their pension benefits.  (*Id.* at 145-46.)

The Teamsters Fund plan documents lay out the definitions and entitlements of active participants in the plan—*i.e.*, participants who are still employed by a contributing employer and continue to earn their pension benefits; vested participants of the plan, who are usually retired and receiving their monthly pension benefits; and beneficiaries of the plan, who are usually the surviving spouses of deceased vested participants when a survivorship benefit applies.

The Teamsters Fund plan provides a schedule for workers to accrue benefits and for those benefits to vest.  (ECF 165-1 at 349-63, 374-79.)  An "active participant" in the plan is usually an active employee "on whose behalf a Contributing Employer is required to make contributions to the Plan."  (ECF 169-1 at 13.)  A participant ceases to become active when the participant incurs a break in service, retires, or becomes disabled.  (*See id.*)  The plan defines "accrued benefit" in the case of an active participant as "that portion of the Participant's prospective monthly benefit . . . that has been earned or accrued to the date of reference, as computed pursuant to the provisions of the Plan."  (*Id.*)

The plan defines "vested" as meaning that a participant "has (a) met the minimum service requirements . . . and has acquired a non-forfeitable right to a pension benefit under the Plan, or (b) attained Normal Retirement Age."  (ECF 165-1 at 339.)  A participant attains "Normal Retirement Age" at the age of 65 with five years of service credits, on the fifth anniversary of a date the participant commenced participation in the plan before a break in service, or in some cases at the age of 64.  (ECF 169-1 at 18.)  The "normal form of benefit payment" is a life

4

annuity, which "provides monthly payments for the life of the Pensioner."[3] (*Id*. at 45.)  The plan also allows participants to elect a survivor annuity if the participant is married upon retirement. (*Id*. at 45-46.)  The plan defines "accrued benefit," in the case of a participant who has reached normal retirement age, as "the monthly pension benefit, payable in the normal form, that would be payable upon the retirement of the Participant as of the date of reference." (*Id*. at 13.)

Since its establishment, the Teamsters Fund has advertised that "[a]ll pensions are payable for life without reduction." (ECF 165-1 at 4.)  The Teamsters Fund has also explained in informational materials sent to participants and beneficiaries that "[a] 'vested' benefit is non-forfeitable and, therefore, cannot later be curtailed or eliminated." (*Id*. at 234.)

Despite that representation, at least as early as 1963, plan documents provided how funds would be allocated if the Teamsters Fund were "terminated." (*Id*. at 17-18.)  Plan participants would be entitled to "shares" according to age and pension credits, but "[i]f the funds of the Plan are insufficient to provide in full for the shares" due to plan participants, "each share . . . as to which the funds are insufficient shall be reduced pro [ ] rata." (*Id*.)  Further, the trustees would have discretion as to the method of distribution of those shares: "The Board of Trustees may require that all shares be withdrawn in cash or in immediate or deferred annuities or other periodical payments as they may determine." (*Id*.)

The Teamsters Fund plan agreement has been amended repeatedly since its inception in 1954. (ECF 169-1 at 10.)  The agreement was "amended and completely restated" on January 1, 1976, to comply with ERISA. (*Id*.)  The agreement was amended again in 1978, 1990, and 1997 due to mergers with other pension funds. (*Id*.)  The agreement was also amended in 2000 due to additional mergers and to "comply with changes required by recent legislation." (*Id*. at 11.)  The agreement was amended again in 2004, 2010, and 2015. (*Id*.)  In sum, the agreement was amended "on several . . . occasions by action of the Trustees to incorporate technical changes requested by the Internal Revenue Service and to comply with changes required by continuing legislation." (*Id*. at 10.)  The trustees intend "that the Plan operate in accordance with the applicable provisions of the [Internal Revenue] Code, ERISA, and regulations issued thereunder." (*Id*. at 12.)

## C.    The Named Plaintiffs

The three class representatives are retired employees of UPS and vested participants in the Teamsters Fund.

As of the time the plaintiffs filed their pending motion for summary judgment, William King is 74 years old and worked to earn his pension for 30 years, 27 of those years at UPS. (ECF 165-3 at 930.)  The pension was a primary reason Mr. King worked at UPS. (*Id*. at 1055.)

---

[3] Other forms of payment described in the plan agreement include a five-year certain annuity, ten-year certain annuity, and social security leveling option.  Other forms of payment are not at issue in this case. (ECF 169-1 at 45-47.)

Mr. King believed that once his pension benefit vested, it could not be reduced.  (*Id.* at 1056.)
Mr. King declined an alternative job offer based, in significant part, on his expectation of
receiving a pension upon retirement.  (*Id.*)  Mr. King also refrained from searching for other job
positions.  (*Id.*)

Stephen Dardzinski is currently 73 years old and accrued his pension by working at UPS
from 1989 until 2011.  (*Id.* at 871.)  Mr. Dardzinski accepted a job at UPS because of a small
raise relative to his prior position and the pension benefits; those benefits made the trade-off of
needing to work a night shift at UPS (working from 6:00 p.m. to approximately 2:30 a.m.)
worthwhile.  (*Id.* at 1026.)  Like Mr. King, Mr. Dardzinski also did not expect his pension
benefits to be reduced.  (*Id.* at 1027.)

Anthony Gugliuzza is currently 79 years old and began earning his pension at UPS in
1971, before ERISA was enacted.  (*Id.* at 921.)  He worked for UPS for 30 years and retired in
2001.  (*Id.*)  Like the other class representatives, Mr. Gugliuzza had the subjective expectation
that he would receive his vested pension benefit at an unreduced level for the rest of his life.  (*Id.*
at 1046.)

### D.    The MPRA

The PBGC's multiemployer program "insures the benefits of more than 10 million
workers and retirees in 1,400 plans.  When multiemployer plans fail, PBGC provides financial
assistance so the plans can pay benefits at no more than PBGC's statutory multiemployer benefit
guarantee level."  *PBGC Reports Record Deficit of $62 Billion in 2014*, 20 Pension & Benefits
Week Newsletter 47, 2014 WL 6491783 (Nov. 24, 2014).  In 2014, the PBGC's insurance
program faced a record-breaking deficit of $62 billion "due largely to the declining financial
condition of multiemployer plans."  *Id.*  The PBGC projected that, absent legislative
intervention, it faced a more than 50-percent chance of becoming insolvent by 2022 and a 90-
percent chance of becoming insolvent by 2025.  *Id.*  If the PBGC were to become insolvent, it
would only be able to pay a fraction of the statutorily guaranteed level of basic benefits to
participants of insolvent multiemployer pension plans, a level that is already a fraction of what
vested pension plan participants receive when a plan is financially sound.  *Id.*

In December 2014, Congress passed the MPRA.  According to the PBGC, the aim of the
MPRA was to "provide[ ] new options for troubled multiemployer plans to avoid insolvency."
*Pension Benefit Guaranty Corporation: PBGC Paid Nearly $6 Billion in Pension Benefits to
Retirees in FY 2015*, PBGC Press Release No. 15-12, 2015 WL 7249945 (Nov. 17, 2015); *see
also* 160 Cong. Rec. H9264 (daily ed. Dec. 11, 2014) (statement of Rep. King) (the MPRA was
enacted to give trustees of "troubled" pension plans "additional tools to maintain the solvency of
the plans").

The MPRA provided a new, additional statutory exception to ERISA's "anti-cutback"
rule.  The MPRA permitted solvent pension funds that were in "critical and declining" status to,
"by plan amendment, suspend benefits" of plan participants to avoid insolvency.  29 U.S.C.

§ 1085(e)(9)(A).[4]  The MPRA defined a "suspension of benefits" as "the temporary or permanent reduction of any current or future payment obligation of the plan to any participant or beneficiary under the plan, whether or not in pay status at the time of the suspension of benefits." *Id.* § 1085(e)(9)(B)(i).  Before a pension fund could suspend benefits under the MPRA, the MPRA required the completion of five steps.

First, a pension fund had to apply to the Secretary of the Treasury for approval of its plan to reduce pension benefits.  *Id.* § 1085(e)(9)(G)(i).  A fund's application had to specify the size of the proposed cuts and demonstrate that the cuts are projected to prevent insolvency.  *Id.* § 1085(e)(9)(C)(i).  The MPRA imposed conditions on a pension fund's proposed reduction of benefits.

The plan sponsor (*i.e.*, the trustees) had to demonstrate that "all reasonable measures to avoid insolvency have been taken (and continue to be taken during the period of the benefit suspension)." *Id.* § 1085(e)(9)(C)(ii).  The plan sponsor could take into account factors such as "[c]urrent and past contribution levels," "[c]ompetitive and other economic factors facing contributing employers," the "impact of benefit and contribution levels on retaining active participants and bargaining groups under the plan," the "impact of past and anticipated contribution increases under the plan on employer attrition and retention levels," and "[m]easures undertaken by the plan sponsor to retain or attract contributing employers."  *Id.*

Furthermore, the suspensions "shall be equitably distributed across the participant and beneficiary population, taking into account factors, with respect to participants and beneficiaries and their benefits," including:

(I) Age and life expectancy.

(II) Length of time in pay status.

(III) Amount of benefit.

(IV) Type of benefit: survivor, normal retirement, early retirement.

(V) Extent to which participant or beneficiary is receiving a subsidized benefit.

(VI) Extent to which participant or beneficiary has received post-retirement benefit increases.

(VII) History of benefit increases and reductions.

(VIII) Years to retirement for active employees.

(IX) Any discrepancies between active and retiree benefits.

---

[4] The Internal Revenue Code contained an identical provision at 26 U.S.C. § 432(e)(9)(A). For consistency, the Court cites the provisions in 29 U.S.C. § 1085(e)(9), but the same language could be found in 26 U.S.C. § 432(e)(9).

>> (X) Extent to which active participants are reasonably likely to withdraw support for the plan, accelerating employer withdrawals from the plan and increasing the risk of additional benefit reductions for participants in and out of pay status.
>>
>> (XI) Extent to which benefits are attributed to service with an employer that failed to pay its full withdrawal liability.

*Id*. § 1085(e)(9)(D)(vi).

The suspension of benefits under the MPRA was prohibited for anyone who was over the age of 80 or disabled at the date of suspension. *Id*. §§ 1085(e)(9)(D)(ii), 1085(e)(9)(D)(iii). Participants or beneficiaries between the ages of 75 and 80 faced lesser reductions than participants or beneficiaries under the age of 75. *Id*. § 1085(e)(9)(D)(ii). The proposed suspensions could not reduce benefits below 110 percent of the benefit level guaranteed by the PBGC. *Id*. § 1085(e)(9)(D)(i). The proposed suspensions had to be "reasonably estimated to achieve, but not materially exceed, the level that is necessary to avoid insolvency." *Id*. § 1085(e)(9)(D)(iv).

Second, Treasury would consult with the PBGC and Labor to review the application. *Id*. § 1085(e)(9)(G)(i). No later than 30 days after receiving the application, Treasury, PBGC, and Labor are required to publish notice in the Federal Register "soliciting comments from contributing employers, employee organizations, and participants and beneficiaries of the plan for which an application was made and other interested parties." *Id*. § 1085(e)(9)(G)(ii). Treasury had to approve or reject the application within 225 days of submission of the application; otherwise, the application would be deemed approved. *Id*. § 1085(e)(9)(G)(iii). Treasury was required to approve the application unless the application was "clearly erroneous." *Id*. § 1085(e)(9)(G)(v).

Third, if the application is approved, Treasury, the PBGC, and Labor had to administer an election in which plan participants vote on the proposed reductions. *Id*. § 1085(e)(9)(H)(i). For the proposal to be rejected, an actual majority of all plan participants had to vote to reject the cuts. *Id*. § 1085(e)(9)(H)(ii). Plan participants who did not cast a vote were counted as voting to approve the proposed reductions. *Id*. Even if the majority of all plan participants voted to reject the cuts, Treasury could override the vote if it determined that the proposed reductions were "systematically important," *i.e.*, the PBGC would be exposed to more than $1 billion in insurance obligations if the pension plan were to become insolvent. *Id*. § 1085(e)(9)(H)(v).

Fourth, Treasury, the PBGC, and Labor had to issue a final authorization for the suspension within seven days of the vote. *Id*. § 1085(e)(9)(H)(vi). For the fifth and final step, the pension fund would amend its plan documents to implement the suspension of benefits. *Id*. § 1085(e)(9)(A).

A pension plan that applied under the MPRA and received approval from Treasury to reduce its benefits would be immunized from liability for any reduction in benefits resulting from the approved MPRA application. *Id*. § 1085(e)(9)(B)(iii). "A participant or beneficiary

8

affected by a benefit suspension . . . shall not have a cause of action" under the MPRA.  *Id.* § 1085(e)(9)(I)(iii).

### E.    Approval of the Teamsters Fund's MPRA Application

The Teamsters Fund submitted its first MPRA application to reduce the amount it paid to plan participants on August 31, 2016.  (ECF 165-6 at 1848.)  Treasury identified concerns regarding some of the application's actuarial assumptions.  (ECF 165-2 at 496.)  Treasury encouraged the Teamsters Fund to withdraw its application and resubmit it, offering to expedite its consideration of the resubmission.  (*Id.* at 526, 551.)  The Teamsters Fund subsequently withdrew its application.  (*Id.* at 562.)

The Teamsters Fund submitted a revised application on May 15, 2017.  (*Id.* at 638.)  The Teamsters Fund projected that it was likely to become insolvent during 2026, but the suspension of benefits under the MPRA would postpone the projected insolvency until 2049.  (ECF 169-1 at 266.)  In its revised application, the Teamsters Fund proposed an 18-percent cut to the accrued benefits of plan participants still actively employed and a 29-percent cut to the benefits of retirees.[5]  (ECF 165-2 at 640.)  Treasury approved the application on August 3, 2017.  (*Id.* at 698-99.)

Treasury proceeded to hold an election among Teamsters Fund plan participants. Participants and beneficiaries were given approximately three weeks to vote by mail, phone, or internet.  (ECF 165-2 at 710.)  Materials sent to voters provided in bold that if eligible voters did not vote or their vote was not received prior to the close of voting, they would be treated as though they had voted to approve the benefit reduction.  (ECF 165-7 at 2030.)  The voting materials explained that the Teamsters Fund "would run out of money beginning in 2027 if the benefit reduction does not happen."  (*Id.*)  The voting materials also explained that even if a majority of the participants and beneficiaries voted to reject the proposed benefit reductions, benefits might still be reduced.  (*Id.*)  This point was made because, regardless of the outcome of the vote, the PBGC had advised Treasury that the Teamsters Fund would likely qualify as "systematically important"—*i.e.*, big enough to permit Treasury to override any adverse MPRA vote.  (ECF 165-6 at 1853.)

Of the Teamsters Fund's 34,636 eligible participants who received a ballot, only 40 percent voted.[6]  (ECF 165-2 at 724-25.)  Of those who voted, 71 percent rejected the proposed reductions, and 29 percent approved them.  (*Id.*)  Treasury treated the outcome of the election as

---

[5] The cuts to active employees took effect through the recalculation of their adjusted monthly benefits that would be due to those employees upon retirement.  (*See* ECF 169-1 at 134.)

[6] Treasury sent ballots to 35,173 eligible voters, but 388 ballots were not mailed because the Teamsters Fund could not provide an address for the voters, and 149 ballots were returned to the vote administrator as undeliverable.  (ECF 165-2 at 724.)  Those ballots were not counted as approving the proposed benefit reductions.

approval of the proposed reductions because, pursuant to the MPRA, the 60 percent of plan participants who did not vote were counted as voting to approve the proposed reductions.  (*Id.*)

Following the vote, Treasury issued a final authorization for the Teamsters Fund to reduce its benefit payments by the amounts that had been requested by the application, approved by Treasury, and ratified by the vote of plan participants.  (*Id.* at 728-29.)  With technical assistance and recommended edits from Treasury, the Teamsters Fund then amended its plan documents to implement the reductions.  (*Id.* at 754-59.)

An amended provision of the plan agreement explains: "Notwithstanding any other provision of this Plan to the contrary, effective October 1, 2017, all Affected Participants . . . shall have their pension benefit reduced in accordance with the provisions of Article 18."  (ECF 169-1 at 133.)  Article 18, titled the "Pension Preservation Plan," reduces the monthly pension benefits of active participants by 18 percent and the monthly pension benefits of non-active (*i.e.*, retired) participants by 29 percent.  (*Id.* at 133-34.)

## F.    Reduction of the Plaintiffs' Benefits

The reduction in pension benefits became effective on October 1, 2017.  (*Id.*)  Between October 2017 and December 2022, the monthly pension benefits paid to the three named plaintiffs reflected a 29-percent reduction in their pre-MPRA benefits.

The plaintiffs suffered personal hardships during that period related to the suspension of their benefits, including relying on dwindling savings, forgoing necessary medical care, scrimping on food, and falling behind on mortgage payments and other bills.  Approximately 1,100 of the class members died before their benefits were restored.

## G.    The ARPA

In March 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. 117-2, 135 Stat. 4.  The ARPA requires the PBGC to "provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance." 29 U.S.C. § 1432(a)(1).[7]  The financial assistance is appropriated from funds for Treasury instead of the PBGC's existing multiemployer fund. *Id.* § 1305(i).  Multiemployer plans that suspended benefits under the MPRA are eligible for the special financial assistance. *Id.* § 1432(b)(1)(B).

Under the ARPA, Treasury and the PBGC "shall ensure that an eligible multiemployer plan that receives special financial assistance . . . reinstates any benefits that were suspended under section 1085(e)(9) of this title . . . ." *Id.* § 1432(k)(1).  A fund receiving special financial assistance shall "provide[ ] payments equal to the amount of benefits previously suspended under section 1085(e)(9) . . . of this title to any participants or beneficiaries in pay status as of the effective date of the special financial assistance, payable, as determined by the eligible

---

[7] The Internal Revenue Code contains a functionally similar provision at 26 U.S.C. § 432(k).

multiemployer plan." *Id.* § 1432(k)(2). The payment can be made in a lump sum within three months of receipt of special financial assistance or in monthly installments over a period of five years. *Id.* These reimbursement payments do not include any interest for the suspended benefits. *Id.*

The amount of special financial assistance a fund receives must be sufficient for the fund to pay participants' and beneficiaries' unreduced benefits until 2051:

> The amount of financial assistance provided to a multiemployer plan eligible for financial assistance under this section shall be such amount required for the plan to pay all benefits due during the period beginning on the date of payment of the special financial assistance payment under this section and ending on the last day of the plan year ending in 2051, with no reduction in a participant's or beneficiary's accrued benefit as of March 11, 2021, except to the extent of a reduction in accordance with section 1085(e)(8) of this title adopted prior to the plan's application for special financial assistance under this section, and taking into account the reinstatement of benefits required under subsection (k).

*Id.* § 1432(j)(1).

Under the ARPA, make-up payments are required to be made only to "participants or beneficiaries in pay status" when the special financial assistance becomes effective. *Id.* § 1432(k). Accordingly, the PBGC has issued a regulation providing whether and how make-up payments would be paid to the beneficiaries or estates of participants who died before special financial assistance was received:

> Because a participant who died before the [special financial assistance ("SFA")] is paid is not in pay status as of the effective date of the SFA, no make-up payments are made for reductions that applied to that participant and, accordingly, make-up payments are limited to the total amount of benefits that would have been paid to the beneficiary in the absence of the suspension but that were not paid to the beneficiary because of the suspension. However, if a participant dies after the SFA is paid to the plan but before all of the make-up payments are paid to the participant, the unpaid portion of the make-up payments must be made to the participant's beneficiary.

Special Financial Assistance by PBGC, 87 Fed. Reg. 40,968 (July 8, 2022) (to be codified at 29 C.F.R. pt. 4262).

### H.      Restoration of the Plaintiffs' Benefits

The Teamsters Fund submitted its first application for special financial assistance on January 28, 2022.  (ECF 165-7 at 1991.)  The Teamsters Fund withdrew its application on May 26, 2022, to revise the application and re-filed it on July 21, 2022.  (*Id.* at 1992, 1994.)

The PBGC approved the revised application on November 18, 2022.  (*Id.* at 1985.)  The Teamsters Fund received more than $963 million in special financial assistance from Treasury on December 8, 2022.  (*Id.* at 1985-86.)

The Teamsters Fund restored monthly benefit payments to pre-MPRA suspension levels beginning on January 1, 2023.  (*Id.* at 2005-12.)  Participants and beneficiaries received any make-up payment to which they were entitled under the ARPA by March 1, 2023.  (*Id.*)

No participant or beneficiary received interest as part of the make-up payment.  (*Id.* at 2014.)  Beneficiaries of participants who died before December 8, 2022, received reduced make-up payments, and estates of participants who died before December 8, 2022, without beneficiaries received no make-up payments.  (*Id.* at 2014-15.)  The plaintiffs estimate that more than 1,100 estates will have a claim for principal because they received reduced or no make-up payments.  (ECF 164 at 11-12.)

## II.      PROCEDURAL HISTORY

Much of the relevant procedural history is recounted in the previous opinion on the defendant's motion for summary judgment, *King*, 159 Fed. Cl. 450.

### A.      First Round of Summary Judgment

Mr. King, Mr. Gugliuzza, and Mr. Dardzinski filed suit on behalf of themselves and all others similarly situated on July 31, 2018, which was approximately ten months after the plaintiffs' benefits were suspended under the MPRA and three years before the ARPA was enacted.  (ECF 1.)  The defendant moved to dismiss the plaintiffs' claims under RCFC 12(b)(1) and 12(b)(6).  (ECF 7.)  After holding oral argument on the defendant's motion, that motion to dismiss was converted into a motion for summary judgment to be briefed after discovery regarding the defendant's alleged liability.  (ECF 21.)

The case was transferred to the undersigned on December 17, 2019.  (ECF 36; ECF 37.)  The parties proceeded with discovery.

The defendant filed a motion for summary judgment on January 22, 2021.  (ECF 99.)  The plaintiffs responded to the defendant's motion and cross-moved for summary judgment on March 6, 2021.  (ECF 105.)

On March 11, 2021, Congress enacted the ARPA.  The following day, the defendant moved to vacate the schedule for summary-judgment briefing and to stay the proceedings.  (ECF 109.)  The plaintiffs opposed the motion.  (ECF 110.)  Following oral argument on the

defendant's motion, on March 26, 2021, the proceedings were stayed until July 30, 2021. (ECF 114.)

Following the expiration of that stay, the plaintiffs argued that the ARPA did not fully moot their claims even if the Teamsters Fund received special financial assistance because no participant or beneficiary would receive interest, and participants and beneficiaries who died would receive supposedly incomplete or no make-up payments. (*See* ECF 120.)

The Court requested that the defendant choose any discrete legal issues that were ripe for consideration on a motion for summary judgment even before the Teamsters Fund applied for relief under the ARPA. (*See* ECF 125 at 7:8-15.) The parties' previous cross-motions for summary judgment were denied as moot. (ECF 123.)

### B.    Second Round of Summary Judgment

On September 27, 2021, the defendant moved for summary judgment on two specific grounds: (1) that the plaintiffs do not have a constitutionally cognizable property interest in their entitlement to unreduced pension benefits; and (2) that no government action gave rise to a taking. (ECF 126.) The plaintiffs cross-moved for summary judgment on the grounds: (1) that the plaintiffs had a cognizable property interest in their contractual entitlement to receive a specific amount of pension benefits for life; and (2) that the government's authorization of the Teamsters Fund under the MPRA, the government's coercion of the Teamsters Fund to apply under the MPRA, or the government's agency relationship with the Teamsters Fund gave rise to a taking. (ECF 128.)

The cross-motions were fully briefed, and the Court held oral argument on the motions. After oral argument, the Court ordered supplemental briefing on the applicability of the doctrine of *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), to the plaintiffs' claims. (ECF 132.) The parties filed supplemental briefs accordingly. (ECF 139; ECF 140; ECF 142; ECF 143.) A decision was initially issued under seal and published without redactions on April 8, 2022.

In that ruling, the plaintiffs were found to have identified a cognizable property interest in receiving their unreduced and vested pension benefits at a level contractually promised by the Teamsters Fund plan agreement. *King*, 159 Fed. Cl. at 462-77.

In analyzing whether sufficient government action gave rise to a taking, however, the Court was "constrained by the present stage of litigation . . . because no decision has yet been made as to whether the per se physical-takings test or the more flexible regulatory-takings test should apply to this case." *Id.* at 477. "Given the enactment of the ARPA and its potential impact on the plaintiffs' pensions, the defendant has reserved that issue for a later stage in the litigation." *Id.* In analyzing whether sufficient government action had given rise to a taking, the parties had relied on different types of caselaw—the defendant relied on regulatory-takings cases, while the plaintiffs relied on physical-takings cases. The Court therefore addressed only the issue of "whether the plaintiffs have successfully demonstrated that the government acted in a manner that *could* potentially give rise to a taking, depending on the applicable test, or whether

the defendant has successfully demonstrated that the government did not act in a way that could ever constitute a taking, no matter which test is applied to the plaintiffs' claims." *Id.*

The Court held that *Omnia*, 261 U.S. 502, did not defeat the plaintiffs' claims. 159 Fed. Cl. at 485. The Court also held that under the physical-takings test, "government authorization to a third party to seize a plaintiff's property may give rise to a taking." *Id.* at 487. That holding "does not mean that the plaintiffs have demonstrated government action sufficient to give rise to a physical taking." *Id.* "The issue of the appropriate test is reserved and remains to be resolved." *Id.*

The Court held, however, that the plaintiffs could demonstrate neither an agency relationship between the Teamsters Fund and the government nor coercion by the government of the Teamsters Fund. *Id.* at 487-491.

Because of the ongoing evolution of the regulatory landscape under the ARPA, the Court reserved for later evaluation the character of the government's action and whether precedent required that the plaintiffs' claims be analyzed under the physical-takings test or regulatory-takings test. *Id.* at 492-93.

###    C.    Class Certification

After denying the defendant's motion for summary judgment, discovery was reopened for the purpose of addressing class certification. (ECF 150.) The plaintiffs filed a motion for class certification on June 24, 2022. (ECF 154.) The defendant did not oppose the plaintiffs' motion but identified a class-related legal issue regarding whether the plan participants who did not vote or voted to approve the MPRA suspensions could maintain a claim for a taking. (ECF 156.)

After holding a status conference on the plaintiffs' motion to certify a class, the plaintiffs' motion to certify a class was granted. *King v. United States*, No. 18-1115, 2022 WL 3716442, at *6 (Fed. Cl. Aug. 29, 2022). The following class was certified pursuant to RCFC 23:

> Any person (whether a participant, beneficiary, or other individual) who received one or more pension payments from the New York State Teamsters Conference Pension and Retirement Fund (the "Fund") on or after October 1, 2017 unless either (1) that person was an "Active Participant" as of October 1, 2017 or (2) all pension payments that were received by that person since October 1, 2017 were reduced by 0% relative to the sum the recipient would have been entitled to receive if the Defendant had not authorized the Fund, in or around September 2017, to reduce certain pension benefits under the Kline-Miller Multiemployer Pension Reform Act of 2014.

*Id.* The Teamsters Fund's data indicate that there are 10,893 potential class members. (ECF 164 at 11 n.7.) Mr. King, Mr. Gugliuzza, and Mr. Dardzinski were designated as representatives of the class. *King*, 2022 WL 3716442, at *6. Messing & Spector LLP and Schneider Wallace

Cottrell Konecky LLP were appointed as class counsel.  The parties were instructed to propose definitions for subclasses according to whether and how participants voted in the election administered by Treasury.  *Id.*

The plaintiffs responded with definitions for four proposed subclasses.  (ECF 159 at 3-4.)  The plaintiffs noted potential logistical issues related to opting into the subclasses: there are no records of how each individual voted, and many class members may not remember how they voted or may have died in the intervening time period.  (*Id.*)  The plaintiffs suggested deferring a decision on their motion to certify subclasses until after a decision on summary judgment was reached.  (*Id.* at 13-15.)

After holding a status conference on the plaintiffs' proposed subclasses and their suggestion to address summary judgment before any decision on the scope of the four subclasses was made, the Court stayed briefing and consideration of certifying subclasses.  (ECF 161.)  The potential class members have yet to opt into the case.  A schedule for summary judgment briefing was adopted.  (*Id.*)

### D.     Third Round of Summary Judgment

The plaintiffs filed a motion for summary judgment on December 23, 2022.  (ECF 164.)  The plaintiffs also filed an amended complaint on January 6, 2023; no responsive pleading from the defendant was required.  (ECF 166.)

The plaintiffs' pending complaint includes allegations that Treasury has now given special financial assistance to the Teamsters Fund to issue make-up payments, but participants and beneficiaries who died before December 8, 2022, received no such payments or received smaller make-up payments.  (*Id.* at ¶ 13.)  The plaintiffs also allege that no participant or beneficiary has received interest on the make-up payments.  (*Id.*)

In their motion for summary judgment, the plaintiffs note that they intended to add an additional named plaintiff and class representative: the estate of Robert Campbell.  (ECF 164 at 14.)  Because Mr. Campbell died 63 days before the Teamsters Fund received special financial assistance, his estate received no make-up payment.  (*Id.* at 14-15.)  Although Mr. Campbell's estate has not been formally added as a plaintiff, the plaintiffs' pending complaint raises the problems posed for the estates of deceased plan participants that are part of the certified class.  (ECF 166 at ¶¶ 13, 90, 95, 121.)  The Court therefore considers the claims of the deceased participants and beneficiaries on these pending cross-motions.

The defendant filed a cross-motion for summary judgment and a response to the plaintiffs' motion on February 3, 2023.  (ECF 169.)  The plaintiffs filed a response brief to the defendant's cross-motion for summary judgment and a reply brief in support of their motion for summary judgment on March 6, 2023.  (ECF 171.)  The defendant filed a reply brief in support of its cross-motion for summary judgment on March 20, 2023.  (ECF 175.)

On March 23, 2023, the Court held oral argument on the cross-motions for summary judgment in Syracuse, New York.[8]

## III.    JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(a)(1), gives the Court of Federal Claims jurisdiction over claims for damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Court of Federal Claims has jurisdiction over claims brought under the takings clause of the fifth amendment.  *Id.*; *see also Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.")

The plaintiffs argue that the United States, acting through Treasury, Labor, and the PBGC, has taken the plaintiffs' property without providing just compensation in violation of the fifth amendment.  Their complaint falls within the subject-matter jurisdiction of the Court of Federal Claims under the Tucker Act.

## IV.    STANDARD OF REVIEW

Under RCFC 56(a), a party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* A dispute over material fact must also be "genuine" to preclude summary judgment—*i.e.*, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "If the evidence [in favor of the non-moving party] is merely colorable, . . . or is not

---

[8] During the briefing on the pending cross-motions, the parties disagreed on the potential applicability of the equitable one-way intervention doctrine, which would affect putative class members' ability to opt into the class if summary judgment were granted to the plaintiffs. (*See* ECF 172.)  During oral argument, the parties were directed to confer regarding this issue and file a joint status report prior to resolution of the pending cross-motions for summary judgment. (ECF 176.)  The parties have filed a joint status report indicating that the defendant has waived any intention to rely on the one-way intervention doctrine to try to prevent any class member from filing a claim.  (ECF 177 at 4.)  Accordingly, this issue does not affect the timing of the resolution of the cross-motions for summary judgment.

significantly probative, . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

In this case, the underlying facts regarding the suspension of the plaintiffs' pension benefits are not in dispute. Although the parties dispute the legal characterization of those facts, a trial would not affect the outcome of the suit under governing law and would not make either party's argument more or less probative. *See id.* Both parties agree that no material facts remain in dispute, and no disputed facts are apparent. Accordingly, summary judgment is appropriate in this case.

## V.    DISCUSSION

"Binding precedent requires the Court to analyze government action under the correct takings test." *King*, 159 Fed. Cl. at 492. "One major remaining issue in this case is whether the government has 'appropriated' the plaintiffs' cognizable property interest," and that issue is "relevant to the determination of whether to employ the test for physical takings or the test for regulatory takings in resolving the plaintiffs' claims." *Id.* (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002)).

The Court must now resolve "which takings test applies and the application of that test." *King*, 159 Fed. Cl. at 462. The plaintiffs argue that the defendant authorized the taking of money from the plaintiffs, and when such a taking occurs courts should apply the physical-takings test, or what the plaintiffs term a "*per se* test," to determine if compensation for the taking is due. In the alternative, the plaintiffs argue that even if the appropriate test is *Penn Central*'s regulatory-takings test, their property has been taken, and they are due compensation for that taking. The defendant argues that the physical-takings test does not apply, and the plaintiffs cannot demonstrate that a regulatory taking occurred.

### A.    Applicability of the Physical-Takings Test

The Supreme Court has held that the "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra*, 535 U.S. at 323 (internal footnote omitted).

A physical taking occurs "[w]hen the government physically takes possession of an interest in property for some public purpose." *Id.* at 322. The takings clause categorically requires just compensation when "the government occupies the property for its own purposes," or when "the government appropriates" property. *Id.*

By contrast, even if property remains in the owner's possession and has not been appropriated or used by the public, a regulation that goes "too far" may give rise to a regulatory taking. *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). When "the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property

suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522-23 (1992).

The parties dispute which aspects of this case affect the analysis to support the appropriate takings framework. Specifically, the plaintiffs argue that the physical-takings test can be applied to intangible and personal property interests, that the government's eminent-domain power may be exercised by a third party, and that a physical taking is no less a physical taking because it is characterized as a regulation.

The plaintiffs are correct that the physical-takings test may be applied to a variety of property interests. The Supreme Court has applied the physical-takings test to interest earned from interest-on-lawyers' trust accounts ("IOLTA"), raisins, liens, patents, and sums on an interpleader account, to name a few property interests cognizable under the takings clause. *Brown v. Legal Found. Wash.*, 538 U.S. 216, 233-35 (2003) (interest on IOLTA accounts); *Horne v. Dep't Agric.*, 576 U.S. 350, 360-61 (2015) (raisins); *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (liens); *James v. Campbell*, 104 U.S. 356, 358 (1881) (patents); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 158-64 (1980) (sums in an interpleader account).

The plaintiffs' argument that a non-governmental actor may effect a taking if authorized to do so by the government is also accepted. A taking may be predicated on the actions of non-governmental third parties. *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2251 (2021) ("Since the founding, the United States has used its eminent domain authority to build a variety of infrastructure projects. It has done so on its own and through private delegatees, and it has relied on legal proceedings and upfront takings.") *See also King*, 159 Fed. Cl. at 487 (holding that "government authorization to a third party to seize a plaintiff's property may give rise to a taking," but that the plaintiffs had not yet "demonstrated government action sufficient to give rise to a physical taking").

Additionally, a physical taking may "come[ ] garbed as a regulation (or statute, or ordinance, or miscellaneous decree)," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and can occur even when the government later rescinds or amends the offending law or regulation, *Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991).

Acceptance of those arguments, however, does not end the analysis. It remains to be decided whether the federal government appropriated or occupied the plaintiffs' cognizable property interest. Whether the government appropriated or occupied the plaintiffs' property, not the type of property interest at stake, guides this analysis. The type and extent of government action is the most salient factor in determining whether the physical-takings test applies.

The plaintiffs point out that after the defendant authorized the suspension under the MPRA, they lost 29 percent of their monthly income. The plaintiffs deploy this reality to argue that the defendant in effect occupied that portion of their pensions, that what each plaintiff lost was money, and that out-of-pocket loss was due to the defendant's act of approving the Teamster Fund's MPRA application.

18

The plaintiffs' attempt to apply the physical-takings test to their claims is too simplistic. Under the plaintiffs' argument, any financial loss approved by a government agency in some way would require application of the test for physical takings, thereby obviating the need for the regulatory-takings test. Even without that shortcoming, the plaintiffs' proposed application of the physical-takings test must fail. The plaintiffs lost a contractual right to a specific level of pension benefits. The result of their loss was, indeed, a loss of money, but what was affected was the contractual right itself, and not the money.

The Supreme Court has twice applied the regulatory-takings test rather than the physical-takings test to laws abrogating contractual rights in multiemployer-pension-plan agreements. *Connolly v. PBGC*, 475 U.S. 211 (1986); *Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602 (1993). *Connolly* and *Concrete Pipe* are the most relevant precedents to resolving the question of whether the physical-takings test should apply to the plaintiffs' takings claim. In the face of these precedents, the abrogation of contractual rights in multiemployer pension plans must be analyzed under the test for regulatory takings, even when that abrogation results in a financial loss. Other precedents applying the physical-takings test to the appropriation or occupation of a property interest are also relevant to determining whether to apply the physical-takings or regulatory-takings test to the plaintiffs' claims, but these precedents are distinguishable and inadequate to overcome the Supreme Court's use of the regulatory-takings test in *Connolly* and *Concrete Pipe*.

### 1.    *Connolly* **and** *Concrete Pipe*

In *Connolly*, the Supreme Court assessed whether provisions of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") violated the takings clause of the fifth amendment. 475 U.S. at 213.

The Supreme Court recounted the history of ERISA, noting that the purpose of a system of pension-benefit insurance was "'to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.'" *Id.* at 214 (quoting *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)). To achieve that goal, Congress created the PBGC to administer an insurance program for pension plans.

A PBGC report found that ERISA had failed to protect pension plans adequately from employer withdrawal. *Id.* at 215-16. Withdrawal of some employers reduced a plan's contribution base, which raised the contribution rate for other employers, which in turn encouraged further withdrawals. *Id.* at 216. The "'vicious downward spiral'" caused or accelerated the termination of pension plans. *Id.* (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind) (hereafter "1978 Hearings")). To solve this problem, Congress enacted the MPPAA, which "'requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan,'" calculated based on the "'employer's proportionate share of the plan's unfunded vested benefits.'" *Connolly*, 475 U.S. at 216 (quoting *R.A. Gray*, 467 U.S. at 725). In simple

terms, Congress required employers to pay money into their pension plan if they wanted to withdraw from that multiemployer plan.

The plaintiffs, trustees of a pension plan, argued that "the imposition of noncontractual withdrawal liability violates the Taking Clause by requiring employers to transfer their assets for the private use of pension trusts and, in any event, by requiring an uncompensated transfer." *Connolly*, 475 U.S. at 221.

The Supreme Court agreed with the plaintiffs "that an employer subject to withdrawal liability is permanently deprived of those assets necessary to satisfy its statutory obligation, not to the Government, but to a pension trust," and that the MPPAA imposed a substantial and "real debt." *Id.* at 222.

The Supreme Court nonetheless declined to treat the case as a physical taking:

> But appellants' submission—that such a statutory liability to a private party always constitutes an uncompensated taking prohibited by the Fifth Amendment—if accepted, would prove too much. In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist. Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.

*Id.* at 222-23.

Additionally, the fact that the MPPAA effectively abrogated employers' contractual rights under pension plan agreements did not justify the invocation of the physical-takings test:

> Appellants' claim of an illegal taking gains nothing from the fact that the employer in the present litigation was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed. . . . [T]he fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. *Bowles v. Willingham*, 321 U.S. 503, 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508–510, 43 S.Ct. 437, 438, 67 L.Ed. 772 (1923). This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation. But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.

*Id.* at 223-24.

The rejection of the application of the physical-takings test to the MPPAA did not end the takings inquiry.  Rather, the Supreme Court held that analysis of the MPPAA required the application of an "ad hoc, factual inquir[y]" into the circumstances of the case, as required by the three *Penn Central* factors applicable to determine whether a regulatory taking has occurred.  *Id.* at 224-25.

*Connolly* precludes the plaintiffs' claim that the physical-takings test is appropriate in this case.  The MPPAA and the MPRA are akin to two sides of the same coin: Congress deemed both laws necessary to reduce the likelihood that multiemployer pension plans would fail, to improve plan participants' chances of receiving a greater portion of their pension benefits, and to diminish the PBGC's liability for failed pension plans.  Both laws require the amendment of pension-plan agreements to a party's financial detriment.  The MPPAA attempted to solve this problem by imposing liability on withdrawing employers, and the MPRA attempted to solve the problem by allowing the reduction of pension benefits for participants in "critical and declining" pension plans when the statutory criteria are met.  The purposes of the two laws are analogous.

Moreover, the government action in *Connolly* is analogous to the government action in this case.  Under both the MPPAA and the MPRA, the government permitted the unilateral modification of multiemployer-pension-plan agreements to the detriment of a party.  The government, however, neither seized nor confiscated anything for its own use.  The government acted as a regulator, determining which parties should bear the financial cost of failing multiemployer pension plans.

Like the plaintiffs in *Connolly*, the plaintiffs in this case have suffered economic losses. The MPRA-authorized suspensions have posed real financial burdens to the plaintiffs, and those hardships should not be minimized.  Nonetheless, the Supreme Court rejected the application of the physical-takings test to a legislative effort that imposed costs on a party to a pension-plan agreement to ensure the continuing, long-term viability of multiemployer pension plans.

The fact that the plaintiffs have faced a burden greater than other participants in the plan, such as active employees or participants older than 80, to maintain the plan's solvency does not transform this case into one requiring application of the physical-takings test.  The Supreme Court declined to apply that test in *Connolly*, holding that the takings clause is not "violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* at 223.

Like the plaintiffs in *Connolly*, the plaintiffs in this case have suffered the partial nullification of their contract rights by the government-authorized amendment of the plan documents.  Although contractual rights are cognizable as property interests under the takings clause, *see King*, 159 Fed. Cl. at 463, the modification of those contract rights and the accompanying financial loss do not automatically justify the application of the physical-takings test.  *Connolly*, 475 U.S. at 224-25.

Rather, as *Connolly* makes clear, in the context of congressional amendments to ERISA to shore up multiemployer pension plans, when the government takes nothing for its own use, the regulatory-takings framework applies. In this case, Treasury, Labor, and PBGC took nothing for their own use. Rather, Congress modified the scope of the "anti-cutback" rule and altered the regulatory relationship between the government and multiemployer pension plans.

The plaintiffs' arguments that a physical-takings test should apply are further undercut by *Concrete Pipe*, 508 U.S. 602. In that case, employers challenged the MPPAA as violating the due process clause and the takings clause of the fifth amendment as applied. *Id.* at 636.

The Supreme Court held that nothing had changed since the decision in *Connolly*, and that the effects of the MPPAA on the plaintiffs needed to be evaluated under *Penn Central*. *Id.* at 643. The Supreme Court rejected the plaintiffs' attempt to "shoehorn" their claims under the physical-takings test. *Id.* It did not matter that the property was reallocated for the purpose of protecting the PBGC:

> That the solvency of a pension trust fund may ultimately redound to the benefit of the PBGC, which was set up in part to guarantee benefits in the event of plan failure, is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts like the Plan.

*Id.* at 644. The Supreme Court relied on *Connolly* for the proposition that the nullification of a contractual right in the context of ERISA did not constitute a physical taking when the government took nothing for its own use. *Id.*

As in *Concrete Pipe*, the MPRA's putative benefits to the PBGC in this case are "merely incidental" to the major benefit to all plan participants and beneficiaries of the Teamsters Fund's ongoing solvency. *Id.* The Supreme Court has indicated that in the highly regulated environment of ERISA, Congress's adjustments to the regulatory framework cannot effect a physical taking when the government seizes nothing for its own use.

The plaintiffs attempt to distinguish *Connolly* and *Concrete Pipe* on three grounds. First, the plaintiffs highlight that the Supreme Court has since held that a physical taking may involve intangible property. (ECF 171 at 4 (discussing, among other cases, *Brown v. Legal Found. Wash.*, 538 U.S. 216 (2003)).) Second, the plaintiffs argue that the fact that legislation that destroys contractual rights "does not always" result in a taking does not mean that such legislation *can never* result in a taking. (ECF 171 at 9.) Third, the plaintiffs distinguish the MPPAA from the MPRA because the MPPAA merely created new rules of liability, while the MPRA supposedly appropriated plaintiffs' property interests. (*Id.* at 12.)

First, as discussed above, whether the allegedly taken property is tangible or intangible does not affect the application of *Connolly* and *Concrete Pipe* to the present case—what matters is whether the government appropriated or occupied that property. Second, the Supreme Court's holding that legislation destroying contractual rights does not always result in a taking is consistent with the application of a regulatory-takings test. A more flexible, *ad hoc* factual

inquiry is necessary.  Third, the plaintiffs' proposed distinction between the MPPAA and the MPRA does not hold up.  The MPPAA altered employers' liability to pension plans, just as the MPRA altered pension plans' liability to plan participants.  Both pieces of legislation involved regulatory changes to the rules of liability for multiemployer pension plans.

In sum, *Connolly* and *Concrete Pipe* are the precedents most like this case and govern its outcome.  The Supreme Court twice rejected the physical-takings test when Congress adjusts the regulatory framework for multiemployer pension plans, but the government seizes nothing for its own use.  Accordingly, the physical-takings framework is inapplicable to the plaintiffs' claims.

The plaintiffs rely on precedents involving government appropriation or occupation of property in support of their effort to apply the physical-takings test.  Even beyond the saliency of *Connolly* and *Concrete Pipe* to this case, the precedents on which the plaintiffs rely are distinguishable and cannot bear the weight the plaintiffs put on them.

### 2.    Cases Involving Government Appropriation of Property

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  The plaintiffs argue that the physical-takings test should apply because the plaintiffs' contractual right to unreduced pension benefits was appropriated.  The plaintiffs rely, for example, on *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), and *Horne v. Department of Agriculture*, 576 U.S. 351 (2015).

### a.    *Cedar Point*

In *Cedar Point*, a California regulation required agricultural employers to permit union organizers to enter the employers' property for up to three hours per day, 120 days per year. 141 S. Ct. at 2069.  A district court denied the plaintiffs' request for a preliminary injunction and granted the defendant's motion to dismiss, holding that the regulation did not effect a physical taking, and the employers had not argued that the regulatory-takings test under *Penn Central* applied.  *Id*. at 2070.  The Ninth Circuit affirmed on the ground that because the regulation did not permanently deprive the plaintiffs of all economically beneficial use of their property, application of the physical-takings test was inappropriate.  *Id*.

The Supreme Court reversed the decisions of the lower courts, holding that the "access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking."  *Id*. at 2072.  "Rather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude."  *Id*. at 2072.  The Supreme Court emphasized the importance of the right to exclude under common-law principles of property rights.  *Id*. at 2072-73 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) for the proposition that "[t]he right to exclude is 'one of the most treasured' rights of property ownership").

Justices Breyer, Sotomayor, and Kagan dissented from the majority opinion in *Cedar Point*.  They asserted that the majority viewpoint risked rendering "[m]yriad regulatory schemes"

unconstitutional because such regulatory schemes also depended "upon intermittent, temporary government entry onto private property." *Cedar Point*, 141 S. Ct. at 2089. For example, electricity installations, sewage collection, internet accessibility, and health inspections all require intermittent physical intrusion onto private property according to regulations. *Id.*

In response to the minority's concerns, the majority of the Supreme Court held that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id.* at 2079. "[T]he government does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property owner's] title.'" *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028-29 (1992)).

Additionally, "the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Cedar Point*, 141 S. Ct. at 2079. "Under this framework, government health and safety inspection regimes will generally not constitute takings." *Id.*

The California access regulation fell under neither of those exceptions because "no traditional background principle of property law requires the growers to admit union organizers onto their premises," and "unlike standard health and safety inspections, the access regulation is not germane to any benefit provided to agricultural employers or any risk posed to the public." *Id.* at 2080.

By contrast, the suspension of the plaintiffs' benefits under the MPRA was consistent with "longstanding background principles" regarding the plaintiffs' entitlement to receive their unreduced pension benefits. *See id.* at 2079-80. Since before the enactment of the MPRA, the plaintiffs' pension benefits were subject to reduction under ERISA if the Teamsters Fund faced a "substantial business hardship" or became insolvent. *See* 29 U.S.C. §§ 1082(d), 1441. The MPRA was a modest extension of those exceptions to the "anti-cutback" rule.

Furthermore, the suspension of the plaintiffs' benefits constituted an assertion of pre-existing limitations on the plaintiffs' property rights. Even before ERISA was enacted, plan documents provided that if the Teamsters Fund were terminated, assets would be distributed in the form of shares that would be reduced *pro rata* if the funding was insufficient. (ECF 165-1 at 17-18.) The trustees also retained and frequently exercised the right to amend the plan documents to comply with evolving ERISA, Internal Revenue Code, and regulatory requirements. (ECF 169-1 at 10-12.) Although this case presented the first curtailment of the plaintiffs' benefits in this manner, the possibility that the plaintiffs' pension benefits could be revised, including being curtailed, inhered in the property interest. That the plaintiffs did not expect any reduction to their benefits is not relevant to the issue of whether such a reduction was inherent in the plan; under the plan documents prior to ERISA and after the enactment of ERISA, a reduction in benefits was always a possibility were the Teamsters Fund to become insolvent.

In addition, the reduction of the plaintiffs' benefits under the MPRA is more akin to a health and safety regulation than the California access regulation rejected in *Cedar Point*.

Although the plaintiffs experienced personal hardships as a result of the reduction of their benefits, those hardships were a necessary condition to the continued solvency of the Teamsters Fund. If the suspension had not been approved under the MPRA and the Teamsters Fund had become insolvent, the plaintiffs eventually would have received an even smaller fraction of their monthly benefit payment, and the PBGC would have been subjected to further liability, putting the stability of more pensions at risk. Like a health-inspection regulation, the MPRA required the plaintiffs to face hardships, but the potential benefits of the long-term solvency of the Teamsters Fund and of the enhanced stability of the PBGC, which accrue both to the Teamsters Fund participants and beneficiaries and to the public from the MPRA suspensions, counterbalance to a degree the harm to the plaintiffs. Because of the competing interests at stake and the difficulty of balancing the benefits of the MPRA suspensions against the plaintiffs' hardships, the regulatory-takings test is a more appropriate framework for assessing the plaintiffs' claims.

In sum, *Cedar Point* does not support the plaintiffs' argument that the government's authorization of the suspension of pension benefits constituted a physical taking. The reduction of the plaintiffs' benefits did not amount to a government appropriation of the plaintiffs' property. Rather, implicit in the plaintiffs' right to their benefits was the assumption under both ERISA and the plan documents that the plaintiffs' pension benefits could be curtailed.

### b.    *Horne*

Under the facts giving rise to *Horne*, the U.S. Department of Agriculture promulgated a California Raisin Marketing Order, which required raisin growers to set aside a percentage of their raisin crops "for the account of the Government, free of charge." 576 U.S. at 354. "The Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market." *Id.*

The Supreme Court held that the reserve requirement constituted a "clear physical taking" because "[a]ctual raisins are transferred from the growers to the Government," and "[t]itle to the raisins passes to the Raisin Committee." *Id.* at 361. Although raisin growers had a "speculative hope" that proceeds may be left over and returned to them, the Supreme Court emphasized that the government took possession and control over the raisins and essentially held full title and ownership over the raisins. *Id.* at 362.

The actions of Treasury, the PBGC, and Labor in this case differ from those of the Raisin Committee in *Horne*. The government in this case never took "title" to the plaintiffs' pension benefits. The government had neither "possession" nor "control" over the plaintiffs' pension benefits. Although Treasury authorized the suspension of benefits under the MPRA, the Teamsters Fund trustees retained control over the administration and distribution of the plaintiffs' pension fund benefits; the *trustees*, not the government, sought by their own accord to amend the Teamsters Fund plan documents and ultimately implemented the reduction of benefits. The trustees had controlled the administration and distribution of pension benefits since well before the enactment of the MPRA.

This case would be like *Horne* only if the government authorized the reduction of the plaintiffs' benefits under the MPRA and then seized the reallocated funds directly from the plaintiffs or the Teamsters Fund estate. In this case, title or ownership of the plaintiffs' pension benefits never passed into the hands of government. Rather, the Teamsters Fund adjusted the plaintiffs' benefits as permitted by the MPRA with the goal of ensuring long-term solvency.

3. **Cases Involving Government Occupation of Property**

As an alternative to the appropriation theory, the plaintiffs argue that their pension benefits were unconstitutionally occupied. The plaintiffs analogize their claims to *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003); *Armstrong v. United States*, 364 U.S. 40 (1960); and to *Casitas Municipal Water District v. United States*, 543 F.3d 1276 (Fed. Cir. 2008). The decision in *Yee v. City of Escondido, California*, 503 U.S. 519 (1992) is more relevant.

a. ***Brown***

In *Brown*, the Supreme Court evaluated whether the state of Washington effected a taking in its regulation of the IOLTA program. 538 U.S. at 220. The IOLTA program had four components:

> (a) the requirement that *all* client funds be deposited in interest-bearing trust accounts, (b) the requirement that funds that cannot earn net interest for the client be deposited in an IOLTA account, (c) the requirement that the lawyers direct the banks to pay the net interest on the IOLTA accounts to the Legal Foundation of Washington (Foundation), and (d) the requirement that the Foundation must use all funds received from IOLTA accounts for tax-exempt law-related charitable and educational purposes.

*Id.* at 224 (italics in original).

The IOLTA program was challenged as an illegal taking. The plaintiffs challenged on different grounds both "the requirement that their funds must be placed in an IOLTA account," and "the later transfers to the Foundation of whatever interest is thereafter earned." *Id.* at 234.

The Supreme Court held that the requirement that funds be placed in an IOLTA account was "merely a transfer of principal and therefore does not effect a confiscation of any interest." *Id.* That claim was thus required to be analyzed as a potential "regulatory taking" under *Penn Central. Id.*

The Supreme Court held, however, that a *per se* approach was appropriate to determine whether a taking had occurred regarding the interest earned on IOLTA accounts. *Id.* at 235. In a previous, related case, the Supreme Court had held that the interest earned in IOLTA accounts was private property cognizable under the takings clause of the fifth amendment. *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1998) ("[T]he interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal.") Accordingly, "the

transfer of the interest to the Foundation [in *Brown*] seems more akin to the occupation of a small amount of rooftop space in *Loretto*." *Brown*, 538 U.S. at 235.

The transfer of the principal in *Brown* involved the transfer of funds owed to the plaintiffs to a trust-bearing account, *i.e.*, from the plaintiff to a third party. Nonetheless, ownership of the principal never changed hands; nothing was "confiscated." *See id.* at 234-35. By contrast, the interest on the accounts was transferred to a third party that had no previous legal right to any part of that fund, *i.e.*, the Legal Foundation of Washington.

The suspension of the plaintiffs' benefits under the MPRA is more similar to the transfer of the principal than to the transfer of the interest in *Brown*. Although the plaintiffs' pension benefits were prospectively reduced, the reduction did not constitute a "confiscation." *See id*. Rather, the Teamsters Fund trustees exercised a right predating the MPRA to reduce plaintiffs' pension benefits as allowed by the plan documents and under the ERISA framework. The funds that were not paid out to the plaintiffs were not transferred to a new, intervening third party; rather, they remained part of the trust estate, to which plan participants and beneficiaries have always had only limited access, for the benefit of the other participants and beneficiaries of the Teamsters Fund.

The suspension of the plaintiffs' benefits would be akin to the transfer of interest in *Brown* if, for example, Treasury had not only authorized the suspension of benefits but also used that money to subsidize other, third-party insolvent funds or the PBGC itself. Treasury's authorization to the Teamsters Fund to reduce the plaintiffs' benefits, however, did not benefit any third party. Instead, the Teamsters Fund avoided insolvency through the government's permission to retain more assets in the trust estate, to which the plaintiffs had limited rights, anyways.

Accordingly, the plaintiffs' focus on *Brown* is misplaced. The reduction of the plaintiffs' pension benefits did not constitute "occupation" or "confiscation" of their property interest.

### b.    *Armstrong*

Under the facts giving rise to *Armstrong*, the plaintiffs owned "materialmen's liens under state law for materials furnished to a prime contractor building boats for the United States." 364 U.S. at 41. That prime contractor defaulted, and the federal government exercised its option under the contract to seize the hulls and manufacturing materials owned by the prime contractor. The plaintiffs were not parties to the contract between the federal government and the prime contractor. The federal government failed to pay the plaintiffs for the materials, and their liens were extinguished. *See id.*

The plaintiffs argued that the federal government had destroyed their liens in violation of the takings clause. *See id.* at 42. The Court of Claims held that because the ships were constructed for eventual use by the government, the federal government had "inchoate title" to the liens and that there was therefore no taking. *Id.*

The Supreme Court reversed, holding that the liens constituted a cognizable property interest under the fifth amendment. *Id.* at 46.

The Supreme Court proceeded to analyze whether the destruction of the liens constituted a taking. *Armstrong* was issued in 1960, after *Pennsylvania Coal* but before *Penn Central. See Pa. Coal*, 260 U.S. 393 (1922); *Penn Central*, 438 U.S. 104 (1978). The Supreme Court nonetheless articulated "the difficulty of trying to draw the line between what destructions of property by lawful governmental actions are compensable 'takings,'" and destructions of property that are "a mere 'consequential incidence' of a valid regulatory measure." *Armstrong*, 364 U.S. at 48.

The Supreme Court held that the destruction of the liens constituted a physical taking:

> The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking' and is not a mere 'consequential incidence' of a valid regulatory measure. Before the liens were destroyed, the lienholders admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done.

*Id.* It did not matter to the government's argument that the contract between the federal government and the prime contractor permitted the seizure in the event of the prime contractor's default.

*Armstrong* does not support the application of the physical-takings test to the plaintiffs' claims in this case for two reasons. First, the plaintiffs' right to unreduced pension benefits was not totally destroyed; the property interest in this case did not "vanish[ ] into thin air." *Id.* During the pendency of the MPRA-authorized suspensions, the plaintiffs still received most of their benefits; the benefits were reduced by only 29 percent. Most of the plaintiffs have had their benefits restored and received lump-sum make-up payments. Unlike the plaintiffs in *Armstrong*, the plaintiffs in this case were not permanently deprived of all economic value of their property interests.

Second, in *Armstrong*, the government effectively took the shipbuilding materials "for its own advantage" without paying for them. *Id.* At the time of the prime contractor's default and the government's seizure, the government had paid the prime contractor $141,000, but the prime contractor had expended $198,000 in building the ships. *Id.* at 45. Although the facts in *Armstrong* were not fully developed, the Supreme Court suggested that the government had received a windfall through the prime contractor's default. *Id.* at 45 ("We have no way of knowing what the property would have brought had it been sold, but it cannot be said with certainty that it would have brought no more than the amount of the Government's claim.") In this case, the suspension of the plaintiffs' benefits brought no windfall to the government.

Instead, the benefits paid to the plaintiffs were reduced for the advantage of the ongoing solvency of the Teamsters Fund and, indirectly, the financial stability of the PBGC. The government in this case has not taken anything for its own use.

The facts that the plaintiffs' pension benefits were not completely destroyed, and that the federal government did not acquire unpaid-for property purely for its own benefit distinguish this case from *Armstrong*. Accordingly, the plaintiffs' analogy of their claims to those in *Armstrong* do not require the application of the physical-takings rubric.

### c.   *Casitas*

At oral argument, the plaintiffs analogized the stream of pension benefits due to them to a stream of water the government has diverted and appropriated for some other purpose.

In *Casitas*, the Federal Circuit held that the "government requirement that [the plaintiff] build [a] fish ladder and divert water to it should be analyzed under the physical takings rubric." 543 F.3d at 1296. That holding was predicated on a line of Supreme Court cases in which "the United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property." *Id.* at 1290. In some cases, the diverted water was dedicated to use by a third party. *Id.*

The Federal Circuit distinguished the government's diversion of water in *Casitas* from the government ordering a gold mine to cease operations in *United States v. Central Eureka Mining Co.*, 357 U.S. 155 (1958):

> In *Central Eureka Mining*, the Court expressly distinguished the physical takings cases on the grounds that "[t]he Government had no need for the gold or the gold mines." . . . The government simply halted mining; it did not commandeer the gold for a public use. At the end of the regulatory restriction, the gold mine still had all of its gold and machinery. In this case, in contrast, the government did commandeer the water for a public use—preservation of an endangered species.

*Casitas*, 543 F.3d at 1294 (internal citation omitted) (quoting *Central Eureka Mining*, 357 U.S. at 166).

In this case, the government did not "commandeer" the plaintiffs' pension benefits; Treasury, Labor, and the PBGC "had no need" for the money in the pension benefits themselves. *See Casitas*, 543 F.3d at 1294. Rather, like the government's order to stop mining in *Central Eureka Mining*, Treasury merely allowed the Teamsters Fund to stop paying a portion of the plaintiffs' pension benefits. Those pension benefits were not then diverted to another unrelated public cause. Furthermore, similar to the end-result in *Central Eureka Mining*, the plaintiffs' benefits have now been restored, and make-up payments have been made. Accordingly, this case is distinct from *Casitas*, and the physical-takings rubric is inappropriate here.

####     d.      *Yee*

In *Yee*, the plaintiffs, owners of a mobile-home park, challenged a local rent-control ordinance as a physical occupation of their property. 503 U.S. at 523. A pre-existing law already limited the bases upon which a mobile-home park owner could terminate a mobile-home owner's tenancy. *Id.* at 524. The challenged local ordinance permanently set rents for mobile homes at 1986 levels and prohibited rent increases without approval of the city council. *Id.*

The plaintiffs argued that "the rent control ordinance has transferred a discrete interest in land—the right to occupy the land indefinitely at a submarket rent—from the park owner to the mobile home owner [*sic*]," amounting to a "physical occupation of the park owner's land." *Id.* at 527.

The Supreme Court held that there was no occupation of property, and the physical-takings framework was inappropriate. Because the plaintiffs had willingly chosen to rent their land to mobile-home owners and continued to choose to do so, they had voluntarily agreed to the state and local regulatory scheme. *Id.* at 527-28.

The plaintiffs argued that the ordinance unconstitutionally "transfer[red] wealth from park owners to incumbent mobile home owners [*sic*]." *Id.* at 529. The Supreme Court rejected the invocation of the physical-takings test in that context, noting that "[o]ther forms of land use regulation . . . can also be said to transfer wealth from the one who is regulated to another." *Id.* "[T]he existence of the [wealth] transfer in itself does not convert regulation into physical invasion." *Id.* at 529-30.

The plaintiffs also argued that the ordinance had unlawfully eliminated their right to choose tenants and thus their right to exclude. *Id.* at 530-31. Again, the Supreme Court held that although that element of the ordinance may be relevant under the *Penn Central* framework, "[b]ecause they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." *Id.* at 531.

The facts of this case are analogous to those giving rise to *Yee*. The plaintiffs cannot demonstrate physical occupation of their pension benefits. When the plaintiffs began contributing to their pensions, the promise of unreduced benefits, even after vesting, was not absolute. Pension benefits could be reduced if the Teamsters Fund were terminated or if the Teamsters Fund faced insolvency. Treasury therefore did not "occupy" the plaintiffs' benefits; Treasury merely extended the regulatory and legislative framework to prevent the plaintiffs from receiving an even smaller portion of their benefits if the Teamsters Fund became actually insolvent.

Additionally, the supposed transfer of wealth from the plaintiffs to the Teamsters Fund or from the plaintiffs to active employees does not necessitate application of the physical-takings test. Rather, the regulatory-takings framework under *Penn Central* is more appropriate. *See id.* at 527-28.

Furthermore, by contributing to their pensions, the plaintiffs voluntarily agreed to the regulatory scheme governing the Teamsters Fund. This regulatory scheme permitted the trustees of the Teamsters Fund lawfully either to amend the plan documents or reduce the benefits they were paying when permitted under ERISA. Under both the plan documents and ERISA, benefits were liable to being reduced. The possibility, even if remote, that the plan documents would be amended and that benefits would be reduced was always inherent in the plaintiffs' contract terms with the Teamsters Fund under the trust agreement, pre-dating ERISA.

In sum, *Yee* suggests that the regulatory-takings test provides the appropriate framework for evaluating whether the reduction of the plaintiffs' pension benefits constituted a taking.

### 4.    Conclusion: The Physical-Takings Test Is Not Applicable

The crucial element in determining whether the physical-takings test applies is the government action: the government must have appropriated, occupied, seized, or confiscated the plaintiffs' property interest for the physical-takings test to apply. The type of property interest at stake and whether the property interest ultimately ends up in the hands of a third party are irrelevant to that determination. The plaintiffs bear the burden to demonstrate government action sufficient to give rise to a physical taking. *See King*, 159 Fed. Cl. at 487. Under *Connolly* and *Concrete Pipe*, the plaintiffs cannot do so. The plaintiffs' proposed analogization of their claims to cases involving government appropriation or occupation of property must fail in the face of the Supreme Court's precedents involving legislation to ensure the viability of multiemployer pension plans. Accordingly, the physical-takings test does not apply to the plaintiffs' claims.[9] The regulatory takings framework is more appropriate.

### B.    Application of the Regulatory-Takings Test

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co.*, 260 U.S. at 415. The Supreme Court has "generally eschewed any set formula for determining how far is too far,

---

[9] If the physical-takings test did apply, the defendant argues that the plaintiffs still could not demonstrate a physical taking because, after considering the plaintiffs' likely life expectancy and the projected insolvency of the Teamsters Fund, the plaintiffs fared better financially with the suspensions than they would have absent the MPRA-authorized reductions. (ECF 169 at 29-31.) The plaintiff argue that the Supreme Court in *Horne* rejected the defendant's proposed approach to consider off-setting benefits. (ECF 171 at 18.) Because the physical-takings test does not apply, the parties' argument over the correct application of the physical-takings test to the plaintiffs' claims need not be resolved.

preferring to engage in essentially ad hoc, factual inquiries." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (cleaned up).[10]

A court must consider three factors with "particular significance" in determining whether a regulatory taking has occurred: (1) the "economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124.

As a preliminary issue, the plaintiffs focus their regulatory-takings argument on the situation before the Teamsters Fund received special financial assistance under the ARPA and delivered lump-sum make-up payments to the plaintiffs and most class members. The defendant, on the other hand, considers the fact that each of the plaintiffs and most class members have received make-up payments in its analysis of this case under the *Penn Central* framework.

The defendant's approach provides the correct analytical framework. Here, the situation before Congress enacted the ARPA and the plaintiffs received their make-up payments is irrelevant to the case, except insofar as it affects class members who died and whose estates did not recover the full make-up payment. Courts must take the facts and the law as they are at the time of decision. *See, e.g.*, *Bradley v. Sch. Bd. Richmond*, 416 U.S. 696, 711 (1974) (noting the "principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary"). The complaint pending in this case alleges that make-up payments have been made to most plaintiffs; the plaintiffs now only seek interest on the withheld benefits, because interest was not included in the make-up payments, and make-up payments for participants and beneficiaries who died between October 2017 and December 2022. (ECF 166 at ¶¶ 87-95.)

Accordingly, the resolution of the plaintiffs' claims must account for the facts that the plaintiffs who are still living have received make-up payments and that their benefits have been restored to pre-MPRA levels. The resolution must also account for the fact that the estates and survivor beneficiaries of prospective class members who died between October 2017 and December 2022 received no make-up payments or smaller payments than they would have received had the participants or beneficiaries lived.

### 1. Economic Impact

The plaintiffs argue that the suspension of their pension benefits under the MPRA has had a "destructive impact" on the plaintiffs. (ECF 164 at 39.) The cuts "deprived [the plaintiffs]

---

[10] The plaintiffs argue that they can demonstrate a categorical regulatory taking under *Lucas*. (ECF 164 at 33-34.) They acknowledge, however, that current Federal Circuit caselaw, most notably *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005), forecloses their argument on that point. (*Id.*) The plaintiffs posit that "there is no work for this Court to do on this issue," but they preserve the issue for appeal. (ECF 171 at 23.)

of the money they needed to subsist, thrust them into debt, and forced them to forgo medical care." (*Id.*)

The defendant argues that a 29-percent reduction in pension benefits is insufficient to support a regulatory taking, especially given the advantages the reduction gave the plaintiffs regarding the Teamsters Fund's financial stability. (ECF 169 at 37-39.) Moreover, now that the plaintiffs and most class members have received make-up payments and are receiving their pension benefits at the pre-MPRA levels, there is no serious financial loss. (*Id.*)

The plaintiffs respond by rejecting the defendant's suggested numerical threshold for government liability and suggesting that the "ultimate focus" should be "the impact on the plaintiffs, not the plaintiffs' property." (ECF 171 at 28.)

The defendant replies by arguing that the total value of the property interest over its remaining life must be considered and that the MPRA cuts were not so onerous as to constitute a regulatory taking. (ECF 175 at 12-15.)

In evaluating the economic impact of a regulation, no "automatic numerical barrier prevent[s] compensation, as a matter of law, in cases involving a smaller percentage diminution in value." *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed. Cir. 1990). Nonetheless, the Federal Circuit has remarked that it is "'aware of no case in which a court has found a taking where diminution in value was less than 50 percent.'" *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (quoting the appellant's brief). In *CCA Associates*, an 18-percent diminution in the value of the property interest was held to be too low to constitute a regulatory taking. *Id.* In a case before the Supreme Court, a 10-percent diminution in value of a property interest also was deemed insufficient to support a finding of a regulatory taking. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017).

Additionally, a court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). When "an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 66 (1979).

In *Connolly*, the Supreme Court, applying the regulatory-takings test, considered the fact that the withdrawal liability assessed against employers contributing to multiemployer pension plans was roughly proportional to the employer's contributions to the plan and thus supported the conclusion that no regulatory taking had occurred. The liability assessment was "not made in a vacuum." 475 U.S. at 225. "[T]he mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme." *Id.* at 226.

As to the three named plaintiffs and similarly situated class members, the economic impact of the MPRA suspension and the ARPA precludes finding a regulatory taking. Although the plaintiffs' pension benefits were reduced by 29 percent over a six-year period, those benefits have since been restored, and the plaintiffs have received make-up lump-sum payments for the amount that was withheld from them.

Besides the extent of the loss, the analysis must consider the "value that remains in the property." *Keystone*, 480 U.S. at 497. Because the Teamsters Fund received special financial assistance under the ARPA, it is now projected to remain solvent until at least 2051. *See* 29 U.S.C. § 1432(j)(1). The plaintiffs' pension benefits are thus more secure than they were even before the plaintiffs' benefits were reduced under the MPRA, and that security will likely last for the remainder of the plaintiffs' lifetimes.

At most, the only current loss the three named plaintiffs and similarly situated class members have suffered is the time value of 29 percent of their pension benefits over a period of approximately six years, which would be compensable by interest. The amount of the interest is not of insignificant value to the plaintiffs and the class members they represent, but, when balanced against the benefit of the assured solvency of the Teamsters Fund, that economic loss is less significant. The economic impact of the MPRA in the aftermath of the ARPA's make-up payments on the three named plaintiffs and similarly situated class members cannot support a finding that a regulatory taking occurred.

The members of the class who died before the Teamsters Fund received special financial assistance present a slightly more challenging analytical issue.[11] The estates of participants and beneficiaries who died between October 1, 2017, and December 8, 2022, received either no make-up payments or make-up payments smaller than the size of the pension cuts. (*See* ECF 164 at 11-12.)

Even so, those plaintiffs suffered at most a 29-percent reduction in the value of their pension benefits. Precedents from the Supreme Court and the Federal Circuit suggest that that percentage of diminution in value is likely insufficient to support a taking. *Murr*, 137 S. Ct. at 1949; *CCA Assocs.*, 667 F.3d at 1246.

Notably, the MPRA, the ARPA, and associated regulations were not crafted "in a vacuum." *See Connolly*, 475 U.S. at 225. Rather, they reflect a careful balancing of proportionality as to the parties that should bear more of the financial cost of a multiemployer pension plan's looming insolvency. For example, pension benefits were also reduced for active employees at a lower rate of 18 percent to account for the risk that a higher reduction in future

---

[11] The certified class consists of approximately 10,893 class members who have yet to opt into the class. (ECF 164 at 11 n.7.) The plaintiffs estimate that approximately 1,100 of those class members are estates of participants and beneficiaries who died after their benefits were suspended and before the Teamsters Fund received special financial assistance pursuant to the ARPA. (*Id.* at 11-12.) The plaintiffs' pending complaint alleges that most plaintiffs have received make-up payments, albeit with no adjustment for interest, and that the participants and beneficiaries who passed away received smaller or no such payments. (ECF 166 at ¶ 13.) Although the plaintiffs have noted their intent to add the estate of Mr. Campbell as a named plaintiff and sub-class representative, they have yet to do so. (ECF 164 at 14.) Nonetheless, the interests of the estates of deceased participants and beneficiaries are properly presented in the amended complaint and in the appendices the parties have filed.

benefits for active employees might encourage their withdrawal from the Teamsters Fund. *See* 29 U.S.C. § 1085(e)(9)(D)(iv)(X). If the benefits of active employees were reduced disproportionately to those of vested participants and beneficiaries, the active employees could encourage their employers to withdraw from the plan, precipitating the "'vicious downward spiral'" policymakers have aimed to avoid since the enactment of ERISA. *Connolly*, 475 U.S. at 216 (quoting 1978 Hearings).

Additionally, benefits were not reduced for plan participants who were older than 80 or disabled. *Id.* §§ 1085(e)(9)(D)(ii)(III), 1085(e)(9)(D)(iii). The Teamsters Fund had to demonstrate that there were no other options reasonably available to it to prevent insolvency. *See id.* § 1085(e)(9)(C)(ii) (requiring that the plan sponsor demonstrate that "all reasonable measures to avoid insolvency have been taken (and continue to be taken during the period of the benefit suspension)"). Because the suspension of the plaintiffs' benefits complied with the MPRA, the suspension was roughly proportionate to the financial issues facing the Teamsters Fund and the economic and financial needs of all participants and beneficiaries of the Teamsters Fund. The plaintiffs did not shoulder a disproportionate share of the burden.

Pension benefits are also by design contingent on a participant's or beneficiary's lifespan. The normal form of benefit is a life annuity, which ceases to provide payments upon a participant's or beneficiary's death, unless a survivorship benefit applies. (*See* ECF 169-1 at 45.) Participants and beneficiaries who live long lives reap greater economic reward from the pension system than those who die earlier. The nature of the pension system requires unequal financial burden-sharing based on length of life. The estates of pension participants and beneficiaries who died before the Teamsters Fund received special financial assistance thus have not demonstrated sufficiently adverse economic impact to justify a finding of a regulatory taking.

In sum, the economic impact to the three named plaintiffs and other living class members tilts decidedly against finding a taking. The estates of the participants and beneficiaries who died before special financial assistance was received also have not demonstrated sufficiently adverse economic impact to find a taking, although this factor weighs against them less strongly than against the other plaintiffs. This holding is not intended to trivialize any of the personal, real financial challenges the reduction of pension benefits posed to any of the class members. Those subjective hardships, however, just do not correspond to the objective standards set by binding precedents.

## 2.   Interference with Investment-Backed Expectations

The plaintiffs argue that they had expected the level of their pension benefits to be protected and irreducible during their lifetimes, and that these expectations were both subjectively and objectively reasonable. "They worked challenging hours (including a graveyard shift for Mr. Dardzinski), even when sick or in pain; gave up pay raises and other benefits; skipped vacations; and declined other job opportunities in order to earn their vested pension." (ECF 164 at 36.) They relied on their pre-MPRA pension benefits in electing when to retire.

The defendant argues that "the highly regulated nature of ERISA-based multiemployer pension plans . . . is indisputably an important consideration" in evaluating whether the

plaintiffs' expectations were reasonable.  (ECF 169 at 40.)  The defendant relies on *Connolly* and *Concrete Pipe* for the proposition that the plaintiffs could not have reasonably expected ERISA, the Teamsters Fund pension plan documents, and the benefit levels therein, to remain unchanged and unchanging even as the Teamster Fund approached insolvency.  The payment of pension benefits under a pension plan is always contingent on the pension plan's ongoing viability.

The plaintiffs respond that "[e]ven if Plaintiffs knew their pensions could be cut if the fund went insolvent, that is far different than Plaintiffs knowing that their pensions could be cut at any time, for any reason."  (ECF 171 at 27.)  The plaintiffs argue that they could not have foreseen reduction of their benefits when the Teamsters Fund remained, at least for the time being, solvent.

It is analytically useful to divide this factor into two parts: (1) whether the plaintiffs in fact had reasonable, investment-backed expectations in receiving unreduced pension benefits, and (2) the degree of interference with those expectations.

### a.      Reasonable, Investment-Backed Expectations

Consideration of this factor requires "an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiffs] should have anticipated."  *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003); *see also Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003) ("The critical question is what a reasonable owner in the [plaintiffs'] position should have anticipated.")

The Federal Circuit has outlined three factors to aid in determining whether a plaintiff in a regulatory-takings case had reasonable expectations in a regulatory regime:

> (1) whether the plaintiff operated in a "highly regulated industry;"
> (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and
> (3) whether the plaintiff could have "reasonably anticipated" the possibility of such regulation in light of the "regulatory environment" at the time of purchase.

*Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc)); *accord Reoforce, Inc. v. United States*, 853 F.3d 1249, 1270 (Fed. Cir. 2017) (reciting the same factors).

As to the first factor, there is no doubt that the industry of multiemployer pension plans is highly regulated.  ERISA is a "comprehensive and reticulated statute."  *Nachman Corp. v. PBGC*, 446 U.S. 359, 361 (1980).  In *Connolly*, the Supreme Court observed that pension plans "were the objects of legislative concern long before the passage of ERISA in 1974."  475 U.S. at 226.

Logically, the trustees of pension plans and employers who participate in pension plans operate in a highly regulated industry.  Trustees are responsible for remaining apprised of an

36

ever-growing number of laws and regulations, and judicial decisions interpreting them, related to the administration of pension benefits. *See, e.g.*, *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1621 (2020) ("[U]nder ERISA, fiduciaries who manage defined-benefit plans face a regulatory phalanx.") Similarly, employers "'voluntarily negotiated and maintained a pension plan which was determined to be within the strictures of ERISA.'" *Concrete Pipe*, 508 U.S. at 646 (quoting *Connolly*, 475 U.S. at 227).

The Federal Circuit has instructed courts, however, to put themselves in the plaintiffs' shoes. *See Cienega Gardens*, 331 F.3d at 1346. Retired UPS employees should not be held to the same standard of awareness of ERISA and all its regulatory trappings as the trustees of the Teamsters Fund, UPS, and other contributing employers. The defendant has pointed to no provision in ERISA, the MPRA, the ARPA, or the Teamsters Fund's plan documents bestowing fiduciary duties or obligations on the plaintiffs. Rather, once the plaintiffs' pensions vest, the income the participants and beneficiaries receive from those pensions is generally passive. Accordingly, the plaintiffs, retired UPS employees, do not "operate" in a highly regulated industry merely because they receive monthly pension benefit payments in retirement. *See Appolo*, 381 F.3d at 1349.

The second factor, whether the plaintiffs were aware of the problem of underfunded multiemployer pension plans at the time they "purchased" their pensions, is awkward to apply to the case. *See id.* The plaintiffs began contributing to their pensions when they began working at UPS, and the three named plaintiffs contributed to their pensions for several decades. The plaintiffs' pensions all vested prior to the suspension of benefits under the MPRA.

Both the plaintiffs and the defendant present strong arguments related to this factor. On the one hand, multiemployer pension plans have faced problems with insolvency since before ERISA was enacted. The Teamsters Fund plan documents have always accounted for the potential reduction of pension benefits in the event the plan was terminated. On the other hand, the plaintiffs were repeatedly told that once their pensions vested, their benefits could not be curtailed. This second factor weighs in favor of the plaintiffs.

The third factor asks whether the plaintiffs could have reasonably anticipated the suspension of their benefits given the existing regulatory regime "at the time of purchase." *See id.* This question too is challenging to answer from a temporal perspective as to when the plaintiffs purchased their pension benefits—it is unclear whether the time plaintiffs began employment or vesting should guide the analysis. Although some regulatory reform of multiemployer pension plans was likely foreseeable throughout the period when the plaintiffs were accruing their benefits while they were still employed, the prospect of a 29-percent reduction in their benefit levels after their benefits had vested pursuant to the MPRA suspensions could not have been foreseen.

Generally, plan participants with vested pension benefits are considered to have superior rights to those participants whose benefits have accrued but not yet vested. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749 (2004) (noting that accrued benefits are less protected from forfeiture than vested benefits). The government's authorization of the suspension of the plaintiffs' benefits under the MPRA turned that assumption on its head: while the plaintiffs

suffered a 29-percent reduction in their pension benefits, the pension benefits of active employees were reduced by just 18 percent.

Additionally, the Teamsters Fund was not projected to become insolvent until 2026. By that time, the plaintiffs and similarly situated class members might have attained the age of 80, become disabled, or died. Even though the solvency of multiemployer plans has been an ongoing issue, and amendments to ERISA and the plan documents to attempt to stabilize such plans have been plentiful, the plaintiffs drew the short straw of the bundle in terms of their age at the time the MPRA was enacted and implemented.

At oral argument, the plaintiffs listed many other options at Congress's disposal to address the growing problem of insolvency of multiemployer pension plans, such as adjusting the insurance fee pension funds pay to the PBGC, adjusting accrual rates but not vesting principles, or adjusting the formula for employer-withdrawal liability, for example.

Although reasonable foreseeability is an objective test, it would be unreasonable to expect the plaintiffs, retired UPS employees, to foresee that they would bear most of the financial cost of keeping the Teamsters Fund afloat between 2017 and 2022. The suspension of the plaintiffs' benefits under the MPRA would not have been reasonably foreseeable to them based on the regulatory structure of ERISA and their role in it. Accordingly, the plaintiffs have established that they had reasonable investment-backed expectations to receive their unreduced, vested pension benefits.

### b.      Extent of Interference with those Expectations

The analysis does not end with a finding that the plaintiffs had reasonable, distinct investment-backed expectations. For example, in *Maritrans, Inc. v. United States*, the Federal Circuit held that "the fact that [the plaintiff] had a reasonable, investment-backed expectation in the non-imposition of a" regulation "[did] not help it," when the government action did not unreasonably interfere with that expectation. 342 F.3d 1344, 1359 (Fed. Cir. 2003). A court is tasked with evaluating "the *extent* to which the regulation has *interfered* with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124 (emphases added).

"'Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations even though the effect of the legislation is to impose a new duty or liability based on past acts.'" *Concrete Pipe*, 508 U.S. at 646 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976)) (cleaned up).

In *Alimanestianu v. United States*, the Federal Circuit held that there was no government interference with the plaintiffs' investment-backed expectations when the U.S. State Department settled the plaintiffs' claims against the country of Libya. 888 F.3d 1374, 1383-84 (Fed. Cir. 2018). The Federal Circuit held that the plaintiffs' recovery depended on the cooperation of the Libyan government and that the plaintiffs had not provided any evidence of past success of such efforts. *Id.*

38

In this case, most of the members of the plaintiff class, including the three named plaintiffs, have had their pension benefits restored and have received lump-sum make-up payments in the amount of the reductions made under the MPRA. Interference with those plaintiffs' pension benefits has therefore been negligible. Although the plaintiffs lost the time value of those benefits during the pendency of the benefit suspensions, they have now received the advantage of the Teamsters Fund's solvency, likely for the rest of their lifetimes, under the ARPA.

Relatedly, the regulations expanded a pre-existing exception to the plaintiffs' investment-backed expectations: that pension benefits could be reduced if the Teamsters Fund faced insolvency or other financial hardships. As in *Alimanestianu*, the plaintiffs' right to their pension benefits at an unreduced level has always been contingent on the Teamsters Fund's financial stability. Through the MPRA, the government altered the pre-existing regulations pertaining to the "anti-cutback" rule, which generally protects accrued benefits from curtailment unless a statutory exception applies. The MPRA did not dramatically upset the plaintiffs' expectations in a manner sufficient to give rise to a regulatory taking; rather, it protected the plaintiffs' benefits by preventing the plaintiffs from receiving much less if the Teamsters Fund actually became insolvent.

The plaintiffs who died before the special financial assistance was received experienced a greater degree of interference with their expectations. Their estates received smaller or no make-up payments under the ARPA. That interference is still not substantial enough to support a taking, however, for two reasons. First, as discussed above, the MPRA merely expanded a pre-existing limitation on the plaintiffs' investment-backed expectations.

Second, pension benefits depend on a participant or beneficiary's life span. The financial amount participants and beneficiaries receive in their pension benefits corresponds to their length of life. The estates' expectations thus cannot be as high of those of the still-living plaintiffs. The lack of make-up payments available to estates under the ARPA did not unduly interfere with the estates' expectations because under the Teamsters Fund plan documents, rights to pension benefits are almost always extinguished upon a participant or beneficiary's death. The estates therefore have not demonstrated sufficient government interference with their investment-backed expectations to justify finding a taking.

Accordingly, neither the living plaintiffs nor the estates of deceased plan participants have shown that the government unduly interfered with their reasonable, investment-backed expectations to give rise to a regulatory taking.

### 3.      Character of the Government Action

The plaintiffs argue that five aspects of the character of the government action support a taking in this case. First, the cuts to the plaintiffs' benefits "were of lengthy duration—at least five years, and for many of them, permanent." (ECF 164 at 35.) Second, the MPRA applied retroactively to benefits already earned and vested. Third, the burden on the plaintiffs was disproportionate. Fourth, the regulation was "'intrusive beyond the level of traditional governmental limits'" in this area. (*Id.* (quoting *Cienega Gardens*, 331 F.3d at 1338-39).) Fifth,

the courts do not owe deference to the other branches of government in this field, unlike in other takings cases that have implicated national security.

The defendant argues that the MPRA "is a tailored effort to avoid the problems arising from plan failure." (ECF 169 at 46 (capitalization omitted).) The MPRA merely adjusted the burdens and benefits of economic life, and the magnitude or character of the burden on the plaintiffs does not support a taking.

The parties also dispute whether the MPRA unfairly targeted the plaintiffs, in analogy to the case *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260 (Fed. Cir. 2009).

Application of the plaintiffs' proposed factors leads to the conclusion that the character of the government action did not give rise to a regulatory taking. First, regarding the length of the suspension of benefits, "duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe-Sierra*, 535 U.S. at 342. The plaintiffs' pension benefits were reduced by 29 percent for approximately six years. On the one hand, six years is a long time for retirees to forgo a portion of their pension income and adjust to life without it. On the other hand, the suspension of benefits to living plaintiffs was not permanent, as Congress made up the loss by enacting the ARPA. This factor weighs neither for nor against finding a taking.

Second, although the MPRA applied to pension benefits already earned, the MPRA did not truly apply retroactively.[12] Rather, the MPRA reduced benefits prospectively regarding the pension benefits the plaintiffs would receive after the plan documents were amended. The MPRA would have applied retroactively if, for example, Congress had amended ERISA to allow pension plans to claw back benefits already paid to the plaintiffs. This second factor does not support finding a regulatory taking.

Third, although the plaintiffs faced larger benefit cuts than active employees, the MPRA and its implementation reflected a careful, comprehensive scheme for determining the percentage of cuts that plan participants, including the plaintiffs, faced. Suspension of benefits was a last resort: "all reasonable measures to avoid insolvency [must] have been taken." 29 U.S.C.

---

[12] The plaintiffs rely on *Eastern Enterprises v. Apfel*, 524 U.S. 498, 532 (1998), in which a plurality of the Supreme Court held that "[r]etroactivity is generally disfavored in the law," when evaluating whether a taking had occurred. (*See* ECF 164 at 35.) The Federal Circuit has noted of *Apfel* that five of the justices had concluded "that regulatory actions requiring the payment of money are not takings." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (en banc). The Federal Circuit held that courts "are obligated to follow the views of that majority." *Id.* The plaintiffs' arguments relying on *Apfel* are nonetheless considered for the sake of completeness.

§ 1085(e)(9)(C)(ii).[13]  The benefit suspensions had to be "equitably distributed across the participant and beneficiary population."  *Id.* § 1085(e)(9)(D)(vi).  One important factor was the "[e]xtent to which active participants [were] reasonably likely to withdraw support for the plan, accelerating employer withdrawals from the plan and increasing the risk of additional benefit reductions for participants in and out of pay status."  *Id.* § 1085(e)(9)(D)(vi)(X).  No participant who was over the age of 80 or disabled faced any suspension of benefits, and participants between the ages of 75 and 80 faced lesser reductions.  *Id.* §§ 1085(e)(9)(D)(ii), 1085(e)(9)(D)(iii).  The suspensions were "reasonably estimated to achieve, but not materially exceed, the level that is necessary to avoid insolvency."  *Id.* § 1085(e)(9)(D)(iv).

The fact that the plaintiffs faced larger cuts than other participants and beneficiaries does not mean that the cuts were "disproportionate."  To the contrary, the regulatory scheme created by the MPRA struck a balance between maintaining a pension plan's insolvency, continuing to provide pension benefits to those who needed them most, and mitigating the risk that active employees would withdraw support from the pension plan.  Although the reduction of the plaintiffs' benefits was 11 percentage points higher than the reduction of active employees' benefits, that reduction was not disproportionate upon consideration of the purpose and competing goals of the MPRA.

Fourth, the defendant's action of authorizing the Teamsters Fund to reduce the benefits it paid cannot be characterized as intrusive.  As in *Connolly*, the government did not "physically invade or permanently appropriate any of the [plaintiffs'] assets for its own use."  475 U.S. at 225.  Rather, the MPRA arose "from a public program that adjusts the benefits and burdens of economic life to promote the common good," *i.e.*, ERISA.  *Id.*  It is "within the power of Congress to impose" additional requirements on parties participating in the pension industry, with the ultimate goal of protecting pension benefits paid to participants and beneficiaries.  *Id.* at 224.  In light of the pre-existing ERISA framework and plan documents that permitted the

---

[13] The plaintiffs have not challenged as a factual matter that the conditions for the suspension of benefits were met under the MPRA.  The MPRA immunized the Teamsters Fund from liability due to the MPRA-authorized suspensions and denied participants and beneficiaries a cause of action under the MPRA.  *See* 29 U.S.C. §§ 1085(e)(9)(B)(iii), 1085(e)(9)(I)(iii).  During the second round of summary judgment, the plaintiffs argued in the alternative that Congress's deprivation of the plaintiffs' legal remedies under ERISA also constituted a cognizable property interest taken by the federal government.  *See King*, 159 Fed. Cl. at 463 n.5.  The parties disagreed at oral argument whether the plaintiffs could have brought a claim against the federal government under the Administrative Procedure Act ("APA") in district court if Treasury approval of the Teamsters Fund's MPRA application was arbitrary and capricious.  In any case, the Court of Federal Claims would lack jurisdiction over a claim brought solely under the APA or a claim seeking declaratory or injunctive relief for a taking.  *See, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 904-05 (1988).  Under governing law, whether the Teamsters Fund's application complied with the MPRA is unreviewable in the Court of Federal Claims.

reduction of benefits if the Teamsters Fund was facing insolvency, the MPRA's modification to the scope of the "anti-cutback" rule was not unduly intrusive.

Fifth, the fact that this case does not implicate national security concerns bears no legal significance and does not alleviate the plaintiffs of their burden to demonstrate that the government action in this case supports a taking.

Analogy of this case to *Rose Acre Farms* is instructive.  In that case, the Federal Circuit instructed courts to consider the allocation of the burden posed by a regulation and whether the plaintiff was "single[d] out." 559 F.3d at 1278.  An egg producer was not singled out by a health regulation when the regulation "applied to almost any egg producer in the United States," although the regulation only concerned those farms whose flocks had tested positive for salmonella.  *Id.*  The government's well-established authority to regulate the health and safety of food weighed against finding a regulatory taking.  *Id.* at 1278-82.

Similarly, there is no indication that the plaintiffs in this case were unfairly targeted.  The MPRA applies to all pension plans, even though only those in "critical and declining" status under the MPRA may apply to reduce benefits.  As of April 10, 2023, 48 pension plans have applied to Treasury to suspend benefits under the MPRA.[14]  Treasury has approved 18 of those applications.  Seven applications were denied, and the remainder were withdrawn.  The plaintiffs are not uniquely situated; rather, Congress has adjusted the "anti-cutback" rule for all participants and beneficiaries of multiemployer pension plans.  Congress has the well-established authority to regulate multiemployer pension plans.  *See Connolly*, 475 U.S. at 226-27 (noting that pension plans "were the objects of legislative concern long before the passage of ERISA in 1974").  Congress chose to address a familiar problem of the solvency of multiemployer pension plans using new tools and procedures in the MPRA.

The plaintiffs cite depositions of a Treasury official and the designated Teamsters Fund deponent to argue that the cuts to the plaintiffs' benefits were novel and disfavored retirees of pension funds. (ECF 164 at 35.)  The novelty of the MPRA and the particular amendments to the plan, however, does not equate to a compensable taking of the plaintiffs' benefits under the fifth amendment.  Threats to the stability and solvency of pension plans are longstanding.  Indeed, it was in responding to such threats almost 50 years ago that Congress enacted ERISA and more than 40 years ago that Congress enacted the MPPAA.  The threats to the solvency of multiemployer pension plans have not abated.  Demographic changes, longer life spans, and changes to the workforce, among other factors, have put the retirements of millions of workers at risk.  The novelty of an approach Congress tries in addressing a public policy problem does not of itself amount to a compensable taking.

---

[14] Applications for Benefit Suspension, U.S. Department of the Treasury, https://home.treasury.gov/services/the-multiemployer-pension-reform-act-of-2014/applications-for-benefit-suspension (last visited Apr. 10, 2023).

The character of the government action of amending ERISA does not rise to a taking. Rather, Congress was acting within its constitutional authority to amend ERISA and to adjust reasonably the benefits and burdens of the regulatory scheme in an attempt to preserve funds' financial stability; the plaintiffs have not borne an undue share of the burden of maintaining the solvency of the Teamsters Fund.

### 4.    Balancing the Factors

None of the three *Penn Central* factors, alone or together, supports the existence of a regulatory taking.  The plaintiffs have not demonstrated that the economic impact was sufficiently severe to support a finding that a taking occurred because most of them have had their benefits restored and received a lump sum to compensate for the suspension of benefits. Although the estates of participants and beneficiaries who have died have received smaller or no such payments, the economic impact of the MPRA-authorized benefit suspension to them still does not rise to the level of a taking under applicable precedents.

The plaintiffs also have not demonstrated government interference with their distinct investment-backed expectations sufficient to give rise to a taking.  The plaintiffs have shown that they had reasonable investment-backed expectations in continuing to receive their pension benefits, but the government did not unduly interfere with those expectations.  The government action merely ensured the continued solvency of the Teamsters Fund for the benefit of all its participants and beneficiaries.

Finally, the character of the government action does not support a taking.  Congress has the power to amend ERISA and regulate multiemployer pension plans.  The plaintiffs neither were targeted nor bore a disproportionate share of the burden of maintaining the Teamsters Fund's solvency.  Rather, Congress modestly expanded a pre-existing condition on the plaintiffs' receipt of their pension benefits through a narrowing of the "anti-cutback" rule.

Although the plaintiffs argue that Congress and pension plans had many other tools at their disposal to solve the familiar problem of multiemployer-pension-plan funding, a plan could only suspend benefits under the MPRA after trying all other available options to avoid insolvency.  *See* 29 U.S.C. § 1085(e)(9)(C)(ii).  The suspension of benefits under the MPRA was already a last-ditch effort to maintain the solvency of pension plans.

The plaintiffs present a very sympathetic claim; they did everything right, worked hard, and provided for their retirements.  They did nothing wrong and yet, through no fault of their own, suffered a significant loss to their retirement earnings for several years.  Congress ultimately responded to the sympathetic case presented by the plaintiffs and retirees of other pension plans that had received authorizations to reduce their benefits under the MPRA.  That balancing of the burdens and benefits of limited economic resources is peculiarly suited to the representative branches of government.  Accepting the plaintiffs' arguments, however, would leave Congress with a binomial choice: (1) allow pension plans to become insolvent, in which case beneficiaries would receive a fraction of what they received under the MPRA, or (2) bail out pension plans at taxpayer expense.  Initially, Congress chose a third option.  Under the MPRA, pension plans could adjust benefits to avoid insolvency altogether.  Ultimately, under the

ARPA, Congress made the policy decision to bail out pension plans and their participants and beneficiaries, although the plaintiffs maintain that they are still owed interest and payments to estates of deceased participants and beneficiaries.

The plaintiffs effectively seek to chisel Congress's policy choice to bail out the Teamsters Fund in constitutional stone under the takings clause of the fifth amendment. The Court, however, is guided by the principle that in areas of the law committed to legislative discretion, when Congress's "decisions are mistaken as a matter of policy, it is for Congress to change them." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 427 (1985). "It is Congress's job to enact policy and it is [the courts'] job to follow the policy Congress has prescribed." *SAS Inst., Inc. v. Iancu*, __U.S. __, 138 S. Ct. 1348, 1358 (2018).

Accepting the plaintiffs' theory of liability here would tie the hands of policy makers and require as a constitutional matter that taxpayers become the insurers of all pension benefits. Congress rejected that choice in the MPRA and then adopted it in the ARPA, but those choices are best left to the discretion of Congress. Pension policy should not be ossified within a constitutional straight jacket. The "government may execute laws or programs that adversely affect recognized economic values," without effectuating a taking. *Penn Central*, 438 U.S. at 124. Rewriting ERISA policy using the takings clause of the fifth amendment would be an improper exercise of judicial authority.

## VI.   CONCLUSION

The physical-takings test does not apply to the plaintiffs' claims. Supreme Court precedents reject the application of the physical-takings test to ERISA amendments applicable to multiemployer pension plans when the government seizes nothing for its own use. The government in this case has appropriated nothing for its own use; rather, it altered the governing regulatory framework to permit the Teamsters Fund to reduce the plaintiffs' benefits to avoid insolvency. Finally, the plaintiffs' property has been neither appropriated nor occupied unconstitutionally because the Teamsters Fund trustees have always had the right to amend the plan documents in accordance with evolving legal requirements, especially as related to financial stability. The plaintiffs' effort to apply the physical-takings test to their claims is rejected.

The plaintiffs have also failed to show that a regulatory taking has occurred. The economic impact to the plaintiffs is not enough to support a finding that a regulatory taking has occurred, there was minimal government interference with their reasonable investment-backed expectations, and the character of the government action was relatively unobtrusive.

The defendant's motion for summary judgment is granted, and the plaintiffs' motion for summary judgment is denied. The plaintiffs' motion to certify conditional sub-classes is denied as moot. The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**